**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| SEGA OF AMERICA, INC., | ) |
|  | ) |
| Plaintiff, | ) **Case No. 1:25-cv-257** |
|  | ) |
| v. | ) **FIRST AMENDED COMPLAINT FOR:** |
|  | ) |
| CONSOVOY McCARTHY PLLC, | ) 1. **TORTIOUS INTERFERENCE** |
|  | )    **WITH CONTRACTUAL** |
| Defendant. | )    **RELATIONS;** |
|  | ) 2. **TORTIOUS INTERFERENCE** |
|  | )    **WITH CONTRACTUAL** |
|  |    **RELATIONS;** |
|  | 3. **FALSE ADVERTISING** |
|  |    **(LANHAM ACT); AND** |
|  | 4. **FALSE ADVERTISING (VA.** |
|  |    **CODE § 18.2-216).** |
|  |  |
|  | **DEMAND FOR JURY TRIAL** |

## FIRST AMENDED COMPLAINT

Plaintiff Sega of America, Inc. ("Plaintiff" or "Sega"), brings this First Amended

Complaint against Defendant Consovoy McCarthy PLLC ("Consovoy") and alleges as follows:

## PARTIES

1.      Sega is a corporation organized under the laws of the State of California with its

principal office located in Irvine, California.  Sega is a wholly owned subsidiary of Sega

Corporation, a company headquartered in Japan.  Sega develops and markets video games in

North America.

SMRH:4932-7586-9241.5

-1-

FIRST AMENDED COMPLAINT

2.      Consovoy McCarthy PLLC is a law firm and professional limited liability company.  Consovoy has offices in Arlington, Virginia; Boston, Massachusetts; and Salt Lake City, Utah.

## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, and pursuant to the principles of supplemental jurisdiction under 28 U.S.C. § 1367.

4.      This Court also has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

5.      Sega is a California corporation with its principal place of business in Irvine, California.

6.      On information and belief, Consovoy is a citizen of the District of Columbia, Virginia, Maryland, Maine, Utah, Illinois, Tennessee, Texas, and North Carolina, based on its partners' states of domicile.

7.      The parties are therefore completely diverse for purposes of diversity jurisdiction. *See* 28 U.S.C. § 1332.

8.      The amount in controversy is in excess of $39,000,000, well above the jurisdictional minimum of $75,000.

9.      The Court has personal jurisdiction over Consovoy because the acts or omissions giving rise to Sega's claims occurred in Virginia and Consovoy regularly conducts business in Virginia.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Sega's claims occurred in this District.

## FACTUAL ALLEGATIONS

### JAMS' Provision of Individual Arbitration Services

11.     Over the last two decades, individual arbitration agreements between companies and consumers "have become commonplace."[1]  The reason for this is obvious:  "Companies, consumers, and employees all benefit from [individual arbitration]" because it "reduces the cost of dispute resolution and makes it feasible for individuals to pursue modest claims that normally would be priced out of court."[2]

12.     To administer arbitrations, companies and consumers utilize arbitration providers. JAMS is one of "the most widely used consumer and employee arbitration administrators."[3] JAMS holds itself out as "the largest provider of alternative dispute resolution (ADR) services worldwide,"[4] "the premier player in mediation,"[5] and "the world's largest alternative dispute resolution (ADR) provider."[6]  According to its website, JAMS handles "over 19,000 cases annually."[7]

13.     Arbitration exists to provide "an expedient, efficient and cost-effective method to resolve disputes."  *Sobremonte v. Superior Court (Bank of Am. Nat. Tr. & Sav. Ass'n)*, 61 Cal.

---

[1] https://instituteforlegalreform.com/wp-content/uploads/2023/02/Mass-Arbitration-Shakedown-digital.pdf (last accessed January 6, 2025).

[2] *Id.*

[3] *Id.*

[4] https://www.jamsadr.com/history (last accessed January 6, 2025)

[5] https://www.jamsadr.com/ (last accessed December 28, 2024).

[6] https://www.jamsadr.com/about/ (last accessed December 28, 2024).

[7] https://www.jamsadr.com/about/ (last accessed December 28, 2024).

FIRST AMENDED COMPLAINT

App. 4th 980, 996 (1998).  Consistent with this, JAMS represents that it has the ability to "successfully resolve[] business and legal disputes by providing efficient, cost-effective and impartial ways" to resolve disputes[8] and that its rules are "tailored to help attorneys streamline the arbitration process for a timely and efficient resolution[.]"[9]

14.    A company and its consumers agree to use JAMS as their arbitration provider by including JAMS as the designated provider in an agreement between the company and the consumer.

15.    In a typical agreement, if a dispute arises between the company and the consumer, either party may file a demand for arbitration with JAMS to administer the dispute.  A dispute between the company and one of its consumers would qualify as a two-party matter under JAMS' Schedule of Fees and Costs ("JAMS Fee Schedule").  The filing fee for two-party matters is $2,000.[10]  This filing fee is non-refundable.  Generally, this fee is shared between the two parties.  If two consumers filed claims at the same time, the non-refundable filing fees required would be $4,000, or $2,000 per claimant.  There is generally nothing problematic about JAMS requiring non-refundable fees when the number of individual claimants is small (and therefore manageable).  That is true because, when the number of individual claimants is small, the filing fees are manageable and JAMS has the capacity and administrative capability to administer those disputes in a timely manner.

---

[8] https://www.jamsadr.com/online?tab=overview (last accessed January 21, 2025).

[9] https://www.jamsadr.com/arbitration?tab=overview (last accessed January 21, 2025).

[10] https://www.jamsadr.com/arbitration-fees (last accessed December 28, 2024).

FIRST AMENDED COMPLAINT

**Mass Arbitrations**

16.    However, this case arises in the context of a "mass arbitration," a new phenomenon that JAMS cannot manage like an individual arbitration.  Indeed, it cannot manage it at all.  JAMS has admitted as much: explicitly in statements from personnel and implicitly in adopting mass arbitration procedures.  In a mass arbitration, lawyers often use social media advertising that promises "compensation."[11] Their goal is to round up as many individuals as possible (often in the tens of thousands) who may (or may not) be subject to a particular company's arbitration agreement.  This recruitment process often specifically targets purported California residents in an effort to invoke certain peculiarities of California arbitration law and sorts them for claimants who may qualify for fee waivers (if approved by JAMS, the claimants fees are then shifted to the respondent).  Then the lawyers simultaneously submit (or arrange for submission of) all the arbitration demands on behalf of the individuals with the arbitration provider.  The company is then required to pay all, or virtually all, of its own non-refundable fees and the claimants' non-refundable filing fees, lest they be sanctioned under California law. Because the filing fee for each arbitration demand is often a few thousand dollars and the demands number in the thousands, a company is often subject to tens of millions of dollars in non-refundable filing fees.  Faced with the choice to pay the filing fees or settle with the claimants as a group for a smaller sum, the company often chooses to settle, and the claimants'

---

[11] This social media signup process is computerized, with little to no direct interaction between lawyers and their staff and the claimants.  Instead, the claimants complete an online form or template, often just checking options that may result in them being included in claims.  Indeed, in many cases, when the claimants are told they have filed arbitrations they are surprised by this development.  *See* Exhibits 23-27 in support of Exhibit A to Plaintiff Tubi, Inc.'s Motion for Leave to File Amended Complaint, *Tubi, Inc. v. Keller Postman LLC*, No. 1:24-cv-01616-ACR (D.D.C. Nov. 25, 2024), ECF No. 22.

FIRST AMENDED COMPLAINT

counsel walks away with a large payday without ever intending to or having to litigate the merits of the disputes.

17.     Unsurprisingly, mass arbitrations have garnered a significant amount of criticism. In February 2023, the U.S. Chamber of Commerce Institute for Legal Reform issued an 80-page report detailing the numerous issues arising from mass arbitrations.[12]  And, in July 2023, the Civil Justice Association of California ("CJAC") sent a letter to the State Bar of California, explaining how mass arbitrations can violate a myriad of ethical rules.[13]

18.     For example, under ABA Model Rule 3.1, lawyers are required to "inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."  *See* ABA Model R. of Prof. Conduct 3.1, cmt. 2.  The state bars of California and Virginia prescribe similar requirements.  Under California Rule of Professional Conduct 3.1, a lawyer must have "probable cause" to "bring or continue an action."  Cal. R. of Prof. Conduct 3.1(a).  Under Virginia Rule of Professional Conduct 3.1, a lawyer must "not bring or defend a proceeding . . . unless there is a basis for doing so that is not frivolous."  Va. R. of Prof. Conduct 3.1.

19.     In a mass arbitration, for a plaintiffs' firm, complying with these rules is virtually impossible because the number of clients is in the tens of thousands.  The CJAC letter noted that businesses have faced arbitration demands brought on behalf of "fake or fictitious claimants,"

---

[12] U.S. Chamber of Commerce Institute for Legal Reform, *Mass Arbitration Shakedown: Coercing Unjustified Settlements* (Feb. 28, 2023), https://instituteforlegalreform.com/wp-content/uploads/2023/02/Mass-Arbitration-Shakedown-digital.pdf.

[13] Letter from Jaime Huff, Vice President and Couns., Civ. Just. Ass'n of Cal., to Enrique Zuniga, Public Trust Liaison, State Bar of Cal. (July 6, 2024), https://instituteforlegalreform.com/wp-content/uploads/2023/07/Cal-Bar-Letter-re-Mass-Arbitration-July-202315.pdf.

FIRST AMENDED COMPLAINT

"individuals who never authorized" filing the arbitration demand, or "individuals who were never consumers of . . . the defendant."[14]

20.    Making matters worse, to date, the law firms leading mass arbitration campaigns have generally faced no consequences for violating these ethical rules.  There is no mechanism similar to Federal Rule of Civil Procedure 11 in arbitration.  Rather, lawyers filing bogus demands on behalf of made-up people or people who were never consumers of the defendant business can simply withdraw the arbitration demands without any repercussions.

21.    JAMS and its arbitrators have recognized the inherent unfairness of mass arbitrations.  JAMS has also publicly recognized that it is unable to administer mass arbitrations in a timely manner, thereby failing to uphold its end of the arbitration bargain.

22.    For example, a search of JAMS' Neutral Directory reveals that, as of May 2, 2025, only 200 JAMS arbitrators are based in a California location and only 352 JAMS arbitrators are available to provide services in California.[15]

23.    Of course, with just 352 JAMS arbitrators available to provide services in California, JAMS is unable to timely administer a mass arbitration if handled like individual arbitrations.  Indeed, in a blog article posted on the JAMS website on May 2, 2024, JAMS arbitrator Clifford Bloomfield admitted that "a few hundred arbitrators would not be able to work through 50,000 individual arbitrations—or half or even a third of that number—in a reasonable amount of time."[16]

---

[14] *Id.*

[15] https://www.jamsadr.com/neutrals/search (last accessed May 2, 2025).

[16] https://www.jamsadr.com/neutrals/search (last accessed May 2, 2025).

24.     Despite recognizing that it does not have the resources to administer mass arbitrations like individual arbitrations, JAMS has continued to charge non-refundable filing fees as if each claimant's demand was actually going to be arbitrated individually.  JAMS is thus charging millions of dollars in fees, all non-refundable, when it knows it cannot provide such services on that scale.

25.     Hoping to address this issue, on May 1, 2024, JAMS issued its Mass Arbitration Procedures and Guidelines (the "Mass Arbitration Procedures").  As JAMS itself recognizes, "[t]he filing of dozens, hundreds or even thousands of individual claims may create administrative burden and onerous fees, as well as delay and potential unfairness to all Parties, all of which may impair the integrity of the Arbitration process."[17]  JAMS implemented its Mass Arbitration Procedures "[t]o alleviate that burden and those concerns"; per the Mass Arbitration Procedures, JAMS appoints a Process Administrator to "hear and determine preliminary and administrative matters in a Mass Arbitration" in order to more efficiently handle the litigation.[18] The Process Administrator decides how to group or batch demands together for collective adjudication.[19]  In other words, the Mass Arbitration Procedures abandon the notion that each demand—in a pool of thousands of identical demands filed by the same counsel—will necessarily be adjudicated via individual non-refundable fees.  The Mass Arbitration Procedures eliminate the initial $2,000 per claimant non-refundable filing fee, requiring that defendant businesses now pay only a single initial $7,500 invoice.

---

[17] https://www.jamsadr.com/mass-arbitration-procedures (last accessed December 28, 2024).

[18] https://www.jamsadr.com/mass-arbitration-procedures (last accessed December 28, 2024).

[19] https://www.jamsadr.com/mass-arbitration-procedures (last accessed December 28, 2024).

26.      However, JAMS will only implement its Mass Arbitration Procedures "where the Parties have agreed to the application of these Procedures in a pre- or post-dispute written agreement."[20]  In other words, the JAMS Mass Arbitration Procedures do not automatically apply and JAMS does not apply them to claims initiated under arbitration agreements entered into before the inception of these procedures in 2024 or where the parties have not expressly agreed to the application of these procedures.[21]

27.      In sum, as even JAMS recognizes, it simply lacks the capacity to handle a significant increase in its caseload of individual arbitrations.  Yet, JAMS does not and did not notify would-be consumers of its services, like Sega, of its administrative limitations prior to the designation of JAMS as the arbitral provider or prior to the filing of any demand.

**Sega's Arbitration Agreement**

28.      Sega is a developer and publisher of video games, including a series of mobile games based on its popular "Sonic the Hedgehog" character.  Sega's mobile games have been downloaded hundreds of millions of times.

29.      Consumers who play Sega-published mobile games in the Sonic the Hedgehog series, which are downloaded from either the Apple App or Google Play stores, generally agree to the terms of Sega's End User License Agreement ("EULA").  *See* Exhibit A.

30.      Sega, however, also licenses "Sonic the Hedgehog" to third parties who publish their own mobile games, which can be downloaded from their own platforms.  For instance,

---

[20] https://www.jamsadr.com/mass-arbitration-procedures (last accessed December 28, 2024).

[21] Contrast this with the American Arbitration Association, which enacted similar mass arbitration procedures in 2024, but essentially made them automatically applicable based on the number of claims brought by a single law firm or group of lawyers.  *See* https://www.adr.org/sites/default/files/Mass-Arbitration-Supplementary-Rules.pdf.

FIRST AMENDED COMPLAINT

Roblox, one of the largest gaming websites in the world, is licensed to publish "Sonic the Hedgehog" games that are available for download on the Roblox platform.  When consumers download Sega's games from Roblox, and similar third-party platforms, they do not agree to the EULA.

31.     Section 19 of the applicable version of the EULA states that all claims between Sega and users of its published mobile games are subject to binding arbitration:

> [A]ll claims arising out of or relating to this Agreement (including its interpretation, formation, performance and breach), our relationship with each other, or your use of the Product shall be finally settled solely by binding arbitration unless the claim is within the exceptions described below.

Exhibit A § 19.

32.     Section 19 limits any arbitration or court proceeding to individual actions, prohibiting participation in "collective" or "consolidated" actions.  Specifically, Section 19 states:

> **Class Action Waiver**: The parties agree that any arbitration or court proceeding shall be conducted in their individual capacities only and not as a class action or other representative action, and the parties expressly waive their right to file a class action or seek relief on a class basis.  As a result:
>
> - YOU CANNOT BRING A CLAIM AGAINST SEGA AS A PLAINTIFF OR CLASS MEMBER IN A CLASS ACTION OR ANY OTHER COLLECTIVE, CONSOLIDATED, OR REPRESENTATIVE ACTION
>
> - AN ARBITRATOR CANNOT COMBINE YOUR CLAIMS AGAINST SEGA WITH ANY OTHER PERSON'S CLAIMS AGAINST SEGA INTO A SINGLE CASE

33.     In addition, and in reliance on JAMS' representations regarding its reputation and its ability to arbitrate disputes in a timely and efficient manner, Section 19 also designates JAMS

FIRST AMENDED COMPLAINT

as the arbitration services provider for disputes between Sega and users of Sega-published games. *See id.* § 19.

34.     Sega's inclusion of JAMS as the arbitration provider in the EULA, by expressly referencing JAMS as the provider in any agreement to arbitrate, consummated an agreement between Sega and JAMS to provide arbitration services.

35.     Sega would not have entered into this agreement with JAMS to include it as the arbitration provider in the EULA if Sega had known that JAMS would be unable to accommodate a significant increase in its caseload of individual arbitrations.

**Consovoy Prepares a Mass Arbitration Against Sega**

36.     In or around late 2023 or early 2024, Consovoy began the process of initiating a mass arbitration campaign against Sega.

37.     Consovoy partnered with Troxel Law LLP ("Troxel") to conduct a mass advertising campaign on social media to solicit users of certain Sega video games related to Sonic the Hedgehog.

38.     Troxel is a law firm based in New York that holds itself out as a reputable firm that secures hassle-free compensation for victims of corporate wrongdoing.

39.     In reality, Troxel has an "F" rating with the Better Business Bureau ("BBB"). Many individuals that Troxel purports to assist have filed complaints with the BBB stating that the phone number listed on the firm's website is inoperable and that they are never able to reach counsel, even to end the representation agreement effectuated through the online portal.  This inability to reach Troxel is not surprising given that the address Troxel discloses as its offices,

195 Montague Street, 14th Floor, Brooklyn, NY 11201, actually resolves to a WeWork co-working facility.[22]

40.     To help find potential claimants, Consovoy and Troxel purchased ads on Instagram, Facebook, and YouTube that dangled the possibility of hundreds of dollars to anyone who claimed they had played a Sega game.

41.     Sega has discovered at least some of the ads that internet users saw.  For example, one Facebook ad encouraged users to "Sign up for a Sonic the Hedgehog Compensation Claim" to see if they qualified "for hundreds of dollars in compensation."

---

[22] https://www.wework.com/buildings/195-montague-st--new-york-city--NY?utm_source=Google&utm_campaign=Organic&utm_medium=Listings (last accessed January 8, 2025).



42.     An Instagram ad made a similar pitch:  "Did you play Sonic the Hedgehog?  You likely qualify for hundreds of dollars in compensation."



43.     If a Facebook or Instagram user clicked on the link, they were led to a window where the user was asked:  (1) Have you played any of the Sonic the Hedgehog games on your phone or tablet?  (2) Are you a permanent resident of California?  (3) Have you seen any advertisements while playing Sonic the Hedgehog on your phone or tablet?

44.     On information and belief, Consovoy did not ask (1) exactly which Sonic the Hedgehog game was played, (2) exactly when and where the game was played, (3) from what

FIRST AMENDED COMPLAINT

platform the user obtained the Sega game, (4) when the Sega game was first downloaded onto their tablet or phone, (5) when the ads were seen, (6) what types of ads the potential claimant had seen, or (7) what type of product or service the consumer was then seeking to purchase that might have been the subject of discriminatory ads.

45.    On information and belief, Consovoy did not require supporting documentation, screenshots, or app download records.  Nor did Consovoy utilize standard due diligence procedures such as client interviews, or even a reasonable data scrubbing protocol, to minimize the risk of fraudulent or duplicate demands.

46.    On information and belief, Consovoy at all times knew that many individuals who submitted a claim via its link were fraudulent and/or providing bogus information.

47.    On information and belief, Consovoy at all times knew that many individuals that played a Sonic the Hedgehog game had not agreed to the EULA.

48.    Consovoy's advertisements on social media were false and misleading, insofar as they understated the qualifications to have a valid claim against Sega—in truth, Consovoy knew that many (and possibly hundreds) of the consumers it was soliciting would not have agreed to the EULA.

49.    On information and belief, Consovoy's advertisements deceived consumers into believing they were entitled to "hundreds of dollars in compensation" merely if they (1) played a Sonic the Hedgehog game; (2) were a permanent resident of California; and (3) saw advertisements while playing the game on their phone or tablet.

50.    On information and belief, Consovoy's false advertisement of the qualifications to have a valid claim against Sega had a material effect on the decision of consumers to sign up for Consovoy's services.

FIRST AMENDED COMPLAINT

51.     Consovoy, through Troxel, also maintained a website, www.gamingclaims.com, where it advertised that "[m]any people likely qualify for hundreds to thousands in compensation under consumer protection laws" if they played a Sega game.  *See* Exhibit B.  On information and belief, like the social media advertisements, the website did not require any supporting documentation to corroborate a user's claim.  As with its other advertisements, Consovoy knew that many consumers it was soliciting would not have agreed to the EULA and, in so advertising to such consumers, deceived them into signing up for Consovoy's services.

**Consovoy Decides To Submit The 19,000 Individual Arbitration Demands As A Mass Arbitration**

52.     Consovoy decided to submit the claims it had amassed from its false social media campaign as a mass arbitration filed at the same time.

53.     On information and belief, Consovoy made the decision in Texas or Virginia to submit the claims in a mass arbitration.

54.     On April 3, 2024, after amassing 19,541 Claimants from its social media campaign, Consovoy submitted all 19,541 demands for arbitration with JAMS at the same time.  On information and belief, Consovoy did so from either Virginia or Texas.  It then sent a letter to Sega's legal department notifying Sega that it had filed 19,541 arbitration demands against Sega and provided copies of the demands.

55.     At no point prior to its submission of the 19,541 demands did Consovoy perform any form of verification process for the claimants it had gathered from its false advertising campaign.  Indeed, Consovoy was financially disincentivized to do so—Consovoy knew that a greater number of claimants meant that it could leverage more filing fees in order to extort a settlement from Sega.

56.     Aside from the respective Claimants' identifying information, each demand was identical:  each one alleged that the individual Claimant was a California resident who had (1) played a Sega mobile game in the last year, (2) seen 10 or more ads while playing a Sega mobile game, and (3) objected to receiving discriminatory advertising.  *See, e.g.*, Exhibit C.  The demands contended that Sega engaged in discriminatory ad targeting based on age and gender, and thus violated California's Unruh Civil Rights Act based upon the holding in *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 920-27 (2023).  *Id.*

57.     The demands did not allege that the Claimants had suffered any concrete injury or harm, a basic requirement of statutory standing.  *See* Exhibit C.  They did not allege (1) which discriminatory ads had appeared on the specific Sega mobile games they had played, (2) what product or service the Claimants were then interested in pursuing while they were being deprived of the discriminatory ads, or (3) what they would have done with the information in the discriminatory ads.  *Id.*

58.     The demands invoked the arbitration provision contained in Sega's EULA, with an effective date of September 6, 2021, which was attached to each demand.  *Id.*

59.     Sega has reason to believe many, if not thousands, of the demands are fraudulent, a byproduct of Consovoy's failure to perform its ethical duty to investigate each demand before filing it.

60.     Unsurprisingly, an initial review of all the demands uncovered duplicate demands, fictious claimants with names such as Poop Smear and See Mee, and numerous other deficiencies.  Sega retained a data analytics expert to investigate the 19,541 claimants and determine the likelihood that they were real people—much less actual users of Sega-published games.  The expert analyzed a random sample of 377 claimants, and used public databases, such

-17-

as whitepages.com and spokeo.com, to determine whether any of the personal identifying information—phone number, email address, and home addresses—provided by the Claimant was associated with that Claimant. The results were alarming. Despite the considerable risk of over-inclusion that attend these databases, 8.2% of Claimants (with a margin of error of +/- 2.77%) did not have a match on a single one of their identifiers in any of the five databases queried. Accordingly, there is a high risk that at least 1,000 to 2,000 Claimants either do not exist, have had their identities stolen for purposes of filing a fraudulent demand, or have fabricated their contact information. Each of these scenarios is deeply troubling.

61.    Sega's own records also establish that thousands of Claimants have never played a Sega-published mobile game. While Sega does not have complete records on the identities of users of its mobile games, Sega maintains a customer relationship management ("CRM") database that collects, from among other sources, the email addresses of users of its most popular Sonic the Hedgehog mobile games in the United States—Sonic Dash, Sonic Forces, and Sonic Boom—on an opt-in basis. Users of those games receive in-game promotions if they choose to share their email addresses with Sega. Approximately 6.82% of all players of these three games opted to share their email addresses with Sega. Yet, when Sega took the email addresses of all 19,517 Claimants and checked them against its CRM, only 1.4%, or 287, had matching addresses. In other words, Claimants are suspiciously under-represented in Sega's records of U.S.-based players of its Sonic games. The extraordinarily low match rate leads to one inescapable conclusion: thousands of Claimants likely did not play a Sonic mobile game in the last year as they claimed they had, or played them on platforms like Roblox which do not contain the Sega EULA.

**JAMS Issues Sega a $39 Million Invoice**

62.     On April 16, 2024, JAMS issued Sega a *single invoice* for $39,082,000, representing $2,000 for each of the 19,541 demands.  JAMS arrived at this total by multiplying the number of individual Claimants by the filing fee provided for in JAMS' Fee Schedule ($2,000).

63.     Normally, each party to an arbitration is liable for paying its share of the filing fee.  However, Consovoy submitted sworn declarations to JAMS for all 19,541 Claimants asserting—without further evidence—that each was exempt from having to pay their share of arbitration fees under California law because they were earning less than 300% above the poverty line.  JAMS did not require any further proof from Consovoy or the Claimants and merely accepted these declarations at face value.  For reference, the median household size in the United States is 2.5,[23] the median household income is $80,610,[24] and 300% of the poverty line for a household of 3 is $79,950.[25]  According to Consovoy (and accepted at face value by JAMS), all of the 19,000+ Claimants are well into the bottom half of income distribution.

64.     Additionally, JAMS issued the invoice to Sega despite its knowledge and understanding that it does not have the capacity to handle an additional 19,541 individual arbitrations.  This means that JAMS is requiring Sega to pay a $39,082,000 *non-refundable* filing fee for services that, by its own admission, *it cannot provide.*

---

[23] https://www.census.gov/quickfacts/fact/table/US/HSD310223 (last visited May 2, 2025).

[24] https://www.census.gov/library/publications/2024/demo/p60-282.html (last accessed May 2, 2025).

[25] https://aspe.hhs.gov/sites/default/files/documents/dd73d4f00d8a819d10b2fdb70d254f7b/detailed -guidelines-2025.pdf (last visited May 2, 2025).

FIRST AMENDED COMPLAINT

65.     JAMS has not withdrawn this invoice.  JAMS has also issued one invoice, in the aggregate, rather than separate invoices for each individual arbitration.

66.     As a result, Sega has sued JAMS for breach of contract and other claims.  *See Sega of America, Inc. v. JAMS*, No. 25STCV02240 (L.A. Super Ct. Jan. 27, 2025).

**Consovoy Employs A Third-Party Attorney Service to File A Petition To Compel Arbitration For 19,517 Claimants In A Consolidated Action In Violation Of The EULA**

67.     Sega, unable to confirm it had valid arbitration agreements with all Claimants and suspecting that many Claimants were fake or were asserting fraudulent demands, did not pay the JAMS invoice and requested Consovoy provide corroborating information to support the assertion that Claimants were legitimate users of Sega mobile games.

68.     On information and belief, at some point prior to July 10, 2024, Consovoy (from either Texas or Virginia) sent an email communication to a third-party attorney service in California to secure the third-party attorney service's assistance to submit a Petition to Compel Arbitration for the 19,517 remaining claimants.

69.     On July 10, 2024, the third-party attorney service filed a consolidated Petition for an Order Compelling Arbitration on behalf of 19,517 Claimants.[26]  *See Hensley et al. v. Sega of America, Inc.* No. 24STCP02215 (L.A. Sup. Ct.).[27]

---

[26] Consovoy removed 24 Claimants from the petition as a result of Sega identifying numerous duplicate demands.  In addition, with reference to its internal records, Sega was able to confirm that 287 of the 19,517 Claimants were bona fide players of Sega games.  Sega has consented to arbitration with these 287 Claimants and is not trying to avoid its obligations under the EULA for valid Claimants.

[27] On August 20, 2024, Consovoy filed a Motion for an Order Compelling Arbitration, in support of which it included identical declarations for each of the Claimants.  Like their arbitration demands, these declarations were identical, copy-paste forms that all said: "I have played Sega's mobile games in California, including Sonic the Hedgehog within the last ten months. During that period, I have seen at least ten advertisements while playing SEGA mobile games."  See Exhibit D.  These declarations did nothing to alleviate Sega's concerns that it was litigating

70.     Consovoy's decision to file a single, consolidated petition interfered with Sega and Claimants' contractual relations by causing Claimants to breach the EULA.  As stated, the EULA specifically requires that "any arbitration or court proceeding shall be conducted in their individual capacities only," and specifically prohibits "collective, consolidated, or representative action[s]."  Exhibit A, § 19 (emphasis added).  Thus, the EULA required each Claimant to file their own petition in a separate non-consolidated, non-coordinated and non-representative action.[28]

71.     Upon information and belief, Consovoy chose to file a single, consolidated petition solely to benefit itself and not Claimants.  There is no doubt that Consovoy knew that the EULA prohibited the filing of a consolidated petition to compel arbitration.  Consovoy had no problem with adhering to the EULA in filing 19,541 individual arbitration demands.  But filing 19,517 separate petitions did not benefit Consovoy as it would have had to pay millions of dollars in court filing fees, so it chose to ignore the express terms of the EULA.

72.     Consovoy's interference has caused Sega harm.  It deprived Sega of its contractual right of an individualized court proceeding with each Claimant that agreed to the EULA.  Thus, by filing Claimants' petition in a consolidated action, Sega was forced to present and rely on collective evidence in the superior court rather than an individualized inquiry in each separate petition, as the EULA required.[29]

---

against a substantial number of made-up individuals, individuals that never played a Sega video game, or individuals who played the games on platforms that do not include the EULA.

[28] Again, this assumes that all 19,517 Claimants were parties to the EULA.  As explained, it is likely that many were not.  Sega's tortious interference claim thus applies only to those Claimants that were parties to the EULA.

[29] The superior court granted Claimants' petition relying on collective, rather than individualized, evidence.

FIRST AMENDED COMPLAINT

73.     Sega now faces the significant harm of being compelled to pay over $39 million before it can conduct such an inquiry and individually challenge whether each Claimant is in fact a genuine user of Sega games.  And because these fees are non-refundable, even if Sega proves that Claimants had no right to enforce Sega's EULA, the $39 million will be lost forever.

## CAUSES OF ACTION

## COUNT I

**Tortious Interference With Contractual Relations Between Sega And Claimants**

74.     Sega realleges and incorporates herein by reference each and every allegation set forth above in paragraphs 1 through 73.

75.     Sega's EULA, which contains the arbitration agreement, is a valid and enforceable contract that binds each Claimant that agreed to it.

76.     At all times alleged in this Complaint, Consovoy knew that Sega had a valid and enforceable contract with each Claimant that agreed to the EULA.

77.     Consovoy intentionally induced Claimants that agreed to the EULA to breach it by making the decision to file Claimants' demands in a single, consolidated petition and employing a third-party attorney service to do so.

78.     Consovoy made this decision solely for the benefit of itself and not Claimants.

79.     Claimants that agreed to the EULA materially breached it by filing a single, consolidated petition to compel Sega to arbitrate.

80.     As a direct and proximate result of Consovoy's interference with Sega's contract with each Claimant that agreed to the EULA, Sega has suffered, and will continue to suffer monetary damages in an amount to be proven at trial, which amount exceeds the jurisdictional minimum of this Court.

## COUNT II

**Tortious Interference With Contractual Relations Between Sega And JAMS**

81.     Sega realleges and incorporates herein by reference each and every allegation set forth above in paragraphs 1 through 73.

82.     Sega's inclusion of JAMS as the arbitration provider in the EULA consummated a contract between Sega and JAMS to provide arbitration services.

83.     By expressly promoting itself as a leading provider available to conduct arbitration services, JAMS manifested an intent to enter into a contract with Sega.

84.     JAMS also manifested its intent to continue its contractual relationship with Sega by administering its arbitration services several times in the past to disputes between Sega and its users.

85.     By expressly referencing JAMS as the provider in any agreement to arbitrate, Sega manifested an intent to enter into a contract with JAMS.

86.     At all times alleged in this Complaint, Consovoy knew that Sega had a valid and enforceable contract with JAMS.

87.     Consovoy intentionally induced JAMS to breach its contract with Sega by making the decision to submit 19,541 individual demands for arbitration with JAMS and employing a third-party attorney service to do so.  Consovoy knew that JAMS would be unable to administer the 19,541 arbitration demands.

88.     The filing of the 19,541 arbitration demands caused JAMS to breach its contract with Sega in three distinct ways.

89.     First, JAMS breached its contract with Sega by issuing a $39,082,000 invoice to Sega for services that, by JAMS' own admission, it cannot perform.  Recognizing its inability to

FIRST AMENDED COMPLAINT

handle a significant increase in its caseload in individual arbitrations, JAMS enacted in May 2024 its Mass Arbitration Procedure. By offering its services in this distinct fashion, JAMS has implicitly acknowledged it cannot handle an additional 19,541 arbitrations under its standard procedures. Additionally, statements from JAMS' own personnel and a review of the available arbitrators (as stated on the JAMS website) makes clear that JAMS cannot provide the arbitration services for which it is charging Sega.

90.     This practice is also substantively unconscionable within the meaning of *Perdue v. Crocker National Bank*, 38 Cal. 3d 913 (1985). JAMS has issued Sega an invoice for *non-refundable* filing fees for thousands of claimants totaling over $39 million. By its own admission, JAMS cannot reasonably administer these 19,541 individual arbitrations. JAMS does not warn would-be consumers of its services that it will embrace this course of conduct anywhere on its website or advertising materials. JAMS is, essentially, requiring Sega to forfeit $39 million in *non-refundable* filing fees for thousands of claimants when it (1) admits it cannot provide the service for which it is requiring Sega to pay and (2) can administer arbitrations much more efficiently via the Mass Arbitration Procedure.

91.     Second, JAMS breached its contract with Sega by issuing invoices for the Claimants in one invoice, rather than separate invoices for each individual. JAMS and Sega have a separate contract with respect to each individual Claimant that agreed to the EULA. Therefore, JAMS should have issued Sega individual invoices for each Claimant. JAMS' misconduct in this regard has made it impossible for Sega to parse the validity of an individual claim in advance of paying the non-refundable filing fees.

FIRST AMENDED COMPLAINT

92.     Third, JAMS breached its contract with Sega by impermissibly shifting filing fees from each Claimant to Sega.  By its conduct and representations, JAMS should have invoiced Sega only for its share of the filing fees—not for its filing fees *and* each individual Claimant's.

93.     As a direct and proximate result of Consovoy's interference with Sega's contract with JAMS, Sega has suffered, and will continue to suffer monetary damages in an amount to be proven at trial, which amount exceeds the jurisdictional minimum of this Court.

## COUNT III

### False Advertising (Lanham Act)

94.     Sega realleges and incorporates herein by reference each and every allegation set forth above in paragraphs 1 through 73.

95.     The provisions of the Lanham Act, 15 U.S.C. § 1125 *et seq.*, apply to Consovoy, and protect Sega from the conduct described above.

96.     As set forth above, Consovoy's advertisements were false and misleading insofar as the advertisements suggested to consumers that, in order to qualify for "hundreds of dollars in compensation," the consumer need only: (1) have played a Sonic the Hedgehog game; (2) be a permanent resident of California; and (3) have seen advertisements while playing on their phone or tablet.  However, as Consovoy was well aware, the above criteria would not necessarily entitle an individual consumer to arbitrate against Sega.  Indeed, on information and belief, Consovoy knew that many (and possibly hundreds) of consumers who met the above-described criteria did not agree to the EULA.

97.     Given the false and misleading nature of the advertisements, they had the capacity to deceive consumers and, upon information and belief, did so deceive consumers.

98.    Upon information and belief, said deceptive advertisements had a material effect on the decision-making of consumers who would not have submitted claims against Sega, had Consovoy truthfully represented that such consumers must have also agreed to the EULA.

99.    Insofar as Consovoy published these false and misleading advertisements on the Internet, they had the capacity to affect interstate commerce and, upon information and belief, did so affect interstate commerce.

100.    Despite the fact that Consovoy was at all times aware that many (if not hundreds) of consumers met these criteria but did not factually agree to the EULA, Consovoy nevertheless continued to run the advertisements with these false criteria in order to incur a financial benefit.

101.    Consovoy knew that its conduct would cause consumers who had not agreed to the EULA to sign up for its services.

102.    Due to Consovoy's false advertisement, Sega has suffered, and will continue to suffer damages in an amount to be proven at trial.

## COUNT IV

### False Advertising (Va. Code § 18.2-216)

103.    Sega realleges and incorporates herein by reference each and every allegation set forth above in paragraphs 1 through 73.

104.    As set forth above, Consovoy's mass arbitration campaign suggested to consumers that, in order to qualify for "hundreds of dollars in compensation," the consumer need only: (1) have played a Sonic the Hedgehog game; (2) be a permanent resident of California; and (3) have seen advertisements while playing on their phone or tablet.  However, as Consovoy was well aware, the above criteria would not necessarily entitle an individual consumer to arbitrate

SMRH:4932-7586-9241.5

FIRST AMENDED COMPLAINT

against Sega.  Indeed, on information and belief, Consovoy knew that many (and possibly hundreds) of consumers who met the above-described criteria did not agree to the EULA.

105.    Consovoy advertised in this manner in order to induce as many consumers as possible to sign up for its services.

106.    Despite the fact that Consovoy was at all times aware that many (if not hundreds) of consumers met these criteria but did not factually agree to the EULA, Consovoy nevertheless continued to run the advertisements with these false criteria in order to incur a financial benefit.

107.    Due to Consovoy's false advertisement, Sega has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial, which amount exceeds the jurisdictional minimum of this Court.

## PRAYER FOR RELIEF

WHEREFORE, Sega prays for judgment in its favor and against Consovoy as follows:

- On the First Cause of Action for monetary damages in an amount to be proven at trial;

- On the Second Cause of Action for monetary damages in an amount to be proven at trial;

- On the Third Cause of Action for monetary damages in an amount to be proven at trial;

- On the Fourth Cause of Action for monetary damages in an amount to be proven at trial;

- For Sega's attorneys' fees to the extent permitted by law or contract;

- For Sega's costs of suit; and

- For all such other relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable as of right.

Dated: May 2, 2025

By:    */s/ Paul Werner*

Paul Werner (VSB No. 48910)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppardmullin.com

P. Craig Cardon (*pro hac vice* to be submitted)
Jay T. Ramsey (*pro hac vice* to be submitted)
Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone: 310-228-3700
Facsimile: 310-228-3701
ccardon@sheppardmullin.com
jramsey@sheppardmullin.com

*Attorneys for Sega of America, Inc.*