**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

SEGA OF AMERICA, INC.,

*Plaintiff,*

v.

CONSOVOY MCCARTHY PLLC,

*Defendant.*

Case No. 1:25-cv-257

**DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 2

    A.   Companies require arbitration but then reject the costs of arbitration. .......................... 2

    B.   Sega requires its customers to arbitrate before JAMS. ................................................. 4

    C.   Consovoy's clients file demands before JAMS under Sega's EULA and a California Superior Court compels Sega to arbitrate. ................................................................... 5

    D.   Sega sues Consovoy in this Court for filing its clients' JAMS arbitration demands, their petition to compel arbitration, and their legal advertisements. .............................. 7

STANDARD OF REVIEW ......................................................................................... 8

CHOICE OF LAW ...................................................................................................... 8

ARGUMENT ............................................................................................................. 10

   I.   Immunity bars Sega's claims. ...................................................................... 10

    A.   Litigation privilege precludes liability for Sega's tort claims (Counts I, II, & IV). ..... 10

    B.   *Noerr-Pennington* immunity bars Sega's Lanham Act claim (Count III). .................. 12

   II.  Sega's tortious interference with contract claims (Counts I & II) fail for additional independent reasons. .................................................................................... 13

    A.   Inducing clients to file legal actions is outside the scope of tortious-interference claims. ...................................................................................................... 13

    B.   Count I fails to state a claim for tortious interference due to Consovoy's filing its clients' successful *Hensley* petition to compel arbitration. ......................................... 15

       1.   An agent cannot tortiously interfere with its principal's contract. ........................... 15

       2.   Consovoy's clients did not breach Sega's "Class Action Waiver" by filing the *Hensley* petition to compel arbitration in California Superior Court. ...................... 16

    C.   Count II fails to state a claim for tortious interference due to Consovoy's filing its clients' arbitration demands with JAMS. .................................................................. 20

       1.   Sega cannot prevail on its underlying breach claim against JAMS because JAMS enjoys arbitral immunity. ........................................................................... 20

       2.   Sega has not otherwise alleged JAMS breached a contract. .................................... 21

       3.   Sega does not allege the other elements of a tortious-interference claim. ................ 24

  III.  Sega lacks standing and fails to plausibly plead a Lanham Act claim (Count III). .......... 25

    A.   Sega lacks statutory standing to bring a Lanham Act claim. ....................................... 25

    B.   Consovoy's advertisements did not proximately cause a Lanham Act injury. ............. 26

    C.   Sega failed to plead the basic elements of a Lanham Act claim. ................................ 27

  IV.  Count IV is categorically barred because Virginia law doesn't apply and, in any event, Virginia Code §18.2-216 is a criminal statute with no private right of action. ............... 29

CONCLUSION .......................................................................................................... 30

# TABLE OF AUTHORITIES

## Cases

*Abernathy v. DoorDash, Inc.*,
  438 F. Supp. 3d 1062 (N.D. Cal. 2020) ...................................................................... 4

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
  41 Cal. 4th 1232 (2007) ............................................................................ 1, 10, 11

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ........................................................................................... 8

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ........................................................................................... 2

*Balt. Scrap Corp. v. David J. Joseph Co.*,
  237 F.3d 394 (4th Cir. 2001) ........................................................................... 13

*Baudean v. Pearson Educ., Inc.*,
  2015 WL 3651199 (E.D. Va. June 11, 2015) .................................................. 21

*Belmora LLC v. Bayer Consumer Care AG*,
  819 F.3d 697 (4th Cir. 2016) ........................................................................... 27

*BHR Recovery Cmtys., Inc. v. Top Seek, LLC*,
  355 F. Supp. 3d 416 (E.D. Va. 2018) .............................................................. 30

*Biggins v. Newlee*,
  2011 WL 5842849 (Cal. Ct. App. Nov. 22, 2011) .......................................... 11

*Bocage v. M-I, LLC*,
  2018 WL 1182435 (E.D. La. Mar. 7, 2018) .................................................... 18

*Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*,
  472 F. Supp. 2d 740 (E.D. Va. 2007) .............................................................. 10

*Catanzarite L. Corp. v. Michelman & Robinson, LLP*,
  2015 WL 729374 (Cal. Ct. App. Feb. 19, 2015) ............................................. 11

*CPI Builders, Inc. v. Impco Tech., Inc.*,
  94 Cal. App. 4th 1167 (2001) .......................................................................... 15

*Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*,
  440 F. Supp. 2d 1184 (D. Nev. 2006) .............................................................. 11

*De Simone v. Alfasigma USA, Inc.*,
  847 F. App'x 174 (4th Cir. 2021) .................................................................... 29

*Design Res., Inc. v. Leather Indus. of Am.*,
  789 F.3d 495 (4th Cir. 2015) ........................................................................... 28

*Devonshire v. EurAuPair Int'l, Inc.*,
  1996 WL 33456040 (Va. Cir. Ct. May 22, 1996) ............................................ 30

*DoorDash, Inc. v. Plascencia*,
  2023 WL 2801677 (Cal. Super. Ct. Apr. 3, 2023)....................................... 5

*Ford Motor Co. v. Nat'l Indem. Co.*,
  972 F. Supp. 2d 850 (E.D. Va. 2013) ....................................................... 9

*Freeman v. Time, Inc.*,
  68 F.3d 285 (9th Cir. 1995) ..................................................................... 28

*Gallo v. Wood Ranch USA, Inc.*,
  81 Cal. App. 5th 621 (2022) ..................................................................... 4

*Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*,
  533 F. App'x 200 (4th Cir. 2013) ............................................................ 9

*Gen-Probe, Inc. v. Amoco Corp.*,
  926 F. Supp. 948 (S.D. Cal. 1996)........................................................... 14

*Granite Rock Co. v. Int'l Bhd. of Teamsters*,
  561 U.S. 287 (2010).................................................................................. 23

*Green Tree Fin. Corp.-Ala. v. Randolph*,
  531 U.S. 79 (2000).................................................................................... 3

*Haro v. City of Rosemead*,
  174 Cal. App. 4th 1067 (2009) ................................................................. 18

*Hensley, et al. v. Sega of America, Inc.*,
  2024 WL 5466122 (Cal. Super. Ct. Nov. 21, 2024) ................................. 6

*Hoffmann-La Roche Inc. v. Sperling*,
  493 U.S. 165 (1989).................................................................................. 18

*Intuit Inc. v. 9,933 individuals*,
  2020 WL 7094231 (Cal. Super. Ct. Oct. 6, 2020) .................................... 4

*Khair v. Countrywide Home Loans, Inc.*,
  2010 WL 2486430 (E.D. Va. 2010).......................................................... 22

*Lexmark Int'l., Inc. v. Static Ctrl. Components, Inc.*,
  572 U.S. 118 (2014)..................................................................... 1, 25, 26, 27

*Liapes v. Facebook, Inc.*,
  95 Cal. App. 5th 910 (2023) ..................................................................... 5

*Mayhew v. Benninghoff*,
  53 Cal. App. 4th 1365 (1997) ................................................................... 20

*Milton v. IIT Rsch. Inst.*,
  138 F.3d 519 (4th Cir. 1998) .................................................................... 9

*Mintz v. Blue Cross of Cal.*,
  172 Cal. App. 4th 1594 (2009) ............................................................. 15, 16

*Moore v. Conliffe*,
  7 Cal. 4th 634 (1994) ............................................................................... 11

*Murphy v. Murphy*,
   164 Cal. App. 4th 376 (2008) ................................................................................ 19

*Navient Sols., LLC v. Lohman*,
   -- F.4th --, 2025 WL 1299003 (4th Cir. 2025) ........................................... 1, 12, 13

*Newman v. Wells Fargo Bank*,
   14 Cal. 4th 126 (1996) ......................................................................................... 17

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990) .......................................... 13, 14, 15, 16, 20, 21, 24

*PBM Prods., LLC v. Mead Johnson & Co.*,
   639 F.3d 111 (4th Cir. 2011) ...................................................................... 27, 28, 29

*PM Grp., Inc. v. Stewart*,
   154 Cal. App. 4th 55 (2007) ......................................................................... 15, 16

*Rasidescu v. Midland Credit Mgmt., Inc.*,
   496 F. Supp. 2d 1155 (S.D. Cal. 2007) ................................................................. 11

*Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*,
   407 F.3d 631 (4th Cir. 2005) .................................................................................. 8

*Rosenthal v. Great W. Fin. Sec. Corp.*,
   14 Cal. 4th 394 (1996) ......................................................................................... 17

*Rubin v. Green*,
   4 Cal. 4th 1187 (1993) .................................................................................. 10, 12

*Rusheen v. Cohen*,
   37 Cal. 4th 1048 (2006) .................................................................................. 1, 12

*Sandquist v. Lebo Auto., Inc.*,
   1 Cal. 5th 233 (2016) ........................................................................................... 20

*Schick v. Lerner*,
   193 Cal. App. 3d 1321 (1987) .............................................................................. 11

*Scotts Co. v. United Indus. Corp.*,
   315 F.3d 264 (4th Cir. 2002) ................................................................................ 29

*Scotts Co., LLC v. Pennington Seed, Inc.*,
   2014 WL 12591406 (E.D. Va. Feb. 26, 2014) ...................................................... 30

*Sebastian Int'l, Inc. v. Russolillo*,
   162 F. Supp. 2d 1198 (C.D. Cal. 2001) ................................................................ 24

*Sega of America, Inc. v. Superior Court*,
   B343429 (Cal. Ct. App. Jan. 22, 2025) ................................................................... 7

*Sega of America, Inc. v. Superior Court*,
   No. S289104 (Cal. Feb. 11, 2025) ........................................................................... 7

*Shoemaker v. Myers*,
   52 Cal. 3d 1 (1990) .............................................................................................. 16

*SIC Metals, Inc. v. Hyundai Steel Co.*,
    442 F. Supp. 3d 1251 (C.D. Cal. 2020) ............................................................ 24, 25

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990) ............................................................................................ 10

*Stasz v. Schwab*,
    121 Cal. App. 4th 420 (2004) ............................................................................... 21

*Steves & Sons, Inc. v. JELD-WEN, Inc.*,
    271 F. Supp. 3d 835 (E.D. Va. 2017) ................................................................. 22

*Uber Tech., Inc. v. Am. Arb. Ass'n, Inc.*,
    167 N.Y.S.3d 66 (N.Y. Sup. Ct. 2022) ............................................................ 4, 22

*UCP Int'l Co. v. Balsam Brands Inc.*,
    420 F. Supp. 3d 966 (N.D. Cal. 2019) ................................................................ 13

*Uwasomba v. Bank of Am.*,
    2022 WL 4181719 (E.D. Va. Aug. 22, 2022) ...................................................... 30

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ......................................................... 2, 26, 27, 28, 29

*Vitol, S.A. v. Primerose Shipping Co.*,
    708 F.3d 527 (4th Cir. 2013) .................................................................................. 8

**Statutes**

15 U.S.C. §1127 ......................................................................................................... 25

Cal. Civ. Code §1654 ................................................................................................. 20

Cal. Civ. Proc. Code §1048 ....................................................................................... 19

Cal. Civ. Proc. Code §1281.2 .................................................................................... 17

Cal. Civ. Proc. Code §1281.97 ............................................................................ 4, 6, 23

Cal. Civ. Proc. Code §1284.3 ................................................................................ 6, 23

Cal. Civ. Proc. Code §511.080 .................................................................................. 17

Va. Code §18.2-216 ................................................................................................... 29

Va. Code §59.1-68.3 ................................................................................................... 30

**Other Authorities**

Amicus Brief of the Chamber of Commerce of the U.S., *Am. Express Co. v. Italian Colors Rest.*,
    2012 WL 6759408 (U.S. 2012) .......................................................................... 2, 3

Amicus Brief of the Chamber of Commerce of the U.S., *Green Tree Fin. Corp. v. Bazzle*, 2003
    WL 721691 (U.S. 2003) ......................................................................................... 3

Ann. Mod. Rules Prof. Cond. §7.2(a) (ABA 10th ed., 2023) ....................................... 3

Assembly Committee on the Judiciary, Analysis of Senate Bill No. 762, (2021-2022 Session) ... 4

Cal. Civ. Prac., Employment Litigation (2024) .......................................................... 18

## INTRODUCTION

Sega of America, Inc.'s lawsuit against Consovoy McCarthy PLLC is beyond frivolous. Sega claims that Consovoy should be held liable for: (1) filing its California clients' arbitration demands against Sega under Sega's own arbitration agreement; (2) filing its clients' petition to compel arbitration in California Superior Court after Sega refused to arbitrate (a petition on which those clients prevailed); and (3) publishing routine advertisements for its legal services. In other words, Sega has taken the extraordinary step of suing a law firm for securing and representing its clients in successful litigation against Sega. That's it. That's Sega's entire case.

The Court should dismiss this case with prejudice. Among other reasons, litigation privilege protects a party from state tort claims premised on that party filing a lawsuit. *See Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1249 (2007) ("We contemplate no communication that is more clearly protected by the litigation privilege than the filing of a legal action."). The privilege also protects "attorney prelitigation solicitations of clients." *Rusheen v. Cohen*, 37 Cal. 4th 1048, 1058 (2006). Sega's three claims under state law (Counts I, II, & IV) are therefore barred. *Noerr-Pennington* immunity similarly precludes Sega's federal Lanham Act claim (Count III) because it is premised on Consovoy's advertising to potential clients with claims against Sega. That immunity "safeguards the First Amendment right to petition the government for a redress of grievances … by immunizing [parties] from the liability that may attend the exercise of that right," and "extends to petitioning the courts" and related "pre-suit conduct." *Navient Sols., LLC v. Lohman*, -- F.4th --, 2025 WL 1299003, at *2, *4 (4th Cir. May 6, 2025) (cleaned up). Because Consovoy's advertising is protected "pre-suit conduct," Sega's Lanham Act claim is barred. Sega also lacks statutory standing under the Lanham Act which, in this context, is intended "to protect persons engaged in [interstate] commerce against unfair competition." *Lexmark Int'l., Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 131-32 (2014). That requires a plaintiff to

"allege an injury to a commercial interest in reputation or sales." *Id.* at 132. Because Sega's Lanham Act claim alleges neither "a direct diversion of sales or … a lessening of goodwill associated with its product," *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299 (4th Cir. 2017), Sega lacks statutory standing.

Given Sega's outlandish legal theory—that attorneys can be held liable for representing and soliciting clients—it's unsurprising that there are numerous additional reasons this entire lawsuit should be dismissed. *See infra* 10-30. But the Court can most easily dispose of this case by dismissing it based on litigation privilege, *Noerr-Pennington*, and statutory standing.

## BACKGROUND

### A. Companies require arbitration but then reject the costs of arbitration.

Sophisticated corporations understand that they can minimize liability by blocking class actions, where one plaintiff represents the interests of an entire group. The companies know that imposing binding arbitration clauses on their customers leaves them with little incentive to pursue isolated claims against the companies. That practice reached its zenith after the Supreme Court held that states cannot condition the enforceability of arbitration agreements on the availability of class-wide procedures. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 351 (2011).

Companies justified the legality of these arrangements in several ways. Relevant here, they told the Supreme Court that large numbers of plaintiffs could pool resources and share costs to make individualized arbitration more economical. The Chamber of Commerce, for instance, cited the example of attorneys representing "over 1,000 claimants—each making virtually identical allegations" against AT&T. *See* Amicus Brief of the Chamber of Commerce of the U.S., *Am. Express Co. v. Italian Colors Rest.*, 2012 WL 6759408, at *29 (U.S. 2012). It lauded how the "Internet and social media can be used effectively to reach out to potential claimants … [and to] identify other businesses or individuals with similar claims who can share in the costs of pursuing

claims." *Id.* at 30. The naysayers were "mistaken in concluding that class actions … are the only effective means … of proving small claims." *Id.*[1]

Arbitration costs money, however. Arbitration providers impose filing fees to initiate arbitrations, hourly fees for the arbitrator's own time, and administrative fees for facilitating arbitration. Courts have been concerned that those fees "could preclude a litigant … from effectively vindicating her … rights" because arbitration can be more expensive than court. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 90 (2000). Companies had a solution for that problem too. They have long told courts that arbitral fees are no barrier because companies generally agree to pay some or all those fees. *See, e.g.*, Amicus Brief of the Chamber of Commerce of the U.S., *Green Tree Fin. Corp. v. Bazzle*, 2003 WL 721691, at *7-8 (U.S. 2003). "Such [agreements to pay] substantially reduce (if not entirely eliminate) any financial barrier facing an arbitral client." *Id.* Companies have also told courts that arbitral forums themselves set the claimant's fees quite low or otherwise allow for fee waivers. "With such contractual and institutional protections available," they have argued, "there is no need to impose class action procedures … to protect consumers." *Id.* at *8. "Nor is there any reason to think that individual arbitration will 'choke off the supply of lawyers willing to pursue claims.'" *Id.*

Some lawyers eventually accepted the business community's proposal and began using the suggested technologies to arbitrate thousands of individual claims. The business community,

---

[1] The Chamber of Commerce's proposal aligns with modern practice. Ever since the Supreme Court first recognized lawyers' right to advertise their services, attorneys have made the general public aware of opportunities to pursue claims. In the digital age, attorneys have naturally gravitated towards advertising and recruiting clients online—a reality the American Bar Association's Model Rules of Professional Conduct recognizes. *See, e.g.*, Ann. Mod. Rules Prof. Cond. §7.2(a) (ABA 10th ed., 2023) ("A lawyer may communicate information regarding the lawyer's services through any media."). The commentary to Model Rule 7.2(a) expressly states that "[a]dvertisements over electronic media, including social media, … are also permissible." Ann. Mod. Rules Prof. Cond. §7.2(a).

contrary to its prior representations otherwise, doesn't like that either. Businesses now complain about "mass arbitrations" and the fees they must pay to litigate them—fees they must pay only because they imposed arbitration agreements on their customers. Most courts recognize those defendants' duplicity. For example, one judge blasted the "irony" that a company "faced with having to actually honor its side of the bargain, now blanches at the cost" because it "never expected that so many would actually seek arbitration." *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1067-68 (N.D. Cal. 2020). That judge is hardly alone. *See, e.g.*, *Intuit Inc. v. 9,933 individuals*, 2020 WL 7094231, at *13 (Cal. Super. Ct. Oct. 6, 2020); *Uber Tech., Inc. v. Am. Arb. Ass'n, Inc.*, 167 N.Y.S.3d 66, 70 (N.Y. Sup. Ct. 2022).

The California Legislature shares these courts' ire. A few years ago, it identified a "very specific problem—namely, the procedural limbo and delay that consumers and employees face when they are forced to submit to mandatory arbitration to resolve a dispute, and the business or company that pushed the case into an arbitral forum then stalls or obstructs the arbitration proceeding by refusing to pay the required fees." *Gallo v. Wood Ranch USA, Inc.*, 81 Cal. App. 5th 621, 634 (2022) (cleaned up). That concern was specifically directed at matters where thousands of individual consumers file arbitrations against one company and the company refuses to honor its own agreement. *See* Assembly Committee on the Judiciary, Analysis of Senate Bill No. 762, (2021-2022 Session), as amended June 14, 2021, at 5. California passed several laws to address that problem. Most relevant here, arbitral bodies *must* "issue all invoices [for filing fees] to the parties as due upon receipt." Cal. Civ. Proc. Code §1281.97(a)(2).

### B. Sega requires its customers to arbitrate before JAMS.

This case arises against that backdrop. Sega is a California-based company whose primary business is developing video games. FAC ¶¶5, 28. For its part, Sega follows the industry model and requires anyone playing its games to waive their right to class actions. Sega forces those

players to file any claims against Sega in individual arbitration. Sega's "End User License Agreement," or "EULA," states: "You and Sega … agree that all claims arising out of or relating to this Agreement (including its interpretation, formation, performance and breach), our relationship with each other, or your use of [Sega's games] shall be finally settled solely by binding arbitration." FAC ¶31; Compl., Ex. A, §19. The agreement has a "Class Action Waiver" that requires arbitration in an individual capacity:

> **Class Action Waiver.** The parties further agree that any arbitration or court proceeding shall be conducted in their individual capacities only and not as a class action or other representative action, and the parties expressly waive their right to file a class action or seek relief on a class basis. As a result:
>
> - You cannot bring a claim against Sega as a plaintiff or class member in a class action or any other collective, consolidated, or representative action.

FAC ¶32 (capitalization removed).

Sega chose JAMS as its arbitral provider. The EULA provides that "[y]our arbitration fees and your share of arbitrator compensation shall be governed by the JAMS Comprehensive Arbitration Rules." Compl., Ex. A, §19. Sega's agreement also provides that "[t]he parties understand that, in some instances, the costs of arbitration could exceed the costs of litigation." *Id.*

### C. Consovoy's clients file demands before JAMS under Sega's EULA and a California Superior Court compels Sega to arbitrate.

Defendant Consovoy McCarthy PLLC is a law firm that, among other things, regularly represents consumers in individual arbitration. *See, e.g.*, *DoorDash, Inc. v. Plascencia*, 2023 WL 2801677, at *1 (Cal. Super. Ct. Apr. 3, 2023) (confirming arbitration award of $4,876,000 for 78 of Consovoy's clients). Relevant here, California law prohibits tech companies like Sega from targeting their customers with advertising based on protected characteristics, such as the customers' gender, age, and race. *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 927 (2023). As alleged, Consovoy partnered with a New York-based law firm (Troxel Law LLP) to conduct a

"campaign on social media to solicit users of certain Sega video games." FAC ¶¶36-37. The advertisements sought to identify consumers in California who were unlawfully targeted with advertising based on their gender and age while playing Sega's games. *Id.* ¶¶ 40-42.

Consovoy now represents over 19,000 Californians who played Sega's mobile games and were unlawfully targeted with advertising while doing so. *Id.* ¶54; Compl., Ex. C. Pursuant to Sega's arbitration agreement and JAMS's rules, Consovoy filed individual demands against Sega in April 2024 on behalf of those clients using JAMS's required Demand for Arbitration Form. FAC ¶54; Compl., Ex. C. JAMS evaluated the demands and determined that all of Consovoy's clients had met the necessary filing requirements. FAC ¶62. At that stage, California law required JAMS to invoice Sega for the filing fees needed to get the arbitrations started. *See* Cal. Civ. Proc. Code §1281.97(a)(2). JAMS's fee schedule states that "[f]or two-party matters, the Filing Fee is $2,000." Compl., Ex. C, at 1; *see also* FAC ¶15. "For matters involving consumers," like here, "the consumer is only required to pay $250." Compl., Ex. C, at 1. For consumers with income under 300% of the poverty line, however, California law requires arbitral providers to waive filing fees. *See* Cal. Civ. Proc. Code §1284.3(b). Each of Consovoy's clients is a California resident who fell below that threshold and submitted the requisite JAMS form confirming their income. FAC ¶63. And it is JAMS policy that, when a plaintiff falls below the 300% threshold, the company "must pay 100% of the fees." Compl., Ex. C, at 5. As California law requires, JAMS issued Sega an invoice to pay $39,082,000 in filing fees to start the arbitrations. FAC ¶¶61-62.

Sega has refused to pay the invoice and arbitrate with Consovoy's clients. *Id.* ¶67. That refusal forced Consovoy to file a petition to compel arbitration in California Superior Court on behalf of its clients. *Id.* ¶59; *see Hensley, et al. v. Sega of America, Inc.*, 2024 WL 5466122 (Cal. Super. Ct. Nov. 21, 2024) ("*Hensley*"). In support of that petition, each of Consovoy's clients

submitted a sworn declaration that they played Sega's games in California and, as a result, were subject to the EULA's arbitration requirement. FAC ¶69 n.27; Compl., Ex. D. Sega conceded that 287 of Consovoy's clients were entitled to arbitrate their claims and contested the rest. *Id.* ¶69 n.26.

In November, the court granted the Consovoy clients' petition to compel Sega to arbitrate over Sega's objections and evidence. *See Hensley*, 2024 WL 5466122, at *7. Sega sought appellate review in the California Court of Appeal and then in the Supreme Court of California, which both courts summarily rejected. *See Sega of America, Inc. v. Superior Court*, No. B343429 (Cal. Ct. App. Jan. 22, 2025); *Sega of America, Inc. v. Superior Court*, No. S289104 (Cal. Feb. 11, 2025).

### D. Sega sues Consovoy in this Court for filing its clients' JAMS arbitration demands, their petition to compel arbitration, and their legal advertisements.

Sega responded to that loss by launching a scorched-Earth litigation campaign. One component of that campaign is this case—which seeks to hold Consovoy *itself* liable for filing litigation documents on behalf of its clients. Sega's initial complaint asserted two claims. *First*, Sega asserted that Consovoy's clients breached the EULA merely by filing the successful *Hensley* petition to compel arbitration after Sega refused to arbitrate. FAC ¶¶67-73. But Sega attacks Consovoy's role—as its clients' attorneys—in that supposed breach: It alleges that filing the petition on behalf of its clients tortiously interfered with the EULA. In other words, Sega wants to hold Consovoy liable for representing its clients in successful litigation against Sega. *Id.* ¶¶74-80.

*Second*, Sega asserted that Consovoy's filing its clients' arbitration demands with JAMS induced JAMS to breach a purported contract that it has with Sega. *Id.* ¶87. Unlike Sega's EULA, however, Sega does not attach its purported contract with JAMS to its complaint. Rather, Sega alleges that "[b]y expressly referencing JAMS as the provider in any agreement to arbitrate, Sega manifested an intent to enter a contract with JAMS." *Id.* ¶85. Sega contends that JAMS breached

that purported contract in three ways: (1) by issuing Sega an invoice for $39 million in filing fees for Consovoy clients' arbitrations as required by California law and JAMS's fee schedule; (2) by shifting the clients' arbitration fees to Sega as California law and JAMS policy require because the clients' incomes are under 300% of the poverty line; and (3) by issuing Sega only one invoice rather than separate invoices for each individual arbitration. *Id.* ¶¶89-92.

Consovoy moved to dismiss the complaint, and Sega filed an amended complaint in response. Sega's First Amended Complaint repeated its two tortious interference claims nearly verbatim and added two more claims. The new Count III alleges that Consovoy violated the Lanham Act by advertising to Californians about potential claims against Sega. *Id.* ¶¶94-102; *id.* ¶¶41-42 (listing the advertisements). The new Count IV alleges that Consovoy violated Virginia Code §18.2-216 for the same reason. *Id.* ¶¶103-107.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) requires a complaint to contain sufficient factual allegations that, taken as true, "raise a right to relief above the speculative level" and "nudg[e] its claims across the line from conceivable to plausible." *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 543 (4th Cir. 2013) (cleaned up). A complaint must contain more than "unadorned conclusory allegations," *id.*, and "[t]hreadbare recitals of the elements of a cause of action," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## CHOICE OF LAW

Sega alleges three state-law claims against Consovoy: two tortious-interference-with-contract claims and a false advertising claim. *See* FAC ¶¶ 74-93, 103-107 (Counts I, II, and IV). California law applies to those claims. "A federal court hearing a diversity claim must apply the choice-of-law rules of the state in which it sits." *Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005). For tort claims, "Virginia's choice of law rule selects the

law of the state in which the wrongful act took place." *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 522 (4th Cir. 1998). For a tortious interference claim, the "wrongful interference" is the "breach of a contract between the plaintiff and its business counterparty." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 858-59 (E.D. Va. 2013). In an action for tortious interference, in other words, the "'place of the wrong' becomes the place of the contract breach." *Id.*; *see also Gen. Assurance of Am., Inc. v. Overby-Seawell Co.*, 533 F. App'x 200, 206 (4th Cir. 2013) (similar).

The alleged breach of contract for both of Sega's tortious interference claims occurred in California. Count I alleges that Consovoy's clients breached the EULA by filing the successful *Hensley* petition to compel arbitration. *See* FAC ¶79 ("Claimants that agreed to the EULA materially breached it by filing a single, consolidated petition to compel Sega to arbitrate."). Consovoy's clients filed that petition in California Superior Court in Los Angeles. *Id.* ¶69. California was therefore the "place of the contract breach." *Ford*, 972 F. Supp. 2d. at 858-59.

The same is true for Count II. That claim alleges that Sega is a California-based company and alleges that it had a contract with JAMS, which is also a California-based company. *See* FAC ¶¶5, 82-85. Sega alleges that JAMS breached that contract under California law by issuing Sega an invoice for the California-based arbitrations. *Id.* ¶¶89-90 (citing *Perdue v. Crocker Nat'l Bank*, 38 Cal. 3d 913 (1985)); *see also id.* ¶¶91-92. The alleged breaches, as a result, occurred in California. So California law governs Count II as well.

Count IV is also governed by California law. That claim alleges that Consovoy engaged in false advertising to potential California-based clients that had potential claims against Sega. *See id.* ¶104; *see also id.* ¶¶16, 43, 49, 56, 63, 69 n.27. "[T]he law of the forum where the party allegedly defrauded is headquartered governs tort claims as such locale is both the place where such party relied on the false representations and where its loss was sustained." *Cars Unlimited II, Inc. v.*

9

*Nat'l Motor Co., Inc.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007). Here, Sega is "headquartered" in California, and that is where Sega "sustained" the alleged loss. California law applies to Sega's false advertising claim under state law as a result.

## ARGUMENT

### I.    Immunity bars Sega's claims.

#### A.    Litigation privilege precludes liability for Sega's tort claims (Counts I, II, & IV).

Sega's first two counts seek to hold Consovoy liable for filing lawsuits on behalf of its clients, first the JAMS arbitration demands and then the *Hensley* petition to compel arbitration. But "[f]or well over a century, communications with 'some relation' to the judicial proceedings have been absolutely immune from tort liability." *Rubin v. Green*, 4 Cal. 4th 1187, 1193 (1993). "The principal purpose" of the privilege "is to afford litigants and witnesses … the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Silberg v. Anderson*, 50 Cal. 3d 205, 213 (1990). The privilege is an "absolute protection of access to the courts." *Potter Handy*, 97 Cal. App. 5th at 947. As a result, there is "no communication that is more clearly protected by the litigation privilege than the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. And the privilege protects against "all torts except malicious prosecution," including "intentional inducement of breach of contract." *Silberg*, 50 Cal. 3d at 212, 215.

The litigation privilege bars both of Sega's tortious-interference claims. Sega's Count I alleges that Consovoy tortiously interfered with Sega's contract with Consovoy's clients (the EULA) by "making the decision to file … a single, consolidated petition" to compel Sega to arbitrate. FAC ¶77. The basis for Sega's first claim, in other words, is "the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. That falls squarely in the center of the privilege. *Id.*

Sega's Count II fails for the same reason. Sega alleges that "Consovoy intentionally induced JAMS to breach its contract with Sega by [filing] 19,541 individual demands for arbitration

with JAMS." FAC ¶¶87-88. This claim, as a result, also rests on "the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. The only distinction is the first claim rests on filing a legal action in court, while the second rests on filing a legal action in arbitration. That difference is immaterial; California's litigation "privilege applies to *all* arbitration proceedings." *Moore v. Conliffe*, 7 Cal. 4th 634, 648 (1994) (emphasis added). So just like in court, the protection includes "the contents of all pleadings and process involved in … contractual arbitration proceedings." *Rasidescu v. Midland Credit Mgmt., Inc.*, 496 F. Supp. 2d 1155, 1160 (S.D. Cal. 2007). This Court should thus dismiss both tortious-interference claims as resting on conduct protected by litigation privilege.

Moreover, the target of Sega's lawsuit—the law firm advising the party engaged in litigation—renders Sega's first two counts doubly improper. The litigation privilege protects parties *and* their lawyers from tortious-interference claims premised on the filing of lawsuits. But California provides even more protection to the lawyers. "[P]ublic policy dictates that attorneys must remain free to counsel their clients without fear of subjecting themselves to liability as a result of the proper discharge of their professional obligations." *Schick v. Lerner*, 193 Cal. App. 3d 1321, 1329 (1987). "Any rule to the contrary would constitute a serious impairment to the attorney-client relationship, and a resulting deleterious effect on the administration of justice." *Id.* For these reasons, "California has recognized an attorney cannot be held liable for urging a client to breach a contract with a third party." *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1196 (D. Nev. 2006) (citing *Schick*, 193 Cal. App. 3d at 1329). So Sega's claim fails for the additional reason that it "is suing [a] law firm[] for legal advice [it] gave [its] clients." *Catanzarite L. Corp. v. Michelman & Robinson, LLP*, 2015 WL 729374, at *4 (Cal. Ct. App. Feb. 19, 2015); *see also Biggins v. Newlee*, 2011 WL 5842849, at *3 (Cal. Ct. App. Nov. 22, 2011)

("Not only is a party to a contract exempt from liability for interference or inducing breach, the attorney for the party is exempt as well.").

Litigation privilege also bars Sega's state-law false advertising claim (Count IV) for similar reasons. That claim is premised on Consovoy's soliciting clients who ultimately sued Sega. *See* FAC ¶¶104-07. But the Supreme Court of California has long held that "attorney prelitigation solicitations of potential clients" are "protected by the litigation privilege." *Rusheen*, 37 Cal. 4th at 1058; *see also Rubin*, 4 Cal. 4th at 1194-96. That rule makes good sense because "[i]t is not difficult to imagine the consequences likely to follow in the wake of a rule permitting the defendant in a civil action to institute parallel litigation seeking to impose liability on the attorney for the adverse party based on the circumstances surrounding the formation of the attorney-client relationship that led to the filing of the original suit." *Rubin*, 4 Cal. 4th at 1197-98. The "evils" that would follow include "[t]he impairment of colorable claims by disrupting access to counsel, the intimidating effect on attorneys of facing an almost certain retaliatory proceeding, the distractions inherent in requiring counsel to deal with defending a personal countersuit as well as the predicate action and, in general, the dampening effect on the unobstructed presentation of claims." *Id.* at 1198. This case perfectly encapsulates those "evils." The litigation privilege bars Sega's state-law false advertising claim.

**B.** ***Noerr-Pennington* immunity bars Sega's Lanham Act claim (Count III).**

*Noerr-Pennington* immunity provides similar protections for federal claims. That doctrine "safeguards the First Amendment right to petition the government for a redress of grievances … by immunizing [parties] from the liability that may attend the exercise of that right." *Navient Sols.*, 2025 WL 1299003, at *2 (cleaned up). The immunity "extends to petitioning the courts." *Id.* "[A]s to pre-suit … conduct, courts have generally shown a willingness to immunize 'conduct incidental to the prosecution of the suit,'" including the Fourth Circuit. *Id.* (citing *Balt. Scrap Corp. v. David*

*J. Joseph Co.*, 237 F.3d 394, 401 (4th Cir. 2001)). "[T]he majority of other circuits" have also "extend[ed] *Noerr-Pennington* immunity to litigation-related activities preliminary to the formal filing of the litigation" to "give adequate breathing space to the right of petition." *Id.* (cleaned up).

Here, Sega's Lanham Act claim (Count III) is barred by a straightforward application of *Noerr-Pennington*. Sega sued Consovoy for publishing "advertisements [that] had a material effect on the decision-making of consumers who would not have submitted claims against Sega" otherwise. FAC ¶98. Yet federal courts have applied the *Noerr-Pennington* to bar "claims insofar as they are based on the online statements … related to petitioning activity." *UCP Int'l Co. v. Balsam Brands Inc.*, 420 F. Supp. 3d 966, 983 (N.D. Cal. 2019) (cleaned up). The doctrine applies specifically to the type of communications on which Sega bases its allegations—notifying "purchasers or potential purchasers of [a company's] products" about litigation. *Sliding Door Co. v. KLS Doors, LLC*, 2013 WL 2090298, at *2 (C.D. Cal. May 1, 2013); *see, e.g.*, *AirHawk Int'l, LLC v. TheRealCraigJ, LLC*, 2017 WL 3891214, at *3 (C.D. Cal. Jan. 19, 2017) (where a "communication informs the customers about [a] suit" against a company, "the *Noerr-Pennington* doctrine bars the [company's] Lanham Act claims"). Consovoy's advertisements constitute core "litigation-related" activity, informing consumers of an opportunity to pursue their legal rights. Accordingly, the *Noerr-Pennington* doctrine bars this claim.

## II. Sega's tortious interference with contract claims (Counts I & II) fail for additional independent reasons.

### A. Inducing clients to file legal actions is outside the scope of tortious-interference claims.

Over thirty years ago, the Supreme Court of California was "face[d] with the question … whether it is proper to impose liability for inducing a potentially meritorious lawsuit." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1127 (1990). It "conclude[d] that it is not." *Id.* Here, tortious interference requires a plaintiff to show the defendant engaged in "intentional acts

designed to induce a breach or disruption of the contractual relationship." *Id.* at 1126. But *Bear Stearns* explained that "the *only* common law tort claim that treats the instigation or bringing of a lawsuit as an actionable injury is the action for malicious prosecution." *Id.* at 1131 (emphasis added). And establishing a malicious prosecution requires clearing a high bar "[t]o avoid improperly deterring individuals from resorting to courts for the resolution of disputes." *Id.* Asserting such a claim, *Bear Stearns* explained, requires that a "plaintiff in a malicious prosecution action must prove that the prior action [1] was brought without probable cause and [2] was pursued to a legal termination in plaintiff's favor." *Id.* "To permit a cause of action for interference with contract … to be based on inducing potentially meritorious litigation on the contract would threaten free access to the courts by providing an end run around the limitations on the tort of malicious prosecution." *Id.* at 1137. And "[o]bviously if the bringing of a colorable claim were actionable, tort law would inhibit free access to the courts and impair our society's commitment to the peaceful, judicial resolution of differences." *Id.* at 1131.

Both of Sega's tortious-interference claims are based on Consovoy inducing its clients to undertake litigation against Sega. Sega's first count alleges that Consovoy acted "on behalf of" clients and induced them to file the successful *Hensley* petition to compel in state court and filing that petition caused Sega's injuries. *E.g.*, FAC ¶¶69-73, 77-80. Sega's second count similarly asserts that Consovoy, acting "on behalf of" its clients, induced them to file the arbitration demands with JAMS. *Id.* ¶¶20, 54, 62-63, 87-88. So, "[u]nder [*Bear Stearns*], the only cause of action that can be asserted against a party for initiating litigation is a claim for malicious prosecution." *Gen-Probe, Inc. v. Amoco Corp.*, 926 F. Supp. 948, 957 (S.D. Cal. 1996). Because Sega did not bring a claim for malicious prosecutions, its interference claims must be dismissed.

14

**B. Count I fails to state a claim for tortious interference due to Consovoy's filing its clients' successful *Hensley* petition to compel arbitration.**

Even if not barred by immunity and outside the scope of a tortious interference claim, Sega's allegations do not state a claim for tortious interference with Sega's EULA. To survive dismissal, Sega must plead the elements of tortious interference: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Bear Stearns*, 50 Cal. 3d at 1126. The operative complaint fails to allege a viable claim for multiple independent reasons.

**1. An agent cannot tortiously interfere with its principal's contract.**

The principal-agent relationships between clients and their lawyers (Consovoy) preclude liability for Count I. "The tort of intentional interference with contractual relations is committed only by strangers—interlopers who have no legitimate interest in the scope or course of the contract's performance." *PM Grp., Inc. v. Stewart*, 154 Cal. App. 4th 55, 64-65 (2007) (cleaned up). "Consequently, a contracting party is incapable of interfering with the performance of his or her own contract and cannot be held liable in tort for conspiracy to interfere with his or her own contract." *Id.* Because agents "'stand in the place of the [principal],'" *Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1603-04 (2009), they cannot be held liable for the principal's breach under a tortious-interference theory, *see PM Grp.*, 154 Cal. App. at 65 ("[A]s a matter of law, Stewart and his agents could not have interfered with the performance of these []contracts.").

Attorneys are agents of their clients. *See, e.g.*, *CPI Builders, Inc. v. Impco Tech., Inc.*, 94 Cal. App. 4th 1167, 1174 (2001) ("client as principal is bound by the acts of the attorney agent"). Sega's complaint and exhibits confirm as much. They explain that Consovoy acted "on behalf of" and "for all" its clients as their attorney when it filed the *Hensley* petition and JAMS arbitration

demands. FAC ¶¶63, 69 & n.27, 77-80. "For purposes of this cause of action, then," Consovoy "stand[s] in the place of" its clients. *Shoemaker v. Myers*, 52 Cal. 3d 1, 25 (1990). It thus cannot "be liable for the tort of interfering with the []contracts." *PM Grp.*, 154 Cal. App. 4th at 65, 70.

In a naked attempt to get around this defect, Sega alleges that Consovoy acted "solely for the benefit of itself." FAC ¶78. But that conclusory allegation is irrelevant. Outside of "claims of conspiracy," "there is no 'financial advantage' exception to the rule that a[n] … agent cannot be liable for interfering with its principal's contract." *Mintz*, 172 Cal. App. 4th at 1605-06. "Every agent, in one way or another, acts for its own financial advantage when it acts for its principal." *Id.* at 1606. "The only question is whether the representative of a contracting party may be held liable for the substantive tort of interfering with the contract," and California courts "answer that question in the negative." *Id.* "Because the representative of a contracting party may not be held liable for the tort of interfering with its principal's contract," Sega "cannot state a cause of action against" Consovoy "for intentional interference with contract rights." *Id.* at 1607.

### 2. Consovoy's clients did not breach Sega's "Class Action Waiver" by filing the *Hensley* petition to compel arbitration in California Superior Court.

Sega has also not pleaded an "actual breach or disruption of the contractual relationship." *Bear Stearns*, 50 Cal. 3d at 1126. This count is based on the *Hensley* petition to compel arbitration allegedly breaching the EULA's "Class Action Waiver." That waiver provides:

> **Class Action Waiver.** The parties further agree that any arbitration or court proceeding shall be conducted in their individual capacities only and not as a *class action or other representative* action, and the parties expressly waive their right to file a class action or seek relief on a class basis. As a result:
>
> - You cannot bring a *claim* against Sega as a *plaintiff or class member* in a class action or any other *collective, consolidated*, or representative action.

FAC ¶32 (emphasis added and capitalization removed). Sega's theory is that Consovoy's clients

16

breached the Class Action Waiver because in *Hensley* those clients were "plaintiff[s] or class member[s]" who brought a "claim" against Sega in a "collective" or "consolidated" action. *Id.* ¶¶29, 31-32, 69-80. But the Class Action Waiver was inapplicable to *Hensley* for several reasons.

### a. Consovoy's clients were not "plaintiffs" or "class members" who brought "a claim against Sega."

Most simply, Sega's Class Action Waiver applies only to "plaintiffs" or "class members." Consovoy's clients were neither in *Hensley*—they were "petitioners" who filed a petition to compel arbitration. And under California law, the terms "plaintiff" and "petitioner" are distinct legal terms of art. *See Newman v. Wells Fargo Bank*, 14 Cal. 4th 126, 136 (1996) (legal terms should be given their legal meanings). "'Plaintiff' means a person who files a complaint or cross-complaint," Cal. Civ. Proc. Code §511.080, whereas a "petitioner" in this context is "a party to an arbitration agreement" who seeks a court order "to arbitrate the controversy," *id.* §1281.2. Consovoy's clients were not "plaintiff[s] or class member[s]" in *Hensley* as a result.

Nor did Consovoy's clients assert a "claim" against Sega in *Hensley* because a petition to compel arbitration is not a "claim." Under California law, a "claim" is "'[a] demand for money, property, or a legal remedy to which one asserts a right.'" *Divino Plastic Surgery, Inc. v. Superior Court*, 78 Cal. App. 5th 972, 993 (2022). Yet when "deciding an application to compel," "the superior court does not decide whether plaintiff's causes of action have merit." *Rosenthal v. Great W. Fin. Sec. Corp.*, 14 Cal. 4th 394, 412 (1996). Instead, "[t]he only question implicated by the petition to compel arbitration is whether the arbitration agreements should be specifically enforced." *Id.* So while "[a] petition to compel arbitration is in essence a suit in equity to compel specific performance," *id.* at 411 (cleaned up), it is a "special proceeding" that does not implicate the underlying substantive questions, and there is no final adjudication of the petitioner's "claims," *Roberts v. Packard, Packard, & Johnson*, 217 Cal. App. 4th 822, 834 (2013). The actual "claims"

against Sega are the individual demands for arbitration before JAMS. The *Hensley* petition to compel arbitration does not implicate the merits of those claims.

>    **b. The successful *Hensley* petition to compel arbitration was not a "collective" or "consolidated" action.**

**a.** Consovoy's clients also did not bring a "collective" or "consolidated" action against Sega. Start with Sega's assertion that *Hensley* was a "collective" action. A "collective action" does not refer loosely to any generic case involving multiple parties. Instead, "collective action" refers specifically to cases brought under certain statutory frameworks, such as the Fair Labor Standards Act or Age Discrimination in Employment Act, where employees sue on behalf of themselves and all others "similarly situated." *See* Cal. Civ. Prac., Emp't Litig. §4:70 (2024); *cf. Bocage v. M-I, LLC*, 2018 WL 1182435, at *5 (E.D. La. Mar. 7, 2018) ("'class' and 'collective' actions … are terms of art" that do not include a "multi-party action").

A "collective action" also requires certain components not present in *Hensley*. For one, a "collective action"—much like a class action—requires certification and a court determination that the action represents the interests of other "similarly situated" parties. *Haro v. City of Rosemead*, 174 Cal. App. 4th 1067, 1070-71 (2009). As another, a "collective" action requires an "opt-in" mechanism. *Id.* at 1071. For these reasons, courts have also recognized that a "collective action" is where "an employee may bring an action *on behalf of* himself *and other employees* similarly situated." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 167 (1989) (emphasis added). In a "collective action," the litigation is conducted by one plaintiff and the opt-in parties are "bound by or [] benefit from" a singular "judgment." *Haro*, 174 Cal. App. 4th at 1071 (cleaned up).

None of that happened in *Hensley*. Each Consovoy client proffered his or her own evidence that Sega was required to arbitrate that client's claims; Sega conceded some clients were so entitled

18

while proffering evidence that others were not; Consovoy dismissed a few clients' cases after reviewing Sega's evidence; and the Court evaluated that evidence before entering an order compelling Sega to arbitrate with all of Consovoy's clients who remained. FAC ¶69 n.26, ¶69 n.27; *Hensley*, 2024 WL 5466122, at *7. *Hensley* was not a "collective" action that breached the waiver; each Consovoy client proceeded individually on his or her own evidence.

**b.** Nor did *Hensley* violate the EULA's bar on "consolidated" actions. A "consolidated action" refers to a scenario where multiple, already-pending cases are later combined into one case. Cal. Civ. Proc. Code §1048(a). California's consolidation statute provides that "[w]hen actions involving a common question of law or fact are *pending* before the court, it may *order* a joint hearing or trial of any or all the matters in issue in the actions." *Id.* (emphasis added). Under the statute, "consolidation" occurs only by court order after a judge sees that parallel cases share common issues and orders them to proceed as one. *Id.* None of that happened in *Hensley* either. Each Consovoy client didn't file his or her own petition that the court later combined into one case by a court order. Instead, Consovoy filed one petition in the names of all its clients. Nor did any party seek an order consolidating separate cases brought by Consovoy clients.[2]

**c.** Even if it was unclear whether Consovoy's clients breached the Class Action Waiver, California law requires that any ambiguities in the EULA's application to those clients' petition to compel arbitration be construed against Sega. "Where the drafter of a form contract has prepared an arbitration provision whose application to a particular dispute is uncertain, ordinary contract

---

[2] Sega also argued to the California Superior Court that the *Hensley* petition was a "collective" or "consolidated" action and, as a result, that court should have denied the petition. The court granted the petition despite that argument. Because petitions to compel arbitration are given immediate preclusive effect, *Se. Res. Recovery Facility Auth. v. Montenay Int'l Corp.*, 973 F.2d 711, 713 (9th Cir. 1992), Sega's argument here that the *Hensley* petition was a "collective" or "consolidated" action is also barred by collateral estoppel, *see Murphy v. Murphy*, 164 Cal. App. 4th 376, 400-01, 403 (2008).

principles require that the provision be construed against the drafter's interpretation and in favor of the nondrafter's interpretation." *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 248 (2016). This principle is also codified in statute: "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code §1654. And the rule "applies with even greater force when the person who prepared the writing is a lawyer." *Mayhew v. Benninghoff*, 53 Cal. App. 4th 1365, 1370 (1997). Here, Sega—a sophisticated party represented by counsel—drafted the EULA. To the extent there are any ambiguities whether the EULA barred Consovoy's clients from filing the *Hensley* petition to compel arbitration, then, that ambiguity must be read in those clients' favor and against Sega. Indeed, the California Superior Court granted the *Hensley* petition to compel arbitration to enforce the EULA. That would have been difficult to do if Consovoy's clients had breached the EULA merely by filing the petition to compel.

### C. Count II fails to state a claim for tortious interference due to Consovoy's filing its clients' arbitration demands with JAMS.

Sega's second claim alleges that Consovoy tortiously interfered with a purported contract between Sega and JAMS merely by filing its clients' arbitration demands with JAMS. Sega's allegations do not state a tortious interference claim because (1) Sega hasn't alleged a viable breach claim against JAMS; and (2) Sega hasn't alleged the other elements of tortious interference.

#### 1. Sega cannot prevail on its underlying breach claim against JAMS because JAMS enjoys arbitral immunity.

Sega has no viable breach claim against JAMS itself because arbitral immunity shields JAMS's alleged conduct. *See Bear Stearns*, 50 Cal. 3d at 1126 (liability for breach is an essential element of tortious interference). To that end, the Supreme Court of California has "long" recognized that "an arbitrator enjoys the benefit of an arbitral privilege of immunity because the role that he or she exercises is analogous to that of a judge." *Stasz v. Schwab*, 121 Cal. App. 4th 420,

430 (2004) (cleaned up). "There is hardly any aspect of arbitration law and practice more settled … than the immunity of arbitrators from court actions." *Id.* (cleaned up). The reason for this is to preserve neutrality. "Arbitral immunity, like judicial immunity, promotes fearless and independent decision making." *Id.* at 431 (cleaned up). As a result, courts "have extended arbitral immunity to organizations that sponsor arbitrations," like JAMS. *Id.*

Most relevant here, arbitral immunity applies "where the organization has engaged in tasks such as … *billing for services*." *Id.* at 433 (emphasis added). Sega's breach theories against JAMS relate to calculating and issuing its invoice to Sega's, FAC ¶¶89-92. JAMS is thus immune from Sega's breach claim under black-letter law. *Stasz*, 121 Cal. App. 4th at 430. Because Sega has no viable breach claim against JAMS, it cannot establish that Consovoy induced JAMS to breach either. *See Bear Stearns*, 50 Cal. 3d at 1126.

### 2.  Sega has not otherwise alleged JAMS breached a contract.

**a.** Even if JAMS were not immune, Sega must still plausibly plead the existence of a contract with JAMS and that JAMS breached it. *See id.* Sega alleges neither element. To start with, Sega has not plausibly alleged the formation of a contract between it and JAMS. Unlike Sega's contract with Consovoy's clients (the EULA), Sega does not attach its purported contract with JAMS to the complaint. Nor does Sega allege any details about the contract. Sega doesn't allege any offer by one party to the other, any acceptance by the other party, or the actual terms of the contract. That is insufficient at this stage. *See, e.g.*, *Baudean v. Pearson Educ., Inc.*, 2015 WL 3651199, at *6 (E.D. Va. June 11, 2015) (dismissing a breach of contract claim for failing to plead plausible facts "establishing an offer, acceptance, and valuable consideration").

The complaint's glaring omissions are unsurprising because an arbitral forum's role is analogous to that of a court and court clerk's office. *Stasz*, 121 Cal. App. 4th at 432. And no one would argue that a litigant and court entered a contract together. Previous attempts to claim a contract

existed between a litigant and an arbitral forum have failed for that reason. *E.g.*, *Uber Tech.*, 167 N.Y.S. 3d at 69-70 (rejecting argument that litigant and arbitral forum entered contract).

Sega tries to address this problem by alleging the "inclusion of JAMS as the arbitration provider in the EULA … consummated an agreement between Sega and JAMS to provide arbitration services." FAC ¶34; *id.* ¶82. That theory makes no sense. JAMS is not a party to Sega's EULA—the EULA is an agreement between Sega and those who play Sega's games, like Consovoy's clients. Sega suggests that merely naming a third party in a contract somehow binds that third party to another, unnamed contract. But that's not how offer and acceptance work.

Nor does Sega allege a breach because it never reveals the terms of its purported contract with JAMS. *See, e.g.*, *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835, 844 (E.D. Va. 2017) (to plead a "legally sufficient breach" claim, the plaintiff "must identify specific contract obligations that provide" the basis for the breach). Sega alleges only that its EULA "consummated an agreement between Sega and JAMS to provide arbitration services." FAC ¶34. Consovoy and the Court are left to guess what, exactly, JAMS and Sega agreed to do. There is no way to evaluate whether JAMS's alleged conduct breached the purported contract. *See, e.g.*, *Khair v. Countrywide Home Loans, Inc.*, 2010 WL 2486430, *4 (E.D. Va. 2010). "The Complaint merely states [Sega's] unsupported legal conclusion that [JAMS] breached an undefined contractual duty." *Id.* "Such conclusory allegations are insufficient to plausibly state a breach of contract claim." *Id.*

**b.** At any rate, Sega alleges that JAMS did three different things that amount to a breach of some undefined contractual obligation. *First*, Sega claims JAMS breached by issuing Sega a $39 million invoice for JAMS's filing fees. FAC ¶89. But Sega itself alleges that JAMS's filing fees are $2,000 per case. *Id.* ¶15. From there it is simple arithmetic: the filings fees for over 19,000 individual arbitrations amount to $39 million. Moreover, California law *required* JAMS to issue

Sega an invoice for those fees immediately. *See* Cal. Civ. Proc. Code §1281.97(a)(2). JAMS applying its own fee schedule and following California law cannot constitute a breach.

*Second*, Sega claims that "JAMS breached its contract with Sega" by shifting the Consovoy clients' $250 share of each filing fee to Sega. FAC ¶92. "By its conduct and representations," Sega asserts, "JAMS should have invoiced Sega only for its share of the filing fees—not for its filing fees *and* each individual Claimant's." *Id.* But here again, California law prohibited JAMS from assessing each Consovoy client a $250 filing fee because each client falls below 300% of the poverty line: "All fees and costs charged to or assessed upon a consumer party by a private arbitration company in a consumer arbitration … shall be waived for … a person having a gross monthly income that is less than 300 percent of the federal poverty guidelines." Cal. Civ. Proc. Code §1284.3(b)(1); *see also* FAC ¶63. And Sega's own exhibits show it is JAMS policy that, when a claimant falls below the 300% threshold, the respondent company "must pay 100% of the fees." Compl., Ex. C, at 5. Again, JAMS merely following its own rules and California law cannot provide the basis for breaching the purported Sega-JAMS contract.

*Third*, Sega asserts that "JAMS breached its contract with Sega by issuing … one invoice, rather than separate invoices for each individual." FAC ¶91. It's unclear why that would matter. Sega claims that one invoice somehow "made it impossible for Sega to parse the validity of an individual claim in advance of paying the non-refundable filing fees." *Id.* But of course, the validity of an individual claim is "necessarily a matter for the arbitrator," *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 317 (2010), not for Sega to decide for itself before the arbitration even starts. The California Superior Court recognized as much when it compelled Sega to arbitrate with Consovoy's clients. *See Hensley*, 2024 WL 5466122, at *4 ("As to the issue of whether any spe-

cific petitioner has standing to bring the claim as an injured party, that is a question for the arbitrator."). At any rate, Sega alleges elsewhere that it *was* able to independently evaluate Consovoy's clients' claims ahead of time; Sega conceded that some clients were entitled to arbitration in the *Hensley* action. FAC ¶69 n.26. This breach claim fails too as a result.

### 3.  Sega does not allege the other elements of a tortious-interference claim.

Sega fails to allege other elements: that Consovoy has "knowledge of this contract" and any qualifying "intentional acts designed to induce a breach." *Bear Stearns*, 50 Cal. 3d at 1126. Start with the "knowledge" element. Sega fails to support its allegation that Consovoy had knowledge of its contract with JAMS. FAC ¶¶81-93. This requirement "relates to the state of mind of the defendant at the time that the alleged tort occurred." *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001). When a defendant is "unaware of contractual relations with a third party, then it would be impossible to infer any intent to interfere on the defendant's part." *Id.* That is true here where Sega has not alleged any terms of its purported agreement with JAMS. Indeed, Consovoy *still* has no knowledge of Sega's purported agreement with JAMS.

Next is inducement. Sega fails to allege that Consovoy's filing of arbitration demands was "designed to induce a breach." *Bear Stearns*, 50 Cal. 3d at 1126. Here, Sega conclusorily alleges that "Consovoy intentionally induced JAMS to breach its contract with Sega by [filing] 19,541 individual demands for arbitration with JAMS." FAC ¶87. A lawyer filing an arbitration demand on behalf of a client, however, does not qualify as an act "designed to induce a breach." *Bear Stearns*, 50 Cal. 3d at 1126; *see supra* 10-14.

Courts have otherwise made clear that JAMS arbitration demands don't qualify as an "inducement." *See SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020) (collecting cases). If a defendant's "'conduct was lawful and undertaken to enforce its rights,' it cannot be held liable for intentional interference with a contract even if it knew that such

conduct might interrupt a third party's contract." *Id.* Here, Consovoy carried out its representation by filing arbitration demands on their behalf—in the manner that Sega's EULA *required*. Compl., Ex. A, §19 (requiring claims against Sega to be filed with JAMS). To subject Consovoy to liability for this would effectively bar any lawyer from prosecuting a claim against Sega. A lawyer couldn't sue Sega in court on behalf of clients because its EULA requires arbitration before JAMS; and a lawyer couldn't sue Sega before JAMS because—according to Sega—merely filing an arbitration demand breaches an unknown contract between Sega and JAMS. That cannot be right.

## III.    Sega lacks standing and fails to plausibly plead a Lanham Act claim (Count III).

Sega's third claim alleges that Consovoy violated the Lanham Act because its advertise-ments to potential clients were allegedly false. FAC ¶¶41-42, 94-102. Sega lacks statutory standing under the Lanham Act and hasn't pleaded the basic elements of a false-advertising claim.

### A.  Sega lacks statutory standing to bring a Lanham Act claim.

Section 1125(a)(1) of the Lanham Act provides that "any person who believes that he or she is likely to be damaged" by a false advertisement may sue. But the Supreme Court has made clear this does not mean *anyone* harmed by false advertising can sue under the Lanham Act. *See Lexmark*, 572 U.S. at 129. Courts must first ask "whether [the] legislatively conferred cause of action encompasses a particular plaintiff's claim" and "whether this particular class of persons has a right to sue under this substantive statute." *Id.* at 127 (cleaned up). Those questions require courts to examine "the zone of interests protected by the law invoked." *Id.* at 129.

 For the Lanham Act, the Supreme Court explained it "requires no guesswork" to determine "the zone of interests protected." *Id.* at 129, 131. The Lanham Act is intended "to protect persons engaged in [interstate] commerce against unfair competition." *Id.* at 131. (quoting 15 U.S.C. §1127). And "unfair competition" means "injuries to business reputation and present and future sales." *Id.* So "to come within the zone of interests in a suit for false advertising under [the Lanham

Act], a plaintiff must allege an injury to a commercial interest in *reputation* or *sales*." *Id.* at 131-32 (emphasis added). "This is not a minor or technical element of a Lanham Act claim." *Verisign*, 848 F.3d at 299. The plaintiff must be injured "either by a direct diversion of sales or by a lessening of goodwill associated with its product." *Id.* at 300.

Sega's theory is far afield from the Lanham Act's coverage. Sega's basic theory is that Consovoy used an advertisement to solicit clients who had legitimate claims against Sega, and those advertisements had a "material effect on the decision-making of consumers who would not have submitted claims against Sega." FAC ¶98. If Consovoy had not used the imprecise language, Sega says, fewer claimants would have filed arbitration claims and Sega would not pay quite as much in arbitration fees. *Id.* ¶¶73, 102. But that does not injure Sega's "reputation or sales." *Lexmark*, 572 U.S. at 132. Sega does not allege that Consovoy made a false representation about Sega's products, or that Consovoy tried to pass off its own products as Sega's. Nor has Sega alleged any other injury to its reputation or to past or future sales. It claims an injury based on JAMS's arbitration fees. So Sega "cannot invoke the protection of the Lanham Act." *Id.*

### B. Consovoy's advertisements did not proximately cause a Lanham Act injury.

Even if Sega was inside the Lanham Act's zone of interest, it would still need to plausibly plead that its supposed injuries "are proximately caused by violations of the" Lanham Act. *Id.* Sega has not satisfied this requirement either. The "[p]roximate-cause analysis is controlled by the nature of the statutory cause of action" and asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits" or if it is "too remote" to be actionable under the statute. *Id.* at 133. In the context of a Lanham Act false advertising claim, proximate cause must show that its injury "flow[s] directly from the deception wrought by the defendant's advertising," which occurs "when deception of consumers causes them to withhold trade from the plaintiff." *Id.*

Again, Sega's Lanham Act claim boils down to the allegation that Consovoy used a false advertisement to solicit too many clients, which resulted in Sega being required to pay more arbitration fees. FAC ¶98. Yet this fails to allege that Consovoy's advertisements *caused* consumers to withhold trade from Sega. *Contra Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 712 (4th Cir. 2016) (Lanham Act proximate cause established where customers would be deceived in purchasing a product from defendant, rather than from plaintiff). Unlike a competitor who sues for lost sales, for example, Sega "suffer[s] merely as a result" of its duty to pay the arbitration fees. *Lexmark*, 572 U.S. at 134. That injury is not proximately caused by the type of conduct the Lanham Act addresses. Because Sega's allegations "are insufficient to establish proximate causation," "the complaint must be dismissed." *Id.* at 134 n.6.

### C.  Sega failed to plead the basic elements of a Lanham Act claim.

Even if Sega had statutory standing to bring a Lanham Act claim, Sega cannot plausibly plead enough facts to satisfy the elements of §1125(a) false-advertising claim.  A false-advertising claim under the Lanham Act requires a plaintiff to allege:

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Verisign*, 848 F.3d at 298-99 (cleaned up). Sega must "point to at least one challenged statement that satisfies all five Lanham Act requirements." *Id*. at 299. Sega cannot do so for four elements.

*First*, Sega failed to identify any "false or misleading description of fact or representation of fact in a commercial advertisement." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). To be a "false" statement, "the contested statement or representation must be

either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *Id.* The statement must "be a representation of fact"—"a specific and measurable claim, capable of being proved false." *Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 502 (4th Cir. 2015) (cleaned up). Such a statement must be capable "of being adjudged true or false in a way that admits of empirical verification." *Id.* (cleaned up).

Consovoy's alleged advertisements say only "[i]f you played any of the following games, you *may qualify* for hundreds of dollars in compensation," and "[i]f you played any of the games listed," "[y]ou *likely qualify* for hundreds of dollars in compensation," FAC ¶¶41-42 (emphasis added). This qualifying language makes Consovoy's advertisements not a "specific [or] measurable claim" capable of "empirical verification." *Design Res.*, 789 F.3d at 502. A statement that a consumer "may" qualify for litigation is neither false nor misleading. *See, e.g.*, *Freeman v. Time, Inc.*, 68 F.3d 285, 289 (9th Cir. 1995) (rejecting a claim that an advertisement was misleading where "[t]he qualifying language appears immediately next to the representations it qualifies and no reasonable reader could ignore it"). It is instead a statement of opinion. And "[s]tatements of opinion, rather than fact, cannot be the basis of a Lanham Act claim." *Verisign*, 848 F.3d at 302.

*Second*, Sega also failed to plead a "material" misrepresentation "likely to influence the purchasing decision." *PBM Products*, 639 F.3d at 120. Even by Sega's own account, Consovoy's advertisements say nothing about purchasing Sega's products or using a competitor's products. *See* FAC ¶¶41-42, 96-102. Indeed, this element further reveals that the Lanham Act has no application here. The Act protects against lost sales and goodwill, but there are no allegations the advertisements affected any "purchasing decision." This element cannot be established as a result.

*Third*, Sega failed to plausibly plead that any of Consovoy's advertisements "actually deceive[d] or ha[d] the tendency to deceive a substantial segment of [the] audience." *PBM Products*,

639 F.3d at 120. Since Sega cannot show that a "statement made in an advertisement is literally false" or "false on its face," Sega must "present evidence of consumer deception in order to succeed." *De Simone v. Alfasigma USA, Inc.*, 847 F. App'x 174, 182 & n.10 (4th Cir. 2021). Mere ambiguity or uncertainty is not enough—Sega "must establish that a not insubstantial number of consumers are likely to be confused or misled." *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 280 (4th Cir. 2002). Yet Sega has alleged no facts that a "substantial" number of consumers were confused by the advertisements, nor has Sega pointed to any "consumer survey data" or methodology that could demonstrate whether a substantial swathe of the consuming public was deceived. *Id.* at 276 (cleaned up). Sega therefore failed to plausibly plead actual or a tendency for deception.

*Fourth*, the Fourth Circuit has made clear that Sega must plead the "indispensable fifth element" of an injury "either by direct diversion of sales or by a lessening of goodwill associated with its product." *Verisign*, 848 F.3d at 300 (cleaned up). But as already noted, the only injury Sega alleges is that because additional clients retained Consovoy, Sega must pay more arbitration fees. *See supra* 26-27. This is neither direct loss of sales nor injury to its business reputation. Sega thus failed to plausibly plead the "indispensable" Lanham Act damages. *Verisign*, 848 F.3d at 300.

## IV.    Count IV is categorically barred because Virginia law doesn't apply and, in any event, Virginia Code §18.2-216 is a criminal statute with no private right of action.

Sega's fourth claim alleges that Consovoy violated Virginia Code §18.2-216. But as already outlined, California law applies to Sega's state-law claims against Consovoy. *See supra* 9-10. The Court can dismiss this claim on that basis alone.

At any rate, Sega's Count IV fails because it pleads *only* a claim under a criminal statute (Va. Code §18.2-216) for which there is no private cause of action. *Pro se* litigants have tried what Sega tries here—suing only under §18.2-216—and those cases were dismissed since "[a]s a criminal statute, that provision does not confer a standalone right of action that would allow a private

29

citizen to bring suit to enforce it." *Uwasomba v. Bank of Am.*, 2022 WL 4181719, at *2 (E.D. Va. Aug. 22, 2022); *see also Devonshire v. EurAuPair Int'l, Inc.*, 1996 WL 33456040, at *2 (Va. Cir. Ct. May 22, 1996) ("[N]o private right of action for damages exists as a result of alleged violations of a criminal statute, absent specific authorization," and "§18.2-216 provides no such authorization."). Since §18.2-216 only "establishes criminal liability," a private party must bring claims under a "related civil cause of action," such as Virginia Code §59.1-68.3. *BHR Recovery Cmtys., Inc. v. Top Seek, LLC*, 355 F. Supp. 3d 416, 427 (E.D. Va. 2018). Yet Sega did not plead a related state-law civil cause of auction, so its §18.2-216 claim fails as a matter of law. *See Uwasomba*, 2022 WL 4181719, at *2.

Sega's claim would fail even if it had attempted to plead a claim under Section 59.1-68.3. To state a claim under that statute, Sega must plausibly allege that Consovoy had "(1) an advertisement of any sort; (2) intent to sell or induce the public to enter into an obligation; (3) untrue, misleading or deceptive information, and (4) that the [Sega] suffered a loss." *BHR Recovery*, 355 F. Supp. 3d at 427. As Sega itself acknowledges in its amended complaint, the only relevant statements on Consovoy's advertisements stated that consumers "may qualify" or "likely qualify" to bring an arbitration claim against Sega. *See* FAC ¶¶41-42. Like under the Lanham Act, this qualified language cannot be untrue, misleading, or deceptive, because no reasonable viewer could see the qualified language and interpret the advertisement to mean that any member of the public was certain to recover; it was instead a statement of opinion. *See supra* 27-28; *Scotts Co. v. Pennington Seed, Inc.*, 2014 WL 12591406, at *9 n.1 (E.D. Va. Feb. 26, 2014) ("Since the standard in this case under both the Lanham Act and Virginia law is essential[ly] whether a claim was false or misleading, no separate analysis is needed to resolve the false advertising claim under Virginia law.").

## CONCLUSION

The Court should grant Consovoy's motion to dismiss with prejudice.

Dated: May 30, 2025                           Respectfully submitted,

                                              _/s/ Bryan Weir_
                                              Thomas R. McCarthy (VA Bar No. 47154)
                                              Bryan Weir (VA Bar No. 82787)
                                              CONSOVOY MCCARTHY PLLC
                                              1600 Wilson Blvd., Ste. 700
                                              Arlington, VA 22209
                                              (703) 243-9423
                                              tom@consovoymccarthy.com
                                              bryan@consovoymccarthy.com

                                              _Counsel for Consovoy McCarthy PLLC_

## CERTIFICATE OF SERVICE

I certify that on May 30, 2025, I filed this document via the Court's CM/ECF system, which will email everyone requiring notice.

<u>  /s/ Bryan Weir</u>
Bryan Weir