UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

SEGA OF AMERICA, INC.,

                Plaintiff,

v.

CONSOVOY McCARTHY PLLC,

                Defendant.

Case No. 1:25-cv-257

**PLAINTIFF SEGA OF AMERICA, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ..................................................................................................1

II.     BACKGROUND ....................................................................................................1

    A.      Sega And Its End User License Agreement.............................................1

    B.      Consovoy Submits Over 19,000 Arbitration Demands Against Sega ....................2

    C.      Sega Sues Consovoy ..................................................................................4

III.    CONSOVOY'S MOTION TO DISMISS SHOULD BE DENIED ...............................4

    A.      Virginia Law Applies To Sega's Claims .................................................4

        1.      Virginia law applies to Sega's tortious interference claims.......................4

        2.      Virginia law applies to Sega's false advertising claim ...............................5

        3.      To the extent there is ambiguity, the Court should defer ruling on choice-of-law until after the parties have engaged in discovery.................6

    B.      The Litigation Privilege And *Noerr-Pennington* Doctrine Do Not Apply .............7

        1.      The litigation privilege does not apply to Sega's state-law claims..............7

        2.      Noerr-Pennington does not apply to Sega's Lanham Act claim...............10

    C.      Sega Has Plausibly Alleged Its Tortious Interference Claims................12

        1.      Consovoy tortiously interfered with Sega's contracts with Claimants .........................................................................................12

            a.      Consovoy caused Claimants to breach the EULA ......................12

            b.      An agent can tortiously interfere with its principal's contract.......................................................................................15

        2.      Consovoy tortiously interfered with Sega's contract with JAMS .............18

            a.      Arbitral immunity does not apply ..................................................18

            b.      Sega adequately alleges a contract between it and JAMS ............20

            c.      Sega adequately alleges the remaining elements of a tortious interference claim based on its contract with JAMS ........25

        3.      Pacific Gas & Electric Co. v. Bear Stearns & Co. does not preclude Sega's tortious interference claims ..........................................26

    D.      Sega Has Plausibly Alleged Its Lanham Act Claim ..............................27

        1.      Sega has statutory standing under the Lanham Act....................................27

        2.      Sega otherwise pleads the elements of its Lanham Act claim...................28

    E.      Sega Has Plausibly Alleged Its Virginia State-Law Advertising Claim................29

IV.     CONCLUSION.....................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Action Apartment Assn., Inc. v. City of Santa Monica*
41 Cal. 4th 1232 (2007) ................................................................................................9

*Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*
7 Cal. 4th 503 (1994) ...................................................................................................9

*Beaudean v. Pearson Education, Inc.*
2015 WL 365119 (E.D. Va. June 11, 2015) ...............................................................21

*Benach v. Cnty. of L.A.*
149 Cal. App. 4th 836 (2007) .....................................................................................15

*Berg v. Pulte Home Corp.*
67 Cal. App. 5th 277 (2021) .......................................................................................15

*BHR Recovery Communities, Inc. v. Top Seek, LLC*
355 F. Supp. 3d 416 (E.D. Va. 2018) .........................................................................30

*Bocage v. M-I, L.L.C.*
2018 WL 1182435 (E.D. La. Mar. 7, 2018) ...............................................................14

*Cal. Motor Transp. Co. v. Trucking Unlimited*
404 U.S. 508 (1972).....................................................................................................11

*Cars Unlimited II, Inc. v. National Motor Company, Inc.*
472 F. Supp. 2d 740 (2007) ..........................................................................................5

*Centerline Hous. P'ship I, L.P.-Series 2 v. Palm Communities*
2021 WL 2493255 (C.D. Cal. Apr. 26, 2021) ............................................................17

*Chaves v. Johnson*
230 Va. 112 (1985) ......................................................................................................12

*Cont'l Airlines, Inc. v. Mundo Travel Corp.*
412 F. Supp. 2d 1059 (E.D. Cal. 2006).......................................................................15

*Ctr. for Excellence in Higher Educ., Inc. v. Accreditation All. of Career Sch.*
2023 WL 6282840 (E.D. Va. Sept. 26, 2023)...............................................................6

*De Simone v. VSL Pharms., Inc.*
36 F.4th (4th Cir. 2022) ..............................................................................................27

*Design Resources, Inc. v. Leather Indus. of Am.*
789 F.3d 495 (4th Cir. 2015) ......................................................................................29

*Emerald Aero, LLC v. Kaplan*
  9 Cal. App. 5th 1125 (2017) .................................................................24

*Ford Motor Co. v. Nat'l Indem. Co.*
  972 F. Supp. 2d 850 (E.D. Va. 2013) .....................................................6

*Ford Motor Co. v. Nat'l Indem. Co.*
  972 F. Supp. 2d 862 (E.D. Va. 2013) ...................................................10

*Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*
  893 F. Supp. 2d 761 (E.D. Va. 2012) .....................................................5

*Givago Growth, LLC v. iTech AG, LLC*
  300 Va. 260 (2021) ...............................................................................8

*GMS Indus. Supply, Inc. v. Greer*
  2024 WL 4024034 (4th Cir. Sept. 3, 2024) ...........................................4

*Gonzalez v. Del Recs. Inc.*
  2025 WL 372102 (C.D. Cal. Feb. 3, 2025).............................................16

*Goodman v. Praxair, Inc.*
  494 F.3d 458 (4th Cir. 2007) ...........................................................7, 17

*Gordon v. Cont'l Cas. Co.*
  107 Cal. App. 5th 89 (2024) .................................................................14

*Halvorsen v. Aramark Unif. Servs.*
  65 Cal. App. 4th 1383 (1998) .........................................................15, 16

*Hensley. Castillo v. City of Los Angeles*
  92 Cal. App. 4th 477 ...........................................................................14

*Hensley v. Sega of America, Inc.*
  (Los Angeles Superior Court, Case No. 24STCP02215).................3, 4, 14

*Huynh v. Vu*
  111 Cal. App. 4th 1183 (2003) ....................................................15, 16, 17

*Isle of Wight Cnty. v. Nogiec*
  281 Va. 140 (2011) ...............................................................................7

*Ixchel Pharma, LLC v. Biogen, Inc.*
  9 Cal. 5th 1130 (2020) .........................................................................12

*Jamerson v. UMG Recordings, Inc.*
  2014 WL 12588642 (C.D. Cal. Apr. 14, 2014) ......................................15

*Khair v. Countrywide Home Loans*
    2010 WL 2486430 (E.D. Va. 2010)................................................................22

*Kimmel v. Goland*
    51 Cal. 3d 202 (1990) ........................................................................................8

*Lexmark Int'l v. Static Control Components, Inc.*
    572 U.S. 118 (2014)....................................................................................27, 28

*Lindeman v. Lesnick*
    268 Va. 532 (2004) ............................................................................................8

*Los Angeles Airways, Inc. v. Davis*
    687 F.2d 321 (9th Cir. 1982) .....................................................................16, 17

*M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*
    2023 WL 8798086 (4th Cir. Dec. 20, 2023) ....................................................6

*Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*
    991 F.2d 94 (4th Cir. 1992) .............................................................................12

*Milton v. IIT Research Inst.*
    138 F.3d 519 (4th Cir. 1998) .........................................................................4, 5

*Mintz v. Blue Cross of California*
    172 Cal. App. 4th 1594 (2009) ...................................................................16, 18

*Mir v. Charter Suburban Hosp.*
    27 Cal. App. 4th 1471 (1994) ..........................................................................13

*Moore v. Conliffe*
    7 Cal. 4th 634 (1994) .........................................................................................9

*Morgan Phillips, Inc. v. JAMS/Endispute, L.L.C.*
    140 Cal. App. 4th 795 (2006) ...............................................................18, 19, 21

*N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*
    666 F.2d 50 (4th Cir. 1981) ...............................................................................7

*Navellier v. Sletten*
    106 Cal. App. 4th 763 (2003) ............................................................................8

*Netbula, LLC v. BindView Development Corp.*
    516 F. Supp. 2d 1137 (N.D. Cal. 2007) ..........................................................20

*Otay River Constructors v. San Diego Expressway*
    158 Cal. App. 4th 796 (2008) ..........................................................................13

*Pacific Gas & Electric Co. v. Bear Stearns & Co.*
  50 Cal. 3d 1118 (1990) ..................................................................................26, 27

*People v. Potter Handy, LLP*
  97 Cal. App. 5th 938 (2023) ........................................................................9

*Pizza Hut, Inc. v. Papa John's Intern., Inc.*
  227 F.3d 489 (5th Cir. 2000) ......................................................................29

*PM Group, Inc. v. Stewart*
  154 Cal. App. 4th 55 (2007) ......................................................................16

*Ramalingam v. Thompson*
  151 Cal. App. 4th 491 (2007) ......................................................................7

*Ramos v. Amazon.com, Inc.*
  2024 WL 4882638 (C.D. Cal. Nov. 25, 2024).....................................................15

*Rasidescu v. Midland Credit Mgmt., Inc.*
  496 F. Supp. 2d 1155 (S.D. Cal. 2007)..........................................................9

*Rosenfeld, Meyer & Susman v. Cohen*
  146 Cal. App. 3d 200 (1983) ......................................................................9

*Rubin v. Green*
  4 Cal. 4th 1187 (1993) ...............................................................................9

*Sacks v. Dietrich*
  663 F.3d 1065 (9th Cir. 2011) ....................................................................18

*Schertzer v. Bank of Am., NA*
  109 F.4th 1200 (9th Cir. 2024) ....................................................................14

*SIC Metals, Inc. v. Hyundai Steel Company*
  442 F. Supp. 3d 1251 (C.D. Cal. 2020) ......................................................25

*Silberg v. Anderson*
  50 Cal. 3d 205 (1990) ................................................................................9

*Smartco*
  2020 WL 5356916 ......................................................................................18

*Stacy & Witbeck v. City*
  47 Cal. App. 4th 1 (1996) ..........................................................................8

*Steve & Sons, Inc. v. JELD-WEN, Inc.*
  271 F. Supp. 3d 835 (E.D. Va. 2017) ........................................................21

*Tubi, Inc. v. Keller Postman LLC*
    No. 1:24-cv-1616 (D.D.C. Sept. 4, 2024), ECF No. 13 .........................................................11

*Uber Technologies, inc. v. American Arbitration Association, Inc.*
    N.Y.S. 3d 66 (2022) .....................................................................................................22

*Verisign, Inc. v. XYZ.COM LLC*
    848 F.3d 292 (4th Cir. 2017) .........................................................................................29

*Viriyapanthu v. California*
    2018 WL 6265091 (C.D. Cal. June 7, 2018) ...................................................................10

*Wagner Constr. Co. v. Pac. Mech. Corp.*
    41 Cal. 4th 19 (2007) ..................................................................................................13

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*
    728 F.3d 354 (4th Cir. 2013) .........................................................................................11

*Wechsler v. Capitol Trailer Sales, Inc.*
    220 Cal. App. 2d 252 (1963) .........................................................................................12

*Welch v. Highlands Union Bank*
    526 B.R. 152 (W.D. Va. 2015) .........................................................................................6

*Yu v. Signet Bank/Virginia*
    103 Cal. App. 4th 298 (2002) ..........................................................................................8

Statutes

15 U.S.C. § 1125(a) ..............................................................................................................27

Cal. Civ. Code § 1644 ......................................................................................................13, 14

Cal. Code Civ. P. § 1063 ......................................................................................................12

Cal. Code Civ. P. § 1281.97 ..................................................................................................23

Cal. Code Civ. P. § 1284.3 ...............................................................................................23, 24

Virginia Code § 18.2-216 ....................................................................................................30

Virginia Code § 59.1-68.3 ....................................................................................................30

Other Authorities

Federal Rule of Civil Procedure 12(b)(6) ...............................................................................6

## I.    <u>INTRODUCTION</u>

The motion to dismiss should be denied. This case arises from extraordinary circumstances. Last year, Defendant Consovoy McCarthy PLLC ("Consovoy") orchestrated the submission of over 19,000 arbitration demands against Plaintiff Sega of America, Inc. ("Sega"). Consovoy did so not to litigate the underlying claims or to vindicate any alleged rights, but to extort a settlement by leveraging JAMS's practice of invoicing the corporate respondent $2,000 per arbitration demand in nonrefundable filing fees. The net effect was that JAMS billed Sega nearly $40 million in non-refundable filing fees before even one of 19,000 arbitrations began or a single arbitrator was appointed. Consovoy's intent was to use that fee as leverage to extract a crippling settlement from Sega. If that weren't concerning enough, Sega has discovered that many of the demands are likely fraudulent because many of the people on who behalf the claims were submitted—*i.e.*, Consovoy's purported "clients"—never agreed to arbitrate their claims with Sega or are not even real people. In pursuing its scheme, Consovoy has tortiously interfered with multiple contracts and violated false advertising laws. Consovoy cannot, as it apparently believes it can, escape liability for this conduct simply because it is a law firm. The motion should be denied.

## II.    <u>BACKGROUND</u>

### A.    **Sega And Its End User License Agreement**

Sega is a developer and publisher of video games, including a series of mobile games based on its popular "Sonic the Hedgehog" character. (First Amended Complaint ["FAC"] ¶ 28, ECF No. 34.) Consumers who play Sega-published games generally agree to Sega's End User License Agreement ("EULA"). (*Id.* ¶ 29.) However, Sega also licenses "Sonic the Hedgehog" to third parties who publish their own mobile games, such as Roblox (one of the largest providers of online games). (*Id.* ¶ 30.) When consumers download Sonic the Hedgehog games from Roblox or other third-party platforms, they do not agree to the EULA. (*Id.*)

The EULA contains an arbitration provision, subjecting disputes between Sega and users of its published games to arbitration. (FAC ¶¶ 31, 33.) In the EULA, Sega designated JAMS as the arbitration provider. (*Id.* ¶¶ 33-35.) The EULA also has a Class Action Waiver, which requires an "arbitration or court proceeding" to be "conducted in [the claimants'] individual capacities only and not as a class action or other representative action." (*Id.* ¶ 32.) The provision also states that one "cannot bring a claim against Sega as a plaintiff or class member in a class action or any other collective, consolidated, or representative action." (*Id.* [all-caps removed].)

### B.    Consovoy Submits Over 19,000 Arbitration Demands Against Sega

Last year, Consovoy initiated a mass arbitration against Sega. (FAC ¶ 36.) Mass arbitrations are a new and ethically fraught phenomenon. In a mass arbitration, lawyers target consumer-based companies that have arbitration provisions in their terms of use. (*Id.* ¶ 16.) The lawyers' goal is to engage as many individuals as possible (often in the tens of thousands) to submit arbitration demands to a private arbitration provider. (*Id.*) After submitting the demands, the private arbitration provider issues a non-refundable administrative filing fee (often in the tens of millions of dollars) to the company. (*Id.*) The company is then forced to either pay the non-refundable fee and proceed with the arbitrations or settle with the lawyers for a smaller sum. (*Id.*) Unsurprisingly, companies often choose to settle, and the underlying arbitration demands are never litigated. (*Id.*)

To amass as many demands as possible, Consovoy published advertisements on social media, falsely promising hundreds or thousands of dollars in compensation to anyone who played certain games based on the Sonic the Hedgehog character and signed up for a "compensation claim." (FAC ¶ 40-51.) After gathering sign-ups, Consovoy submitted 19,541 identical arbitration demands to JAMS. (*Id.* ¶ 54.) Consovoy thereafter submitted fee waivers for all 19,541 individuals ("Claimants"), declaring that each Claimant earned less than 300% above the federal poverty line.

(*Id.* ¶ 63.) JAMS then shifted to Sega the $250 in filing fees that Claimants would have been obligated to pay, and issued Sega a single, nonrefundable invoice for $39,082,000, which represented $2,000 per Claimant. (*Id.* ¶¶ 62-63.) This fee was not to pay any arbitrator who would actually adjudicate the claims, but to pay JAMS. In other words, Sega was being required to pay $39,082,000 for the privilege of arguing that the claimants' claims were without merit, and to have the opportunity to then pay arbitrators in each of these cases.

Consovoy submitted the arbitration demands to JAMS despite knowing that the submission would cause JAMS to breach its contract with Sega. (FAC ¶ 88.) Consovoy knew that JAMS could not conduct that many arbitrations in any reasonable time period. (*Id.* ¶ 87.) Moreover, Consovoy submitted the demands without conducting even a cursory review of each Claimant's claim. (*Id.* ¶ 59.) For example, Consovoy submitted demands on behalf of individuals named "Poop Smear" and "See Mee." (*Id.* ¶ 60.). Only after Sega raised how clearly fraudulent these names were did Consovoy withdraw those demands and about two dozen others. (*Id.* ¶ 69 n.26.) Even more concerning, hundreds or thousands of the remaining demands are likely fraudulent because the Claimant never played a Sega-published game (as opposed to a game published by a third-party, like Roblox) and therefore never agreed to the EULA. (*Id.* ¶ 61.)

Because it believed that many of the demands were fraudulent, Sega did not pay JAMS's non-refundable filing fee. (FAC ¶ 67.) In response, Consovoy caused a service to file a single, consolidated Petition to Compel Arbitration on behalf of all 19,517 remaining Claimants ("Petition") in Los Angeles County Superior Court. *See Hensley v. Sega of America, Inc.* (Los Angeles Superior Court, Case No. 24STCP02215). The manner in which the Petition was filed— as a single, consolidated petition—breached the Class Action Waiver. (FAC ¶ 70.) The Class Action Waiver required Claimants to file 19,517 separate petitions, but Consovoy chose not to.

(*Id.*) This choice allowed Consovoy to avoid paying court filing fees for 19,517 separate petitions. (*Id.*)

### C.    Sega Sues Consovoy

Sega asserts four claims against Consovoy. (*See* FAC ¶¶ 74-107.) Sega alleges two claims for tortious interference with contractual relations premised on Consovoy's interference with Sega's contracts with Claimants and JAMS. (*Id.* ¶¶ 74–93.) Sega alleges that the manner in which the Petition was filed, as a single, consolidated petition, violated the EULA's Class Action Waiver, and that the manner in which the arbitration demands were submitted, over 19,000 in a single day, caused JAMS to breach its contract with Sega. (*Id.*) Additionally, Sega alleges two claims for false advertising—one under the Lanham Act and the other under Virginia state law.  (*Id.* ¶¶ 94–107.) The gravamen of those claims is that Consovoy's social media advertisements falsely misrepresented that any consumer who (i) played a Sonic the Hedgehog game, (ii) was a permanent resident of California, and (iii) saw an advertisement would be entitled to arbitrate their claims against Sega. However, in truth, Consovoy knew that many consumers have no such entitlement.

## III.    CONSOVOY'S MOTION TO DISMISS SHOULD BE DENIED

### A.    Virginia Law Applies To Sega's Claims

#### 1.    *Virginia law applies to Sega's tortious interference claims*

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum in which it sits. *Milton v. IIT Research Inst.*, 138 F.3d 519, 521 (4th Cir. 1998). For tort actions, "Virginia applies the *lex loci delicti* . . . the law of the place where the wrongful act occurred." *Milton*, 138 F.3d at 521-22. In other words, the place "where the perpetrator committed the tort, *not* the jurisdiction where the victim felt harm." *GMS Indus. Supply, Inc. v. Greer*, 2024 WL 4024034, at *2 (4th Cir. Sept. 3, 2024).

Here, Consovoy argues that the place of the wrong is California, where the Petition was ultimately filed, and the arbitration demands were submitted. But Consovoy oversimplifies and misconstrues Sega's allegations. As to Consovoy's tortious interference with Claimants and Sega's contracts, the wrongful act was not the filing of the Petition, but Consovoy's decision to file the Petition on a consolidated basis, and that decision was made from Virginia. (FAC ¶¶ 68, 70, 71, 77.) Indeed, the actual ministerial act of the filing in California was carried out by a service, not Consovoy. (*Id.* ¶¶ 68-69.) Thus, the wrongful act occurred in Virginia. The same goes for Consovoy's tortious interference with Sega and JAMS's contract. Consovoy "knew that JAMS would be unable to administer the 19,541 arbitration demands" (*Id.* ¶ 89), but Consovoy cooked up this scheme based on that knowledge, issued the arbitration demands, and electronically submitted them to JAMS all from its offices in Virginia. Because the wrongful acts occurred in Virginia, Virginia law applies to both claims.

### 2. *Virginia law applies to Sega's false advertising claim*

Consovoy argues that Sega's false advertising claim should be governed by California law because "Sega is 'headquartered' in California and that is where Sega 'sustained' the alleged loss." (Mot. at 10.)[1] But, as explained, "Virginia law selects the place of where the wrongful act occurred and not . . . the place where the injury was suffered." *Gen. Assur. of Am., Inc. v. Overby-Seawell Co.*, 893 F. Supp. 2d 761, 777 (E.D. Va. 2012). And a plaintiff's domicile is not relevant in determining where a wrongful act occurred. *See Milton*, 138 F.3d at 522.

Here, the wrongful acts did not occur California. Consovoy, located in Virginia, partnered with Troxel law, located in New York, to create and run the false and misleading advertisements.

---

[1] *Cars Unlimited II, Inc. v. National Motor Company, Inc.*, 472 F. Supp. 2d 740 (2007) is distinguishable because it held the wrongful act for a *business conspiracy* claim occurred where the defrauded party was headquartered.

(FAC ¶¶ 37-40.) The advertisements were published from Virginia—again, not California—and nothing on the face of the advertisements was specific to California residents.[2] (FAC ¶¶ 41-42.) Therefore, Consovoy's argument that California law should apply to Plaintiff's false advertising claim is incorrect. Virginia law should apply.

### 3. *To the extent there is ambiguity, the Court should defer ruling on choice-of-law until after the parties have engaged in discovery*

"[C]ourts are generally in a better position to decide a choice of law issue after discovery when the factual record is more developed." *Ctr. for Excellence in Higher Educ., Inc. v. Accreditation All. of Career Sch.*, 2023 WL 6282840, at *7 (E.D. Va. Sept. 26, 2023) (declining to decide at the pleadings stage which law applied to a tortious interference claim). This is because "determining what law applies to a particular claim is often a fact-intensive undertaking." *M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, 2023 WL 8798086, at *3 (4th Cir. Dec. 20, 2023). For tortious interference clams, "there are significant factual variations that can affect the *lex loci delicti* analysis." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 850, 857 (E.D. Va. 2013). "Parties therefore may not be able to make appropriate choice-of-law arguments without the benefit of discovery." *Id.* As a result, "District courts in this Circuit . . . regularly defer choice-of-law issues until after the parties have completed discovery." *Id.* (collecting cases). And courts will deny a motion to dismiss when "potentially different outcomes could result" based on which states' law is applied. *Welch v. Highlands Union Bank*, 526 B.R. 152, 161, 166 (W.D. Va. 2015).

Here, to the extent the Court is not inclined to apply Virginia law, the Court should defer deciding the choice-of-law issue until after Sega is able to take discovery. Discovery would

---

[2] If Consovoy wants to claim that it targeted its advertising to Californians, that would be a factual assertion outside the four corners of the FAC and would therefore not be relevant on a Rule 12(b)(6) motion. It would also be ironic if Consovoy were to claim this, as the gravamen of the underlying arbitration demands relates to targeted advertising.

confirm:

(1) That Consovoy made the decision to file the Petition in a single, consolidated manner in Virginia and caused the Petition to be filed in such manner from Virginia;

(2) That Consovoy made the decision to submit the over 19,000 individual arbitration demands in Virginia and caused the demands to be submitted to JAMS from Virginia; and

(3) That Consovoy and Troxel created and published the false and misleading advertisements in Virginia.

Accordingly, because choice-of-law is inherently fact-intensive, the Court should defer ruling on choice of law until after the parties engage in discovery, so that Sega can present evidence that Virginia law should apply.

### B.    The Litigation Privilege And *Noerr-Pennington* Doctrine Do Not Apply

Consovoy argues that the litigation privilege and *Noerr-Pennington* doctrine bar all of Sega's claims. (Mot at. 10-13.) Both doctrines are affirmative defenses. *N. Carolina Elec. Membership Corp. v. Carolina Power & Light Co.*, 666 F.2d 50, 52 (4th Cir. 1981) (*Noerr-Penningtion*); *Isle of Wight Cnty. v. Nogiec*, 281 Va. 140, 155 (2011) (Virginia's litigation privilege); *Ramalingam v. Thompson*, 151 Cal. App. 4th 491, 497 (2007) (California's litigation privilege). A court "generally cannot reach the merits of an affirmative defense" on a motion to dismiss unless "all facts necessary to the affirmative defense clearly appear *on the face of the complaint*." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (cleaned up). Sega's allegations establish that neither affirmative defense applies here and that, at the very least, there are factual issues that cannot be resolved at this stage.

### 1.    *The litigation privilege does not apply to Sega's state-law claims*

Consovoy argues that only California's litigation privilege bars Sega's state-law claims. (Mot. at 10-12.) But, as explained, Virginia law applies to this case. Under Virginia law, the litigation "privilege does not apply to non-defamation torts . . . specifically including . . . tortious

interference with contractual relations." *Givago Growth, LLC v. iTech AG, LLC*, 300 Va. 260, 267 (2021). Nor does the privilege apply to Sega's false advertising claim because it is not a defamation claim, and Consovoy published the deceptive advertisements before any litigation had commenced between Sega and Claimants. *See Lindeman v. Lesnick*, 268 Va. 532, 538 (2004) (holding that the litigation privilege does not apply to "potential litigation").

Even if the Court determines that California substantive law applies, California's litigation privilege does not bar Sega's state-law claims for tortious interference. California's litigation privilege "applies to all 'publications or broadcasts' made in the course of a 'judicial proceeding.'" *Kimmel v. Goland*, 51 Cal. 3d 202, 209 (1990). It does not apply to "tortious courses of conduct." *Stacy & Witbeck v. City*, 47 Cal. App. 4th 1, 8 (1996). Thus, a "threshold issue" is whether the plaintiff's injury resulted from "communicative acts," which are privileged, or "noncommunicative conduct," which is not. *Id.* at 211. While it is true that "[p]leadings and process in a case are generally viewed as privileged communications[,] . . . exceptional situations can arise where pleadings and conduct connected with litigation are not privileged." *Navellier v. Sletten*, 106 Cal. App. 4th 763, 771 (2003). For example, where a plaintiff is "challenging" the "act" or "manner" in which a claim is asserted, the privilege does not apply. *See id.* (citing *Yu v. Signet Bank/Virginia*, 103 Cal. App. 4th 298, 309 (2002)) (explaining that the privilege does not apply where the "action challenged" is the "location where [the] suit was filed, not [the] relief sought in the complaint").

Here, Sega's tortious interference claims challenge the decision to file the arbitration demands and Petition in a particular *manner*, not the contents of those filings. *See Navellier*, 106 Cal. App. 4th at 771. As to Sega's claim that Consovoy tortiously interfered with its contract with Claimants, Sega alleges that "the EULA required each Claimant to file their own petition in a

separate non-consolidated, non-coordinated and non-representative action." (FAC ¶ 70.) But rather than doing so, Consovoy decided to cause Claimants "to file a single, consolidated petition" in breach of the EULA. (*Id.*) Thus, it was the "manner" in which the petition was filed, as a single consolidated petition, that caused the breach of the EULA. Similarly, for Sega's claim that Consovoy tortiously interfered with its contract with JAMS, the manner in which Consovoy filed the arbitration demands with JAMS—over 19,000 demands on the same day—caused JAMS to breach its contract with Sega. (FAC ¶ 87.) Critically, nothing bearing on whether Consovoy tortiously interfered with Sega and Claimant's contractual relations, or Sega and JAMS's contractual relations, has anything to do with the content of the Petition, the arbitration demands, or any other communication. That distinguishes this case from the cases that Consovoy relies on, which all concerned communicative conduct.[3] Accordingly, California's litigation privilege does not apply to Sega's claims for tortious interference.[4]

---

[3] *See Rubin v. Green*, 4 Cal. 4th 1187, 1196 (1993) (plaintiff's claim was premised on "alleged misrepresentations" made by a law firm to potential clients "in the course of discussions"); *Silberg v. Anderson*, 50 Cal. 3d 205, 219 (1990) (litigation privilege applied to "defendant's statements" made "in the course of [a] marital dissolution proceeding"); *People v. Potter Handy, LLP*, 97 Cal. App. 5th 938, 948 (2023) (litigation privilege applied to "the filing of ADA/Unruh lawsuits in federal court based on false standing allegations, and the use of those lawsuits to coerce settlements"); *Action Apartment Assn., Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1237 (2007) (litigation privilege preempted ordinance that authorized penalties for landlords that brought lawsuits to evict tenants); *Moore v. Conliffe*, 7 Cal. 4th 634, 658 (1994) (statements made in the course of a private contractual arbitration proceeding are protected by the litigation privilege); *Rasidescu v. Midland Credit Mgmt., Inc.*, 496 F. Supp. 2d 1155, 1160 (S.D. Cal. 2007) (the "litigation privilege applies to the contents of all pleadings and process in any judicial proceeding").

[4] Defendant's assertion that Sega's tortious interference claims are "doubly improper" because a lawyer can never be liable for tortiously interfering with a client's contract is incorrect. (Mot. at 11.) As explained *infra* in section III.C.1.b., an agent (such as an attorney) can be liable for causing its principal (such as an attorney's client) to breach a contract. Consistent with this, California law holds that "[a]n attorney has no absolute privilege to interfere with contractual relations, whether those of his client or anyone else." *Rosenfeld, Meyer & Susman v. Cohen*, 146 Cal. App. 3d 200, 228 (1983), *disapproved on other grounds by Applied Equip. Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503 (1994).

### 2.    Noerr-Pennington *does not apply to Sega's Lanham Act claim*

Consovoy argues that the *Noerr-Pennington* doctrine bars Sega's Lanham Act claim because Consovoy's advertisements constitute petitioning activity that informed consumers of an opportunity to file an arbitration claim. (Mot. at 12-13.) This argument fails for at least two reasons.

*First*, Consovoy's advertisements informing consumers of a potential arbitration claim are outside the scope of the *Noerr-Pennington* doctrine. The doctrine's purpose is to protect "the right of the people to petition *the Government* for redress of grievances." *Ford Motor Co. v. Nat'l Indem. Co.*, 972 F. Supp. 2d 862, 868 (E.D. Va. 2013) (emphasis added) (cleaned up). But a claim in private arbitration "does not petition the Government at all." *Id.* Thus, the *Noerr-Pennington* doctrine "does not provide . . . immunity to private parties initiating private arbitration proceedings." *Id.* at 866-67. Any argument to the contrary "runs counter to the clear language used by the Founders to establish protection for petitioning the *Government*." *Id.* at 868 (emphasis added). Other courts outside of the Fourth Circuit have also recognized the same. *See Viriyapanthu v. California*, 2018 WL 6265091, at *10 (C.D. Cal. June 7, 2018) ("Noerr-Pennington is inapplicable where defendants initiate *private* arbitrations.")

Here, Consovoy published the advertisements in order to amass as many individuals as possible to submit private arbitration claims against Sega. (FAC ¶ 40.) After accumulating over 19,000 individuals as a result of those advertisements, Consovoy submitted the arbitration claims to JAMS, a private arbitration company. (*Id.* ¶ 54.) Consovoy's advertisements are therefore outside the scope of the *Noerr-Pennington* doctrine because they pertain to private arbitration.

*Second*, even if the Court holds that the *Noerr-Pennington* doctrine applies to private arbitration, it is still inapplicable because Consovoy has engaged in sham litigation. The *Noerr-Pennington* doctrine does not apply when a party engages in "a pattern of baseless, repetitive claims" that "lead[] the factfinder to conclude that the administrative and judicial processes have

been abused." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 516 (1972). To determine whether a litigant has engaged in a series of sham litigation, courts focus on "[t]he pattern of the legal proceedings," "the subjective motive of the litigant," and "the objective merits of the suits." *Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 364 (4th Cir. 2013). The Fourth Circuit has noted that withdrawal of suits "under suspicious circumstances" is an "indicia of bad faith litigation." *Id.* at 365.

Here, Sega's allegations demonstrate that Consovoy's conduct is repetitive, baseless, and an abuse of the judicial process. (FAC ¶¶ 16-20, 44-47, 51, 55-61.) Consovoy submitted over 19,000 identical arbitration demands against Sega. (*Id.* ¶¶ 56, 68-69.) Consovoy did so not to pursue the merits of its clients' claims, but rather to take advantage of JAMS's non-refundable filing fees. (*Id.* ¶ 55.) This conduct is abusive. Even worse, the underlying legal theory that Consovoy encouraged people to assert against Sega in their purported arbitration demands—one based on targeted advertising—is baseless. Other courts have commented that the theory is "cockamamie," "baffl[ing]," and "insanity." (Declaration of Paul Werner ("Werner Decl."), Ex. A (*Tubi, Inc. v. Keller Postman LLC*, No. 1:24-cv-1616 (D.D.C. Sept. 4, 2024), ECF No. 13, at 18:3-10, 19:10-12, 42:1-4)). And Sega alleges Consovoy did not even perform a cursory review of the arbitration demands before submitting them. (FAC ¶¶ 55-61.) Consovoy submitted duplicate demands and demands on behalf of individuals named "Poop Smear" and "See Mee." (*Id.* ¶ 60.) Moreover, Sega's expert and internal records establish that hundreds or thousands of Claimants likely did not agree to the EULA. (*Id.* ¶¶ 60-61.) Consovoy has even implicitly acknowledged that some of the demands were baseless—it has already withdrawn over a dozen arbitration claims. (*Id.* ¶ 69 n.26; Mot. at 19.) Such conduct smacks of bad faith. Accordingly, the *Noerr-Pennington* doctrine does not bar Sega's Lanham Act claim.

### C.    Sega Has Plausibly Alleged Its Tortious Interference Claims

#### 1.    *Consovoy tortiously interfered with Sega's contracts with Claimants*

##### a.    Consovoy caused Claimants to breach the EULA

To state a claim for tortious interference, a plaintiff must plausibly allege "(1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been damaged." *Chaves v. Johnson*, 230 Va. 112, 120 (1985); *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1141 (2020) (same under California law).

Here, Consovoy argues that Sega has not sufficiently alleged the third factor; namely, that Claimants did not breach the EULA's Class Action Waiver when they filed the Petition. (Mot. at 17-20.) Consovoy argues that no breach occurred because the terms of the Class Action Waiver do not apply to Claimants or the Petition. (*Id.*) But, as more fully explained below, those terms are "capable of two different reasonable interpretations." *Wechsler v. Capitol Trailer Sales, Inc.*, 220 Cal. App. 2d 252, 263 (1963). As a result, the Court should deny Consovoy's motion because "the construction of ambiguous contract provisions is a factual determination that precludes dismissal on a motion for failure to state a claim." *Martin Marietta Corp. v. Int'l Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir. 1992).

***First***, Consovoy argues that the Class Action Waiver does not apply to Claimants because the provision applies only to "plaintiff[s]," and Claimants are "petitioners." (Mot. at 17.) But the terms "plaintiff" and "petitioner" are synonymous under California law. Indeed, California Code of Civil Procedure section 1063, which governs special proceedings such as petitions to compel arbitration, states that "[t]he party prosecuting a special proceeding may be known as plaintiff." Relying on section 1063, the California Court of Appeal held that the term "petitioner" is

"synonymous with 'plaintiff.'" *Mir v. Charter Suburban Hosp.*, 27 Cal. App. 4th 1471, 1481 (1994). Thus, it is reasonable to conclude that the term "plaintiff" in the Class Action Waiver encompasses "petitioners."

**Second**, Consovoy argues that Claimants did not bring a "claim." (Mot. at 17.) But California courts have held that a petition to compel arbitration is a "contract claim." *Otay River Constructors v. San Diego Expressway*, 158 Cal. App. 4th 796, 807 (2008). For example, in *Otay*, the Court of Appeal held that a respondent on a petition to compel arbitration could recover attorney fees because it "defeated the only *contract claim* before the trial court"—the petition to compel arbitration. *Id* (emphasis added). Moreover, the California Supreme Court has held that a petition to compel arbitration "is in essence a suit in equity to compel specific performance of a contract." *Wagner Constr. Co. v. Pac. Mech. Corp.*, 41 Cal. 4th 19, 29 (2007). Nothing in the EULA suggests that the term "claim" is so limited that it would not apply to a suit in equity for specific performance. In fact, the EULA states that it "applies to all kinds of claims, including legal, *equitable*, or statutory claims, under any legal theory." (FAC, Ex. A (emphasis added).) Thus, Claimants' petition to compel specific performance of the EULA's arbitration provision constitutes a "claim."

**Third**, Consovoy argues that the Petition was not a "collective" or "consolidated" action. (Mot. at 18-19.) Consovoy assumes that the term "collective" refers to an employment action brought under certain employment statutes and that the term "consolidated" refers only to a scenario "where multiple, already-pending cases are later combined into one case." (*Id.*) But under California law, "words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning" unless the parties indicate otherwise. Cal. Civ. Code § 1644. Consovoy does not cite any portion of the EULA that requires either term to be interpreted

in a strictly legal manner. Nor would it even make sense to interpret the terms in such way. Interpreting the term "collective," for example, to refer to employment actions does not make sense in the context of the EULA because the EULA applies to consumers who purchase or use Sega's products; it is not geared toward employees. (FAC, Ex. A.) Even the cases that Consovoy cites hold that use of either term in a contract "*might*" demonstrate an intent for the legal definition to apply. *Bocage v. M-I, L.L.C.*, 2018 WL 1182435, at *5 (E.D. La. Mar. 7, 2018) (emphasis added). At best, Consovoy has offered one possible interpretation of the terms.

A better interpretation is that the terms were meant to be read in their "ordinary and popular sense." Cal. Civ. Code § 1644. This would make particular sense here, where the contract at issue is a consumer contract meant for laypersons. *See Schertzer v. Bank of Am., NA*, 109 F.4th 1200, 1208 (9th Cir. 2024) ("The ordinary and popular meaning of a term is the meaning a layperson would ascribe to it." (cleaned up)). To determine how a layperson would interpret a disputed term, courts "consider the dictionary definitions of the words." *Gordon v. Cont'l Cas. Co.*, 107 Cal. App. 5th 89, 103 (2024). According to the dictionary, the term "collective" means "a number of persons or things considered as one group or whole,"[5] and the term "consolidated" means "joined together into a coherent, compact, or unified whole."[6] Applying those definitions, the Petition falls within the Class Action Waiver. It "joined together" all 19,517 Claimants in "one" "unified" action for compelling arbitration against Sega rather than 19,517 separate actions. It is thus reasonable to conclude that the Petition was a consolidated or collective action under the Class Action Waiver.[7]

---

[5] *Collective*, Merriam Webster, https://www.merriam-webster.com/dictionary/collective.

[6] *Consolidated*, Merriam Webster, https://www.merriam-webster.com/dictionary/consolidated.

[7] Defendant additionally argues collateral estoppel bars Sega from arguing that the Petition was a consolidated action because Sega raised that issue at oral argument in the *Hensley* action. (Mot. at 19 n.2.) But that argument was not "actually litigated" or "necessarily decided" in *Hensley*. *Castillo v. City of Los Angeles*, 92 Cal. App. 4th 477, 481(2001). The argument was not presented in Sega's opposition papers, and the *Hensley* court never addressed it in its order.

**Finally**, Consovoy's argument that the Court should construe the Class Action Waiver against Sega is premature. (Mot. at 19-20.) That rule is one of last resort, applying only after exhausting "all other rules of interpretation" (*Berg v. Pulte Home Corp.*, 67 Cal. App. 5th 277, 294 (2021)), including examination of extrinsic evidence. *See Benach v. Cnty. of L.A.*, 149 Cal. App. 4th 836, 847 (2007); *cf. Cont'l Airlines, Inc. v. Mundo Travel Corp.*, 412 F. Supp. 2d 1059, 1065 (E.D. Cal. 2006) (holding that on a motion to dismiss the court "should strive to resolve any contractual ambiguities in the nonmoving party's favor." (cleaned up)). Because the Court is considering the EULA on a motion to dismiss, it "cannot consider extrinsic evidence that might shed light on the contracting parties' intentions." *Jamerson v. UMG Recordings, Inc.*, 2014 WL 12588642, at *12 (C.D. Cal. Apr. 14, 2014). Thus, the Court should not construe the Class Action Waiver against Sega until it examines the parties' extrinsic evidence. *See Ramos v. Amazon.com, Inc.*, 2024 WL 4882638, at *5 (C.D. Cal. Nov. 25, 2024) (denying motion to dismiss because contract terms were ambiguous).

### b.    An agent can tortiously interfere with its principal's contract

Consovoy argues it is not liable for tortious interference because it was acting as Claimants' agent when it caused Claimants to breach the EULA. (Mot. at 15-16.) Preliminary, Consovoy's argument fails because it is based on California law, which does not apply here. Additionally, Consovoy cannot assert this privilege for many Claimants because the Claimants are either not real people (for example, Poop Smear) or do not consider Consovoy to be their agent. Regardless, even assuming Consovoy is an agent for some Claimants, it is not immune from liability.

The "agent's privilege," also known as the "manager's privilege," is an affirmative defense to a claim for tortious interference. *Huynh v. Vu*, 111 Cal. App. 4th 1183, 1194 n.11 (2003); *Halvorsen v. Aramark Unif. Servs.*, 65 Cal. App. 4th 1383, 1391 (1998). If the privilege applies, the agent is not liable for causing its principal to breach a contract. *Huynh*, 111 Cal. App. 4th at

1194. There are three formulations of the privilege that California state and federal courts have applied: "(1) absolute, (2) mixed motive, and (3) predominant motive." *Halvorsen*, 65 Cal.App.4th at 1391. Under the absolute standard, an agent is *per se* immune from liability "without regard to the [agent's] motives or state of mind." *Huynh*, 111 Cal. App. 4th at 1195. "The 'mixed motive' formulation applies the privilege as long as the [agent] is motivated, at least in part, by a desire to benefit the principal." *Id.* Finally, under the "predominant motive" formulation, an agent has the privilege of interfering with a principal's contract "only when the [agent's] predominant motive is to serve the interest of the principal." *Id.*

Consovoy's argument is premised on the absolute version of the privilege—that as Claimants' agent, Consovoy can never be liable for inducing Claimants to breach the EULA. (Mot. at 15-16.) But California courts apply the absolute formulation "in the employment termination context," such as "in the unique context of employment advice to higher management," or in the context of a corporate agent acting on behalf of a corporation or public entity. *Huynh*, 111 Cal. App. 4th at 1196-97 (quotation omitted); *see also Mintz v. Blue Cross of California*, 172 Cal. App. 4th 1594, 1598, 1604 (2009) (applying absolute privilege to a claims administrator, Blue Cross, an agent of the public health insurer, CalPERS). This case is obviously not an employment case or an instance where Consovoy is acting on behalf of a corporation or public entity; so, the absolute version of the agent's privilege does not apply.[8]

That leaves either the mixed motive or predominate motive formulations. In *Los Angeles Airways, Inc. v. Davis*, 687 F.2d 321 (9th Cir. 1982), the Ninth Circuit, "in the absence of a clear

---

[8] *PM Group, Inc. v. Stewart*, 154 Cal. App. 4th 55 (2007), is distinguishable. There, the "parties did not question whether the agent's and manager's conduct benefited [the principal]." *Gonzalez v. Del Recs. Inc.*, 2025 WL 372102, at *9 (C.D. Cal. Feb. 3, 2025). That is not the case here: Sega alleges Defendant caused a breach "solely to benefit itself." (FAC ¶¶ 71.)

declaration in California case law," adopted the mixed motive test. *Huynh*, 111 Cal. App. 4th at 1196 (citing *Los Angeles Airways, Inc.*, 687 F.2d at 328). But two decades later, the California Court of Appeal in *Huynh* surveyed California caselaw and declined to follow *Los Angeles Airways*. 111 Cal. App. 4th at 1194-98. The court instead adopted the predominant motive test, holding that if "it is at least reasonably possible" that an agent "acted out of self-interest rather than in the interest of the principal, the [agent] should not enjoy the protection of the [agent's] privilege unless the trier of fact concludes that the [agent's] *predominant* motive was to benefit the principal." *Id.* at 1198. After *Huynh*, multiple California courts have adopted the predominant motive test.  *See, e.g.*, *Centerline Hous. P'ship I, L.P.-Series 2 v. Palm Communities*, 2021 WL 2493255, at *4 (C.D. Cal. Apr. 26, 2021) (collecting cases). Accordingly, the Court should apply the predominant motive test here.

Under that test, Sega's allegations are sufficient to preclude application of the agent's privilege. Because the privilege is an affirmative defense, the Court "cannot reach [its] merits" on a motion to dismiss unless "all facts necessary" to the defense "clearly appear *on the face of the complaint*." *Goodman*, 494 F.3d at 464 (cleaned up). Sega alleges that Consovoy "chose to file a single, consolidated petition solely to benefit itself and not Claimants." (FAC ¶¶ 71, 78.) Consovoy did so because it knew "filing 19,517 separate petitions" was not in its benefit because "it would have to pay millions of dollars in court filing fees." (FAC ¶ 71.) These allegations are sufficient on a motion to dismiss for the Court to conclude that it is "reasonably possible that [Consovoy] acted out of self-interest rather than in the interest of [Claimants]." *Huynh*, 111 Cal. App. 4th at 1198.[9] Accordingly, the agent's privilege does not preclude Count I.

---

[9] Defendant argues that an agent can cause its principal to breach a contract even if the agent did so for its "financial advantage." (Mot. at 16.) But the "financial advantage exception" is an exception to the "agent's immunity rule"—a rule that applies only to "civil conspiracy claims."

### 2.    *Consovoy tortiously interfered with Sega's contract with JAMS*

#### a.    **Arbitral immunity does not apply**

Consovoy argues that Sega's Count II tortious interference claim fails because the predicate breach of contract claim against JAMS is precluded by the arbitral immunity doctrine. (Mot. at 20.) Not so. The arbitral immunity doctrine exists to "protect[] arbitrators from civil liability for conduct in their quasi-judicial capacity, including the exhibition of bias or prejudice in the rendering of their decisions." *Morgan Phillips, Inc. v. JAMS/Endispute, L.L.C.*, 140 Cal. App. 4th 795, 800 (2006). "The purpose of arbitral immunity is to encourage fair and independent decision-making by immunizing arbitrators from lawsuits arising from conduct in their decision-making role." *Id.*; *see also Sacks v. Dietrich*, 663 F.3d 1065, 1069-70 (9th Cir. 2011) ("The pivotal question is whether the claims at issue arise out of a decisional act.") (citation and internal quotation marks omitted).

At the outset, Sega notes the absurdity of Consovoy's attempt to hide behind the arbitral immunity doctrine. The doctrine applies to judicial and quasi-judicial officials seeking immunity for their decision-making; the doctrine is not meant to insulate from liability opportunistic lawyers pursuing shaky claims for self-enrichment.[10]

Arbitral immunity does not apply to Sega's breach of contract claim against JAMS. Specifically, Sega alleges JAMS breached its contract to provide arbitration services to Sega by

---

*Mintz*, 172 Cal. App. 4th at 1606. While it is true that the *Mintz* court also stated in dicta that the "financial advantage exception" does not apply to a claim for tortious interference, the court's statement was made within the context of discussing the agent's immunity rule—again, a different rule that applies to a different claim, civil conspiracy. *Id.* at 1605-06. Thus, the financial advantage exception is not applicable to this case because Sega alleges a claim for tortious interference, not civil conspiracy. *See Smartco*, 2020 WL 5356916, at *3-4 (acknowledging *Mintz* but nonetheless applying the predominant motive test).

[10] To the extent the Court agrees with Consovoy's arbitral immunity arguments (which it should not), Sega requests that the Court first issue a stay pending a ruling on JAMS's demurrer in Sega's lawsuit against JAMS, currently pending in the Los Angeles Superior Court.

issuing a non-refundable invoice of $39,082,000 despite knowing that it does not have the capacity to handle 19,541 individual arbitrations. (FAC ¶ 64.)[11] California law makes clear that the immunity does not apply to breaches of a contract divorced from the arbitral function of rendering a decision on the merits of a dispute. *See Morgan Phillips*, 140 Cal. App. 4th at 800. Put another way, the immunity does not shield JAMS from a breach of contract claim alleging that it charged an incorrect or unconscionable fee.

*Morgan Phillips* is instructive. In that case, the plaintiff alleged causes of action for breach of contract, negligence, unfair competition, and false advertising against JAMS. 140 Cal. App. 4th at 800. The plaintiff argued that JAMS's arbitrator had breached their contract by seeking to "coerce an unfavorable settlement from [plaintiff], and avoid having to issue an award, by withdrawing as arbitrator without justification." *Id.* at 802. The court, noting that arbitral immunity exists "to foster principled and fearless decision-making," found that the plaintiff's allegations were not "sufficiently associated with the adjudicative phase of the arbitration to justify immunity." *Id.* (citations omitted) (cleaned up).

The conduct that Sega challenges does not relate to any arbitral decision-making, such that JAMS can be said to be acting in a "quasi-judicial capacity." Specifically, Sega's claim challenges JAMS's issuance of a non-refundable invoice of $39,082,000 for services that, by its own admission, it cannot perform (FAC ¶¶ 89–90); JAMS's issuance of one single invoice, rather than

---

[11] JAMS cannot administer mass arbitrations of this scale in a timely manner, thereby failing to uphold its end of the arbitration bargain. (FAC ¶ 21.) For example, as of May 2, 2025, only 200 JAMS arbitrators were based in a California location and only 352 JAMS arbitrators were available to provide services in California. (*Id.* ¶ 22.) Of course, with just 352 JAMS arbitrators available to provide services in California, JAMS is unable to timely administer a mass arbitration if handled like an individual arbitration. (*Id.* ¶ 23.) Further, in a blog article posted on the JAMS website on May 2, 2024, a JAMS arbitrator admitted that "a few hundred arbitrators would not be able to work through 50,000 individual arbitrations—or half or even a third of that number—in a reasonable amount of time." (*Id.*)

separate invoices for each individual claimant (*id.* ¶ 91); and JAMS's practice of shifting fees from claimants to Sega (*id.* ¶ 92). Indeed, each of these challenged acts occurred prior to any proceedings actually taking place concerning the merits of the arbitrations, and prior to any arbitrators being appointed. As a result, these acts cannot possibly be related to any quasi-judicial decision-making by an arbitrator.

This distinction makes sense. Were Consovoy's impermissibly broad interpretation of the caselaw accurate, JAMS could, for example, charge its clients fees triple that which is called for in the JAMS Fee Schedule and the parties to the arbitration would be left without recourse.

### b. Sega adequately alleges a contract between it and JAMS

The FAC alleges that JAMS manifested an intent to enter into a contract with Sega by promoting itself as a leading arbitration provider and previously administering its arbitration services to Sega and its consumers on several occasions. (FAC ¶¶ 83-84.) The FAC further alleges that, based on JAMS's representations, Sega manifested an intent to enter into a contract with JAMS to provide arbitration services by including JAMS as the designated arbitration services provider in the EULA. (FAC ¶¶ 82, 85.)

Consovoy claims that Sega "does not attach its purported contract with JAMS to the complaint" or "allege any details about the contract." (Mot. at 21.) This is an intentionally narrow reading of the FAC. Sega does not claim that a single, discrete written contract with JAMS exists. Rather, the contract between JAMS and Sega was formed by Sega's reliance on JAMS's representations regarding its capabilities and designating JAMS as the provider of choice in the EULA. *See Netbula, LLC v. BindView Development Corp.*, 516 F. Supp. 2d 1137, 1155 n.10 (N.D. Cal. 2007) ("A contract need not be written to be legally binding; oral and written evidence may be received to establish the terms of the agreement between the parties.") (citations omitted). The terms of the parties' agreement include those set forth in the JAMS Comprehensive Arbitration

Rules and Procedures and Fee Schedule. (*See* FAC ¶ 15.)

Consovoy further argues that Sega's allegation that it has a contract with JAMS to provide arbitration services "makes no sense" because "JAMS is not a party to Sega's EULA." (Mot. at 22.) As set forth above, this argument misses the point. Sega does not claim that JAMS is a party to the EULA itself—rather, Sega alleges that JAMS's conduct has evidenced a desire to create a contractual relationship with Sega to provide arbitration services. (FAC ¶¶ 83-84.) Courts have recognized the existence of a contract in virtually identical circumstances. *See Morgan Phillips*, 140 Cal. App. 4th at 789. The case that Consovoy cites, *Beaudean v. Pearson Education, Inc.*, 2015 WL 365119 (E.D. Va. June 11, 2015), is distinguishable. The breach of contract claim in *Beaudean* involved an employee's allegation that his employer modified his at-will employment status via an ambiguously-worded e-mail. *Id.* at *3. The court found that the plaintiff had failed to establish an offer, acceptance, or consideration. *Id.* at *6.

Here, Sega has plausibly alleged all elements required for the existence of a contract with JAMS. JAMS offered its services through its advertisements and by providing Sega its arbitration services in the past. (FAC ¶¶ 82-83.) Sega accepted JAMS's offer by designating it as the arbitration services provider in its EULA. (*Id.* ¶ 85.) The consideration JAMS receives for arbitrations it conducts is revenue in exchange for its services.

Further, contrary to Consovoy's assertion, Sega alleges the terms of its contract with JAMS. The terms are that JAMS is to provide Sega and the relevant claimant with arbitration services, the terms of which are available in the JAMS Comprehensive Arbitration Rules and Schedule of Fees. (FAC ¶ 15.) In exchange, both parties are to pay fees as set forth in the Schedule of Fees (which, notably, does not contain any language regarding fee-shifting). Consovoy's cited authority on this point, *Steve & Sons, Inc. v. JELD-WEN, Inc.*, 271 F. Supp. 3d 835 (E.D. Va.

2017), is factually distinguishable: Sega alleges that its contract with JAMS obligated the latter to provide arbitration services in line with its Rules and invoice Sega in accordance with its Schedule of Fees. (*See* FAC ¶ 15.). As set forth above, JAMS failed to do so on several fronts.  For similar reasons, *Khair v. Countrywide Home Loans*, 2010 WL 2486430 (E.D. Va. 2010) is also distinguishable. The relevant complaint in that case contained "no allegations regarding what [the defendant's] obligations under the alleged contract were/are and what action or inaction by [defendant] may have breached such obligations." *Id.* at *4. Here, Sega has alleged what JAMS's obligations were and how it failed to perform.

Consovoy's attempts to liken Sega's contract with JAMS to a contract between a litigant and a court likewise fail. (*See* Mot. at 21-22.) Unlike a court, parties to arbitration proceedings have an agreement with an arbitral forum to provide services. An arbitrator is in the business of providing such arbitral services. (*See* FAC ¶¶ 12-13.) A court is very different and does not act pursuant to contract. Consovoy cites *Uber Technologies, inc. v. American Arbitration Association, Inc.*, N.Y.S. 3d 66 (2022), a case decided under New York law, as a "[p]revious attempt[] to claim a contract existed between a litigant and an arbitral forum" that has "failed." (Mot. at 21-22.) In that case, Uber alleged that AAA breached its own protocols by failing "to charge reasonable fees related to its actual costs"—instead, AAA charged fees as outlined in the fee schedule. *Uber Techs.*, N.Y.S. 3d at 69. The New York appellate court did not find that no contract existed between Uber and AAA. In fact, the court's analysis impliedly assumes the existence of a contract between Uber and AAA to provide arbitration services in exchange for fees as outlined in AAA's fee schedule. *See id*. Here, Sega does not premise its breach of contract claim on an alleged failure to administer fees in a manner distinct from that outlined in the Schedule of Fees. In fact, Sega asserts the opposite—JAMS administered an invoice for fees in a manner *not* outlined in the Schedule of

Fees to which the parties agreed. (FAC ¶¶ 91-92.)

Consovoy's contortions of Sega's arguments regarding the breach intentionally misconstrue the allegations in the FAC. It is true, as Consovoy states, that California Code of Civil Procedure section 1281.97 requires an arbitration provider to immediately provide an invoice for arbitration fees. *See* Cal. Code Civ. P. § 1281.97. However, no rule or regulation required JAMS to do so in a single invoice for thousands of individual arbitrations, thus depriving Sega of the ability to decide whether to challenge each on an individual basis. (*See* FAC ¶ 91.) In fact, JAMS's own policy should require individualized invoicing. (*See id.* ¶ 15.)

Consovoy questions that it is "unclear" why such consolidated invoicing "would matter." (Mot. at 23.) But Sega explains this in the FAC—consolidated invoicing renders Sega unable to parse the validity of each individual claim. (FAC ¶ 91.) To the extent Consovoy now argues that validity may only be determined after Sega has been extorted into paying a fraudulent filing fee, that is inconsistent with its own prior admissions, as it has previously agreed to withdraw claims on behalf of claimants such as "Poop Smear" and "See Mee." (*See id.* ¶ 60.) Consovoy attempts to construe these bizarre examples as evidence that Sega "was able to independently evaluate Consovoys' clients' [sic] ahead of time[.]" (Mot. at 24.) As set forth in the FAC, however, these egregious examples became apparent after just an "initial review." (*See* FAC ¶ 60.) Because of JAMS's consolidated invoice, if Sega were able to uncover less obviously-fraudulent claimants, Sega would be without recourse if Consovoy did not voluntarily withdraw the fraudulent claims.

Consovoy also misinterprets California law regarding fee waivers for indigent claimants in arbitration. California Code of Civil Procedure section 1284.3 requires JAMS to waive costs for persons who have a gross income less than 300 percent of the federal poverty guidelines. *See* Cal. Code Civ. P. § 1284.3(b). However, California law does not require that JAMS shift those waived

fees over to the other party. *See id.* Citing to one line of text included in JAMS's Demand for Arbitration Form, Consovoy argues that it is JAMS's "policy" to shift waived fees to other party. (Mot. at 23.) But this form can hardly be considered JAMS's "policy"—this proposition is nowhere in JAMS's Comprehensive Rules or the Schedule of Fees (*i.e.*, the documents that set the terms of the agreement between JAMS and its consumers). In the absence of statements to the contrary, Sega had no reason to suspect that JAMS's provision of a fee waiver to a claimant would necessarily mean increased fees for Sega.

While the statute precludes JAMS from requiring the consumer "to provide any further statement or evidence of indigence" (Cal. Code Civ. P. § 1284.3(b)(3)), JAMS is not required by law to merely accept all declarations regarding indigency at face value. As set forth in the FAC, that is exactly what JAMS did—all claimants so qualifying would be a statistical anomaly. (FAC ¶ 63.) In context, section 1284.3 applies only to fee shifts that occur at the *end* of arbitration proceedings. *See* Cal. Code Civ. P. § 1284.3. The legislative history of section 1284.3 reveals that the California Legislature enacted the statute as an analogue for moving *in forma pauperis* in court. (*See* Werner Decl., Ex. B (Cal. Bill Analysis, A.B. 2915 Assem. (May 14, 2002)) ("Under California law, civil litigants may proceed in forma pauperis and obtain a waiver of all fees and costs. This bill would enact a similar provision for indigent customers in mandatory arbitration.")). Thus, Sega should not be required to bear the other side's fees in the same manner the party adverse to someone proceeding in forma pauperis is not required to bear that party's. Were the statute to mean otherwise, and section 1284.3 applied to charges at case initiation, it would amount to a violation of Sega's due process right. *See Emerald Aero, LLC v. Kaplan*, 9 Cal. App. 5th 1125, 1142 (2017) (arbitrators are required to provide for due process). Section 1284.3 was enacted in 2002, far before the advent of mass arbitration proceedings. In a mass arbitration world, this fee-

shifting practice subjects companies like Sega to millions of dollars in non-refundable filing fees.

> **c.    Sega adequately alleges the remaining elements of a tortious interference claim based on its contract with JAMS**

Consovoy next argues that it did not have knowledge of Sega's contract with JAMS or engage in any intentional act designed to induce JAMS's breach. (*See* Mot. at 24) (citing *Bear Stearns*, 50 Cal. 3d at 1126.) Consovoy's claim that it was not aware of the contractual relationship between Sega and JAMS is absurd. Consovoy was clearly aware of the EULA, which designated JAMS as the provider of arbitral services for Sega and its customers. (*See* FAC ¶¶ 33-34.) Thus, Consovoy had direct knowledge of an ongoing relationship between Sega and JAMS.

Sega also adequately alleges that Consovoy took actions designed to induce breach. Consovoy engaged in tactics designed to overwhelm and manipulate a system maladapted to its novel and extortive mass arbitration tactics. (*See* FAC ¶¶ 16, 54.) Consovoy also misconstrues Sega's allegation that Consovoy "intentionally induced JAMS to breach its contract with Sega by making the decision to submit 19,541 individual demands for arbitration demands," when it "knew that JAMS would be unable to administer the 19,541 arbitration demands." (*Id.* ¶ 87.) Specifically, Consovoy argues that a lawyer filing an arbitration demand for a claimant does not "qualify as an act designed to induce breach." (Mot. at 24) (internal quotation marks omitted).  Again, this is an intentional mischaracterization of Sega's claims. The mere act of filing an arbitration demand is not within itself an act meant to induce breach—it is the *manner* in which Consovoy did so.

For this reason, *SIC Metals, Inc. v. Hyundai Steel Company*, 442 F. Supp. 3d 1251 (C.D. Cal. 2020) is inapposite. The proposition for which *SIC Metals* collects cases is that a legitimate exercise of rights cannot form the basis of a contractual interference claim. *See id.* at 1256. Here, Sega alleges that Consovoy's tactics were illegitimate, insofar as it engaged in conduct meant to overwhelm Sega's and JAMS's resources in order to obtain leverage. (*See* FAC ¶¶ 87-93.)

Consovoy argues that subjecting it to liability "would effectively bar any lawyer from prosecuting a claim against Sega." (Mot. at 25.) Not so. Lawyers have before and will in the future undoubtedly bring claims on behalf of consumers against Sega in some capacity. The distinction is where those lawyers (like Consovoy has here) operate in a manner so as to force JAMS to act in a manner contrary to its agreement with Sega (and its other arbitration services customers).

### 3. *Pacific Gas & Electric Co. v. Bear Stearns & Co. does not preclude Sega's tortious interference claims*

Consovoy argues that, under *Pacific Gas & Electric Co. v. Bear Stearns & Co.,* 50 Cal. 3d 1118 (1990), Sega's tortious interference claims must be dismissed because the claims are premised on Consovoy "inducing its clients to undertake litigation against Sega." (Mot. at 14.) As a preliminary matter, Consovoy's reliance on *Bear Stearns* is misplaced because Virginia law applies. But even if California law applies, *Bear Stearns* does not help Consovoy.

To state a claim for tortious interference under California law, a plaintiff must allege that the Consovoy induced "a breach **or** disruption of the contractual relationship." *Bear Stearns*, 50 Cal.3d at 1126 (emphasis added). Thus, a plaintiff "need not allege an actual or inevitable breach of contract in order to state a claim." *Id.* at 1129. The plaintiff can allege a disruption, such as where the Consovoy's interference has made the "plaintiff's performance more costly or more burdensome." *Id.* In *Bear Stearns*, the plaintiff alleged a tortious interference claim based on a *disruption*, not a breach. *Id.* at 1130. There, the California Supreme Court considered whether defending "a costly lawsuit" constituted a disruption. *Id.* at 1130, 1137. The court held that it did not because if defending a lawsuit constituted a disruption, then anytime one person induced another to bring a lawsuit, that person would be liable for tortious interference. *Id.* at 1136. This would in turn "impair free access to the courts" and create "an end run around the limitations on the tort of malicious prosecution." *Id.* at 1133, 1137.

Here, Sega alleges that Consovoy caused Claimants and JAMS to *breach* their respective contracts. (FAC ¶¶ 21-27, 33-35, 64, 70, 77-79, 88-92.) Thus, unlike *Bear Stearns*, Sega's tortious interference claims are not based on a disruption, let alone a disruption based on defending against a lawsuit. (Mot. at 14.) Rather, Sega is alleging that Consovoy interfered with its contracts with Claimants and JAMS by causing Claimants to file the Petition and submit the arbitration demands *in a manner* that breached those contracts. As a result, this case is nothing like *Bear Stearns*, and Consovoy's argument that it precludes Sega's tortious interference claims is therefore incorrect.

### D.    Sega Has Plausibly Alleged Its Lanham Act Claim

#### 1.    *Sega has statutory standing under the Lanham Act*

The Lanham Act's statutory standing inquiry exists to determine whether "the cause of action in [15 U.S.C.] § 1125(a) extend[s] to" the plaintiff. *Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014). "To invoke the Lanham Act's cause of action for false advertising," a plaintiff must plead an injury that falls within the Act's zone of interest and plausibly allege that injury was "proximately caused by the Consovoy's misrepresentations." *Id.* at 140. The statement at issue must also be a "commercial advertising or promotion"—that is, "commercial speech for the purpose of influencing consumers to buy goods or services." *De Simone v. VSL Pharms., Inc.*, 36 F.4th at 518, 532 (4th Cir. 2022).

Consovoy misconstrues the nature of Sega's Lanham Act claim. Consovoy argues that Sega has not "alleged any … injury to its reputation or to past or future sales." (Mot. at 26.) However, the FAC expressly states that Consovoy's misrepresentations to Sega's consumers have damaged Sega. (FAC ¶ 102.) This damage comes in many forms. As mentioned, Consovoy's false advertisement has caused Sega to be threatened with excessive, non-refundable arbitration fees. (*Id.* ¶¶ 64, 73.) But Consovoy's false advertisement also damages the goodwill associated with Sega's product. Consovoy's advertisements very strongly imply to all consumers that merely

playing Sega games would entitle them to hundreds of dollars in compensation (*i.e.*, there is something inherently damaging about Sega's games). (FAC at 13–14.)[12]

For similar reasons, the FAC also establishes that Consovoy's conduct is the proximate cause of Sega's damages. That Sega's consumers are the ones who relied upon Consovoy's false advertisement, and not Sega itself, is of no consequence. *See Lexmark Int'l*, 572 U.S. at 133 ("[S]ince the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing or proximate causation required by the statute. [citation omitted]. That is consistent with our recognition that under common-law principles, a plaintiff can be directly injured by a misrepresentation even where a third party, and not the plaintiff, relied on it.") (cleaned up).

Here, Sega alleges damage to the goodwill associated with its products as a direct result of Consovoy's misrepresentations. (*See* FAC ¶¶ 97-98, 101-102.) The Lanham Act's proximate cause inquiry is meant to weed out those seeking damages for conduct that is far more attenuated. "For example, while a competitor who is forced out of business by a defendant's false advertising generally will be able to sue for its losses, the same is not true of the competitor's landlord, its electric company, and any other commercial parties who suffer merely as a result of the competitor's inability to meet its financial obligations." *Lexmark Int'l*, 572 U.S. at 134 (citation omitted) (cleaned up).

### 2.    *Sega otherwise pleads the elements of its Lanham Act claim*

A false advertising claim under the Lanham Act requires Sega to allege five elements: (1) that Consovoy made a false or misleading statement or representation of fact in a commercial advertisement about Sega's product; (2) the misrepresentation is material, in that it is likely to

---

[12] To the extent the Court believes this allegation is not sufficiently elaborated upon in the FAC, Sega respectfully requests it be given leave to amend the FAC.

influence commercial activity; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its audience; (4) that Consovoy placed the false or misleading statement in interstate commerce; and (5) Sega has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products. *See Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 298-99 (4th Cir. 2017).

As a threshold point, the advertisements that Sega reproduced in the FAC (*see* FAC at 13-14) are not intended to be exhaustive; they are mere exemplars of what Sega has a good faith basis to believe discovery will fully bear out. Even so, the advertisements in the FAC are misleading to a reasonable consumer. Consovoy cites *Freeman v. Time, Inc.* and *Verisign* for the proposition that its advertisements are mere "statements of opinion." (*See* Mot. at 28.) But the advertisements in the FAC (and possibly ones to be bore out in discovery) are representations of fact, insofar as they are capable of "being reasonably interpreted as a statement of objective fact." *Design Resources, Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 502 (4th Cir. 2015). Consovoy's advertisements in the FAC state in no uncertain terms that the mere act of "play[ing] Sonic the Hedgehog" will "likely qualify [the consumer] for hundreds of dollars in compensation." (FAC ¶ 41.) Whether the individual consumer is actually entitled to compensation can be conclusively determined by a judicial or quasi-judicial body and is therefore determinable.[13]

Contrary to Consovoy's assertions, Sega is not required to produce any "consumer survey data" at this early stage in the case. (*See* Mot. at 29.) To the extent Sega will be required to produce such consumer data, it will do so via expert testimony as this action matures.

### E.    Sega Has Plausibly Alleged Its Virginia State-Law Advertising Claim

---

[13] Nor are Defendant's advertisements "puffery," relating to "general claims of superiority." *See Pizza Hut, Inc. v. Papa John's Intern., Inc.*, 227 F.3d 489, 496 (5th Cir. 2000); *Verisign*, 848 F.3d at 303.

As set forth in Section III.A.2 *supra*, Virginia law applies to Sega's false advertising claim. Sega adequately pleads a cause of action for violation of Virginia Code section 18.2-216. Section 18.2–216 establishes criminal liability and section 59.1-68.3 provides relief for anyone who suffers a loss as a result of a predicate section 18.2-216 violation. *See BHR Recovery Communities, Inc. v. Top Seek, LLC*, 355 F. Supp. 3d 416, 427-28 (E.D. Va. 2018). "To plead a claim for false advertising, a plaintiff must show (1) an advertisement of any sort; (2) intent to sell or induce the public to enter into an obligation; (3) untrue, misleading or deceptive information, and (4) that the plaintiff suffered a loss." *Id.* (citation omitted).

Sega meets all four elements here. First, the FAC contains exemplar pictures of some of Consovoy's advertisements and an allegation that there are many others. (*See* FAC at 13-14.) Second, the FAC alleges Consovoy intended to induce the public to sign up for its services. (*Id.* ¶ 105.) Third, the FAC alleges that Consovoy's advertisements were deceptive, in that they greatly overestimated the amount of Sega customers who would be entitled to compensation. (*See id.* ¶ 106.) As set forth above, Consovoy's "statement of opinion" argument misses the mark. Finally, Sega alleges that it has been damaged by Consovoy's conduct. (*See id.* ¶ 107.)

Consovoy's argument appears to be that Sega's section 18.2-216 claim is deficient merely because Sega did not cite section 59.1-68.3 explicitly, despite clearly alleging a loss as a result of a section 18.2-216 violation. (*See* FAC ¶ 107.) To the extent the Court agrees with Consovoy's position, Sega respectfully requests that it be provided with leave to amend the FAC to add a reference to section 59.1-68.3.

## IV.  <u>CONCLUSION</u>

For the foregoing reasons, Sega respectfully requests that the Court deny Consovoy's motion to dismiss. In the alternative, if the Court is inclined to grant the motion, Sega requests that the Court grant it leave to amend.

Dated: June 27, 2025

*/s/ Paul Werner*

Paul Werner (VSB No. 48910)
Sheppard, Mullin, Richter & Hampton LLP
2099 Pennsylvania Avenue NW
Washington, D.C. 20006
Telephone: 202-747-1931
Facsimile: 202-747-3817
pwerner@sheppardmullin.com

P. Craig Cardon (admitted *pro hac vice*)
Jay T. Ramsey (admitted *pro hac vice*)
Sheppard, Mullin, Richter & Hampton LLP
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6055
Telephone: 310-228-3700
Facsimile: 310-228-3701
ccardon@sheppardmullin.com
jramsey@sheppardmullin.com

*Attorneys for Plaintiff*
SEGA OF AMERICA, INC.