UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

SEGA OF AMERICA, INC.,

               Plaintiff,

v.

CONSOVOY McCARTHY PLLC,

               Defendant.

Case No. 1:25-cv-257

**DECLARATION OF JAY T. RAMSEY IN SUPPORT OF PLAINTIFF SEGA OF AMERICA, INC.'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**

<u>DECLARATION</u>

I, Jay T. Ramsey, declare as follows:

1.      I am a partner in the law firm of Sheppard, Mullin, Richter & Hampton LLP, counsel of record for Plaintiff Sega of America, Inc. ("Sega").  I respectfully submit this declaration in support of Sega's Opposition to Defendant Consovoy McCarthy PLLC's Motion to Dismiss First Amended Complaint.  I am familiar with the facts and circumstances set forth herein.  This declaration is based upon my personal knowledge and review of the relevant documents.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the transcript of the hearing on September 4, 2024, in the matter of *Tubi, Inc. v. Keller Postman LLC*, Case No. 1:24-cv-01616 (D.D.C.), ECF No. 13.

3.      Attached hereto as **Exhibit B** is true and correct copy of the Bill Analysis on California Assembly Bill 2915, published on May 14, 2002, which was printed from the Westlaw database.

I affirm that these facts are true under penalty of perjury under the laws of the United States and the State of Virginia.

Dated: June 27, 2025

*/s/ Jay T. Ramsey*
Jay T. Ramsey (admitted *pro hac vice*)

# EXHIBIT A

```
1                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3      TUBI, INC.,
                                            Civil Action No.
4                   Plaintiff,              1:24-cv-1616

5            vs.                            Washington, DC
                                            September 4, 2024
6      KELLER POSTMAN, LLC,
                                            2:03 p.m.
7                   Defendant.
       _____/
8

9               TRANSCRIPT OF PRE-MOTION CONFERENCE
                BEFORE THE HONORABLE ANA C. REYES
10                 UNITED STATES DISTRICT JUDGE

11
       APPEARANCES:
12
       For the Plaintiff:       BRANDON FOX
13                                 Jenner & Block LLP
                                   515 South Flower Street
14                                 Suite 3300
                                   Los Angeles, CA 90071
15

16     For the Defendant:       WARREN POSTMAN
                                 ALBERT PAK
17                               KIRAN BHAT
                                   Keller Postman, LLC
18                                 1101 Connecticut Avenue, NW
                                   Suite 1100
19                                 Washington, DC 20036

20

21

22

23     Court Reporter:          JEFF HOOK
                                   Official Court Reporter
24                                 U.S. District & Bankruptcy Courts
                                   333 Constitution Avenue, NW
25                                 Washington, DC 20001
```

**P R O C E E D I N G S**

1            **DEPUTY CLERK:**  We're in civil action 24-1616,

2 Tubi, Inc. vs. Keller Postman, LLC.  If I can have counsel

3 please approach the podium and state your names for the

4 record, starting with counsel for the plaintiff.

5            **MR. FOX:**  Good afternoon, Your Honor.  Brandon Fox

6 on behalf of plaintiff Tubi, Inc.

7            **THE COURT:**  Hello, Mr. Fox.  Mr. Fox, you're with

8 Jenner & Block?

9            **MR. FOX:**  That is correct, Your Honor.

10            **THE COURT:**  Yeah, Jenner & Block refused to give

11 me a summer offer when I was a 2L, because clearly I was

12 going nowhere.

13            **MR. FOX:**  Our mistake, Your Honor.

14            **THE COURT:**  I mean, it's fine, it's totally fine,

15 whatev.  It didn't like impact me at all.  It's not like I

16 thought about it, sadly, for the last 23 years.  I mean, you

17 did give my friend Kathleen Hartman an offer.  I have to

18 say, you know, even if Kathleen were here, I would challenge

19 her as to who the better lawyer is.  But we're at least

20 even-steven.

21            **MR. FOX:**  Let me know if it's time to pull out the

22 Carlton Fisk reference that I've been holding in my back

23 pocket since --

24            **THE COURT:**  You might want to pull it out right

1    now.

2        **MR. POSTMAN:** Good afternoon, Your Honor. Warren

3    Postman of Keller Postman, the defendant. And I'm here with

4    Albert Pak and Kiran Bhat.

5        **THE COURT:** Okay. So I read through your papers,

6    and I have a couple of questions for you, Mr. Fox, which I

7    had -- okay. So first of all, your complaint alleges that

8    you all have -- that Keller -- that you all have to pay

9    arbitration fees?

10        **MR. FOX:** That Tubi will have to, yes.

11        **THE COURT:** Will Keller also have to pay those

12    fees?

13        **MR. FOX:** Mr. Postman will have to answer that

14    question. I don't know what arrangement they have with

15    JAMS. We don't see the invoices that --

16        **THE COURT:** Mr. Postman, come up.

17        **MR. FOX:** -- they receive. I believe that they

18    will not be required to under the arbitration rules that

19    JAMS has set. But, again, Mr. Postman will know that better

20    than me.

21        **THE COURT:** You guys both stay up.

22        **MR. POSTMAN:** Is it okay if I speak from here?

23        **THE COURT:** Yeah, but you need to be by the mic.

24        **MR. POSTMAN:** Yes. My understanding is that

25    there's a small portion of that that will be the claimant's

1    portion, and then the lion's share will be the defendant's

2    portion.

3            **THE COURT:**  Well, how large are we talking?

4    Because they're talking they're going to have pay -- they

5    were going to have to potentially pay $46,000,000.

6            **MR. POSTMAN:**  So I believe it would be around

7    $4,000,000 for the plaintiffs -- is that right?  Because

8    it's around $200 per person times 23,000 claimants.

9            **THE COURT:**  All right.  Mr. Fox, I'm just -- I'm

10   torn, and obviously I'm going to let you guys brief this.

11   Sometimes I have these pre-motion conferences and we

12   actually get rid of motions, even dispositive motions.

13   You'd be surprised how often that happens.  Lots of times I

14   have these and I give people my initial impressions, and

15   then I shoot them off to mediation and the case settles

16   because they know what I'm thinking.  And then sometimes,

17   probably like a case like this, I have them so you all know

18   sort of what my concerns are and my questions are, and

19   hopefully that makes your briefing more effective.

20           So Mr. Fox, you can sit down for a bit.  So the

21   reason -- no, no, I'm sorry, you can sit down for a bit,

22   Mr. Fox.

23           So the reason this is a really interesting

24   complaint for me is -- so, I understand well and fully,

25   F-U-L-L-Y, how the class action system works in terms of

1    forcing settlements in cases that don't survive a motion to

2    dismiss or class certification.  And that given the large

3    amount of settlement, a large portion of that will go to

4    plaintiffs' attorneys, and a minute portion of that will go

5    to the individual plaintiffs.  I have received class action

6    checks for less than a dollar, right.  And I understand that

7    most of those don't ever get deposited.  And then, you know,

8    there's a provision for what happens to the leftover funds,

9    right.

10          And I certainly understand -- in a way that's not

11   disparaging to plaintiffs' attorneys, it just is what it is,

12   that if you've got 24,000 claims together, obviously the

13   plaintiffs' lawyers are going to get much more than any

14   individual plaintiff, and that that would be a driving force

15   for litigation.  My problem is that that's the way it works.

16   So a lot of the things that you're challenging are that's

17   the way it works.  And I don't know that by saying:  Yeah,

18   but they're not doing this in the clients' best interests,

19   they're doing it in their best interests, gets you very far,

20   because that's every single case that is structured like

21   this.  And I also don't know how we're going to get into

22   their communications with their clients without invading the

23   privilege.  You certainly haven't shown fraud enough to do

24   that.

25          So can you just sort of -- and also, if the

1   arbitrator decides that the plaintiffs -- or the petitioners

2   do have the right to go directly to arbitration and not

3   first to this whatever you did, coming to me to say that

4   that's wrong in a case against a lawyer seems to me like a

5   way to evade the FAA's constraints on my power to review

6   things.  I mean, this feels like -- this is not disparaging

7   at all, but what this feels like is a way around a case that

8   falls within the system in a way that's particularly bad for

9   your client here, but isn't really all that different from

10  others.

11          MR. FOX:  May I respond, Your Honor?

12          THE COURT:  Of course, yeah.

13          MR. FOX:  Talking about that -- I think it was the

14  first and last issue that you raised, and what's different

15  here is the tortious interference component, which of course

16  is what this complacent is all about.  In a class action, if

17  there has not been tortious interference by a law firm, they

18  have complied with whatever rules are out there.  They have

19  not breached any contracts.  They have not failed -- caused

20  their clients to fail to perform anything.  So that's what

21  we've alleged here, is that this is a failure to perform

22  that they caused without the inform consent of their clients

23  which --

24          THE COURT:  Sir, you need to slow down.

25          MR. FOX:  Okay, yes, Your Honor.  Which is very

1    different than a class action standpoint.  So here, unlike a

2    --

3         **THE COURT:**  But there are plenty of class actions

4    where -- I mean, I see -- look, I did products liability

5    work, and I would see commercials asking people to call in

6    if you have a claim about X drug.  And I would think, I know

7    everything there is to know about X drug, and I'm telling

8    you right now that this is BS.  I would just say that in my

9    head out loud -- or out loud in my house.  And I would, you

10   know, say it nicer in court.

11        But how is that different just because they're

12   going to the internet as opposed to the television?

13        **MR. FOX:**  Certainly what we believe is the

14   specious nature of the claim matters, but that's not what

15   the centerpiece of this case is about.  This, again, is

16   about them interfering with Tubi's rights under the terms of

17   use to have this pre-arbitration dispute process.

18        **THE COURT:**  But that assumes that you're right

19   about that and they're wrong about that.  And that's the

20   point, if the -- if your arbitrator ends up agreeing with

21   them, and you come back to me and say:  That's just wrong,

22   we are entitled to it, I would basically be overturning the

23   arbitrator's decision on a different standard of review than

24   I'm actually allowed to use under the FAA, because you've

25   gone around and sued the law firm.

1    **MR. FOX:**  Well, a few different things on that,

2    Your Honor.  First of all, they are not bound by the terms

3    of use.  We can't litigate this against Keller Postman in

4    arbitration, because they are not bound by the terms of use.

5    So there's only one way for us to litigate this issue

6    against the law firm, it's in court.  And they, according to

7    the allegations in the complaint -- which as you know, Your

8    Honor, you must take as true, they have breached this

9    provision; they've caused their clients to breach this

10   provision.  The only way for us to maintain our case is in

11   court, in federal court in this case.  And unlike a class

12   action, they have individual obligations with respect to

13   each one of their clients.  All 24,000 they have an

14   attorney-client relationship with.  And they, in this case,

15   have caused 24,000 --

16        **THE COURT:**  Well, how is that different from a

17   class action?  A class action lawyer doesn't have an

18   attorney-client relationship with each of the class members?

19        **MR. FOX:**  They don't need to vet each individual's

20   claims in the same way.  They brought 24,000 individual --

21   it's like in court, Your Honor, if they were to bring 24,000

22   civil complaints.  That's what this is like.  And it's been

23   consolidated within JAMS, but there's still 24,000

24   individual arbitration demands.  I know you have a lot of

25   experience in arbitrations, this is a different animal.

1    This is a mass arbitration system that they have created.

2    They figured out some loopholes, but what's unique about

3    this case is that they caused their clients to breach

4    without the informed consent of their clients.  They put

5    their clients in a position without informed consent.

6         You asked about communications without invading

7    the privilege, and there are many ways of us proving this.

8    You can ask Mr. Postman, first of all, if they obtained the

9    informed consent of their clients.  That's not privileged.

10        **THE COURT:**  Wouldn't that be invading the

11   privilege?

12        **MR. FOX:**  To say that we obtained the informed

13   consent of our clients I don't think is privileged.  It's

14   not talking about the advice given back and forth, it's just

15   saying they made the decision and we carried it out.  If you

16   think about this --

17        **THE COURT:**  They can't ask them any questions

18   about communications they had with a client or how they

19   got the informed consent or what they asked for in the

20   informed consent.  I mean, maybe they can and I'm just

21   wrong, but it seems odd to me.

22        **MR. FOX:**  If you think about like a privilege log,

23   Your Honor, they would have to produce a privilege log of

24   their communications with their clients.  That is something

25   that is admissible, and it is something -- based on a

1    privilege log, who did you communicate with, what was the

2    subject matter of the communication. That certainly is

3    something that they can answer. I honestly don't know

4    whether it will be disputed by Keller Postman whether they

5    obtained the informed consent. My guess --

6         **THE COURT:** Well, let's find out. Are you all

7    disputing that: Yes or no?

8         **MR. POSTMAN:** Yes, Your Honor.

9         **THE COURT:** Okay, they're disputing it.

10        **MR. FOX:** I'm sorry?

11        **THE COURT:** They're disputing it.

12        **MR. FOX:** Oh, they're disputing that issue. Thank

13   you, Your Honor. It will be interesting to see how they

14   dispute it. In the complaint -- it sounds like it will be a

15   factual dispute. In the complaint, we've alleged that they

16   do not have the informed consent.

17        **THE COURT:** Yeah, I know. I know, yeah.

18        **MR. FOX:** So one of the ways that we believe that

19   we can prove it is through circumstantial evidence. Again,

20   24,000 claims -- individual claims filed against Tubi after

21   they'd been advertising for a month. For them to

22   communicate with 24,000 people and to obtain informed

23   consent addressing all the risk factors and the problems

24   with going forward in this manner would have been impossible

25   to do over the course of one month, which is what they did

 1    when they started advertising in March.

 2            THE COURT:  And what's the individual damages

 3    claim for each award?  Like, what are we talking about here,

 4    a hundred bucks, 75 bucks, a thousand bucks?

 5            MR. FOX:  For the individual claims?

 6            THE COURT:  Yes.

 7            MR. FOX:  They're alleging, what they've put into

 8    the arbitration demands, 24,000 times 16,000.  They say at

 9    least $16,000 per claim is what they've alleged.  So they're

10    alleging --

11            THE COURT:  On what basis are they asking -- this

12    is a subscription service?

13            MR. FOX:  Excuse me, Your Honor?

14            THE COURT:  This is a subscription service, like a

15    TV thingamajig?

16            MR. FOX:  It's free, it's a free service, you can

17    register.  They're alleging damages of $16,000.  There's

18    statutory damages under the Unruh Act.  This is a

19    discrimination statute that is 70 years old, and now firms

20    like Keller Postman are trying to apply it to targeted

21    advertising which everybody in the country gets every day

22    and has for decades.  This is not new.  It might be new

23    technology, but targeted --

24            THE COURT:  I'm sorry, they're claiming that the

25    advertising -- we're going to have a -- okay.

1          MR. FOX:  Yes.

2          THE COURT:  I understand it's not your allegation.

3          MR. FOX:  And Your Honor, I should say that in

4     their individual demands for arbitration, they provided zero

5     detail about what targeted advertising their clients saw or

6     didn't see.

7          THE COURT:  Yeah, I know, they claim

8     discrimination, but they don't even tell you the age of the

9     client.  I got it.

10          MR. FOX:  The age, what commercial they wanted to

11     see but didn't see, what action they took as a result of it

12     or didn't take.  This was all done to cause Tubi to face

13     these extraordinary arbitration fees so they could have

14     leverage.  And what's proven by that is they issued -- even

15     after knowing that a third of their claims did not involve

16     registered users after we put them on notice to that effect,

17     they said okay, and they issued $3,000 -- I'm sorry 24,000

18     letters asking for $3,000 each to settle the case.  This is

19     not privileged -- part of a settlement privilege or anything

20     like that.  They asked for $71,000,000 that would include

21     $3,000 for every user and those who are not users.

22          THE COURT:  What's the current status of the

23     arbitration?

24          MR. FOX:  So that's a great question, Your Honor.

25     We went through the rank and --

1     THE COURT:  That's what I get paid to do -- not as

2  much as I used to get paid to do the same thing, but go

3  ahead.

4     MR. FOX:  We went through the rank and strike

5  process.  There was a perfectly good arbitrator who JAMS had

6  selected at that point.  And Keller Postman decided that

7  they don't like the consolidation, so they asked for on

8  behalf of -- I'll try to get the numbers right, 23,242

9  claimants to have her disqualified; and on behalf of 424

10  claimants, to not have her disqualified.  JAMS has not taken

11  them up on that.  They're saying an all or nothing approach.

12  So now we have a new arbitrator who's been appointed, and I

13  would guess in about 10 days we're going to be seeing a

14  similar filing by Keller Postman that's going to say on

15  behalf of a certain number of claimants, they're going to

16  disqualify her, and on behalf of a certain number, they're

17  not going to disqualify her.

18     THE COURT:  Is that what's going to happen in 10

19  days?

20     MR. POSTMAN:  We are communicating with our

21  clients about what they want to do, but --

22     THE COURT:  Are you representing to the Court

23  right now that you're having a communication with 24,000

24  people to explain to them the situation, and you're getting

25  responses back from those people?

1    **MR. POSTMAN:** Yes, Your Honor.

2    **THE COURT:** Okay, all right.

3    **MR. FOX:** So --

4    **THE COURT:** Well, let me ask you, is this what

5    we're going to keep doing? Because you're not going to get

6    24,000 people to agree on something. I don't know how lay

7    people would even have knowledge to whether to object or not

8    object.

9    **MR. POSTMAN:** There's a lot to say about the

10   way -- our disagreements about how the arbitration should

11   proceed. But to answer your question directly, I do expect

12   this will keep happening. And that illustrates the

13   significance of the dispute we have about how the

14   arbitration should proceed. So I'm happy to go into that,

15   but I want to just answer your question.

16   **THE COURT:** Yeah, well, we're going to get into

17   it. Hold on one second.

18   **MR. FOX:** Your Honor, may I address one --

19   **THE COURT:** I'm just -- hold on one second.

20       (Discussion off the record)

21   **THE COURT:** I might have to take a quick break at

22   2:30 to deal with something else, but that should be quick,

23   because we're not going to be done by 2:30.

24       Can you cancel the 3:00 o'clock and just

25   reschedule that?

1          **DEPUTY CLERK:** Sure, Your Honor.

2          **THE COURT:** What's the disagreement as to how the

3    arbitration should proceed?

4          **MR. FOX:** They still are trying to break it apart.

5    It's been consolidated. They're taking --

6          **THE COURT:** You want 24,000 arbitrations?

7          **MR. FOX:** They want the fees that go along with

8    the 24,000 arbitrations is the real answer, Your Honor.

9          **MR. POSTMAN:** He's spoken to what my motive is, so

10   may I please explain the broader context here? I think it's

11   a little unfair.

12         **THE COURT:** You can be seated, Mr. Fox.

13         **MR. POSTMAN:** I think an important starting point

14   is that the way this works is actually as a result of a

15   contract Tubi drafted. And we've seen this pattern over and

16   over for six years at our firm. Corporate defendants, as

17   you well know, don't like class actions -- that's entirely

18   fair. In order to avoid the ability of plaintiffs to bring

19   class actions in relatively modest value consumer claims,

20   they invoke the FAA -- you're familiar with the precedent --

21   to say we will require individual arbitration. And they

22   draft the agreements, which forum it will go to, the

23   specific rules. And the agreement in question here, in

24   order to eliminate what I would view as the most efficient

25   method to resolve a very standardized consumer claim with

1    statutory damages, the agreement says you all must bring

2    individual arbitrations.  And when you read the agreement,

3    our clients were promised, in my view, an individual

4    arbitration.  Over the past six years --

5         THE COURT:  But first they have to go through some

6    hoops.

7         MR. POSTMAN:  Correct, a 45-day notice period in

8    this agreement.  Over the past six years, my firm has

9    specialized in advertising for claims that we think are well

10   founded and are very standardized.  Here, I think it would

11   be helpful to just lay out what the claim is.  We touched on

12   it briefly.

13        THE COURT:  Yeah, please explain to me how you get

14   $16,000.

15        MR. POSTMAN:  Yes.  The California Court of

16   Appeals, in a case called Liapes v. Facebook, held the

17   California civil rights statute is violated when, in that

18   case, Facebook -- or we think any digital platform, allows

19   advertisers to discriminate on the basis of age or sex.

20        THE COURT:  Can you explain that to me?  How do

21   advertisers discriminate on the basis of age, for example?

22   Give me an example.

23        MR. POSTMAN:  They allow -- Facebook, and we

24   allege Tubi, allow you as an advertiser to -- when you're

25   placing ads, to say please show this only to women; I want

1    my ad to be shown only to women or only to young people.

2    And one can argue about whether that's good policy to

3    prohibit that, but the California Court of Appeals --

4            THE COURT:  But California has a supreme court,

5    no?

6            MR. POSTMAN:  Which denied review, and denied

7    Facebook's request that the Court of Appeals decision be

8    depublished so that it wouldn't be precedential.  So we

9    have --

10           THE COURT:  Well, it's not precedential on me.

11           MR. POSTMAN:  No, of course not, I'm just --

12           THE COURT:  No, just -- well, go ahead.

13           MR. POSTMAN:  I'm just noting that these are very

14   well founded claims in the law.  We have a disagreement --

15   well, we have a Court of Appeals in California saying that

16   California law prohibits this.  We have a disagreement with

17   Tubi about what needs to be shown.  On our reading of the

18   decision, any user of a platform who is subjected to

19   discrimination under this Liapes decision is entitled to

20   $4,000 per violation.  It's a civil rights statute, it's a

21   very stiff remedy.  And I would just say one can --

22           THE COURT:  There's no way -- I mean, I haven't

23   read the Court of Appeals decision.  I will, trust me, read

24   it.  I don't know that you're asking me to look at it, that

25   it's at issue in this case.  But now just because I'm

1    interested --

2         MR. POSTMAN:  Sure.

3         THE COURT:  -- it seems cockamamie to me that you

4    can go to -- I mean, it would be like saying it's

5    discriminatory for an advertiser to put an ad about women

6    products in the time during ABC showing soaps, because far

7    more women see soaps than men; or that it would be

8    discriminatory to put such an ad -- to place such an ad with

9    a women's magazine, because far more women read women's

10   magazines.

11        I mean, is that what the court held?  Because that

12   cannot --

13        MR. POSTMAN:  I don't think it --

14        THE COURT:  -- have possibly been the

15   congressional -- the legislative intent in California.

16        MR. POSTMAN:  I don't think the Court of Appeals

17   decision goes as far as the fact patterns you describe.  But

18   I will say --

19        THE COURT:  That would be the obvious carrying it

20   forward, right?  I mean, the same reasoning would apply.

21        MR. POSTMAN:  I think there's a --

22        THE COURT:  What is the cite for the California

23   decision, by the way?

24        MR. POSTMAN:  It's Liapes v. Facebook, 95

25   Cal.App.5th 910.  And two points if I could, Your Honor, on

1    your reaction -- which I understand.  One, we can attach in

2    our briefing the brief from Facebook's counsel when they

3    filed a request for the California Supreme Court to

4    depublish it about what they thought the decision said.  And

5    they thought it meant that what we say, which is when you

6    not merely make a decision about where to place your ads,

7    but you expressly distinguish which ad gets shown to whom on

8    the basis of a protected characteristic, that's a violation.

9    And I'll --

10            **THE COURT:**  How on earth is that discrimination?

11   I'm just so baffled.  How on God's green earth is that

12   discrimination?

13            **MR. POSTMAN:**  Well, look --

14            **THE COURT:**  I mean, would it be discrimination if,

15   I don't know -- I went on a hiking trip last month.  It was

16   lovely.  I started buying some hiking stuff.  All of a

17   sudden, every time I go anywhere, there's an ad for hiking

18   stuff.  Now, they're not sending those same ads to other

19   individuals who haven't looked into hiking stuff.

20            Is that discriminatory?

21            **MR. POSTMAN:**  Of course not, because they're

22   targeting based on your interest in hiking.  The harm that

23   California was getting at -- and look, California has very

24   different politics and legislature than Virginia.  I think

25   what they're getting at is the idea that advertisers in an

1    advertising platform should not, for example, allow people

2    to indulge in the assumption that if we're talking about

3    financial products or insurance or banking, that should just

4    get shown to men, women aren't interested in that.

5         **THE COURT:**  Well, that's just bad advertising.

6         **MR. POSTMAN:**  I appreciate that perspective, I do.

7    I think in many states, your intuition would govern the law.

8    You'll look at the opinion, you'll make your own assessment.

9    I think that we have strong precedent to support our claims

10   that this violates California law.  So I wanted to just

11   address the claims, but it's also relevant to this

12   allegation that we're doing cookie-cutter complaints.  The

13   very nature of our theory is standardized.  It's one that

14   would have been in a class, it's the same policy.  And on

15   our view of the law, as we'll explain in our brief, we need

16   very simple, straight-forward facts to show a violation and

17   statutory damages.

18        Now, what Tubi has done, and what dozens of

19   defendants have done, is when we then invoke their

20   agreement -- which they wrote, and in our opinion requires

21   individual arbitration, they cry foul and say it's extortion

22   and abusive to make them comply with the very procedures

23   they wrote.  And what we will put in our brief is a list of

24   cases where court after court -- and we hope you, will

25   recognize that this is hypocrisy.  They wrote the

1    provisions.  They had very good reason to think it would

2    benefit them in certain ways.  They didn't expect that a law

3    firm would then say:  You know what, we're going to take you

4    up on your offer; we're going to, at great expense, go find

5    all the people individually who are affected, and we'll file

6    their claims individually.  They have real claims, and no,

7    we're not going to suddenly revise the process to --

8         **THE COURT:**  So let me ask you this:  When you take

9    in the individual, do you -- before you file a claim on the

10   individual's behalf, do you do an individualized assessment?

11   Do you say -- do you make sure that that individual is X

12   gender and saw X ads that you believe were discriminatory?

13        **MR. POSTMAN:**  As we'll explain in our brief -- and

14   I hasten to add, this goes to the underlying merits of the

15   claim, we have a very --

16        **THE COURT:**  No, no, no, this goes to what their

17   claim is.  Their claim is you guys just get all these people

18   on board and then file claims on all their behalves, which

19   there's no way you would be able to do that in federal

20   court.  If you brought to me 24,000 individual cases with

21   one legal question -- and pretend there was no class action

22   world, you would not be able to file all of those complaints

23   under Rule 11 unless you satisfied yourself that these

24   people actually had claims.

25        **MR. POSTMAN:**  That's absolutely true, Your Honor.

1    What I'm saying is we do not believe what you outlined of

2    the gender of the claimant matters.  Because every person,

3    regardless of their gender, is under the theory in Liapes.

4    Men and women are being shown gender-conforming --

5            **THE COURT:**  But you have to at least prove that

6    they saw discriminatory ads.  Just the fact that there are

7    ads in the ether is not a claim.

8            **MR. POSTMAN:**  That is a subject --

9            **THE COURT:**  Okay.  So do you do that assessment

10   before you take that person -- before you file a claim on

11   their behalf?

12           **MR. POSTMAN:**  We do some assessment that

13   ultimately they possess the information about which specific

14   ads --

15           **THE COURT:**  No, no, no, no.  That's insane, no.

16   If you're bringing a claim on behalf of a client based on

17   they were discriminated against because X ad was shown to

18   them only or not shown to them because of some issue, then

19   you're going to have show that they were like at least in

20   the ballpark of where the ads are.

21           **MR. POSTMAN:**  Yes, Your Honor, we do investigate

22   whether they were shown ads.  But it's important that --

23   there's a whole bunch of facts about the way the platform

24   works that, with respect, we haven't had an opportunity to

25   present to you.  We believe --

1          **THE COURT:**  But you're suing them because they

2    allow discriminatory ads on their platform?

3          **MR. POSTMAN:**  Correct, it's an ad-supported -- so

4    it's a free video service --

5          **THE COURT:**  Do you -- I mean, they say that there

6    are thousands of people who don't even have a subscription

7    to their service.  Do you assess whether or not people have

8    subscriptions?

9          **MR. POSTMAN:**  We do assess, and we dispute their

10   allegations.  So if I could --

11         **THE COURT:**  I mean, it seems like that's a pretty

12   easy yes or no.

13         **MR. POSTMAN:**  Yes, we assess.

14         **THE COURT:**  No, no, no, I'm sorry.  It seems

15   pretty easy to me to be a yes or no that they were either a

16   subscriber or they weren't a subscriber.

17         **MR. POSTMAN:**  Well, I would think so, too.  So my

18   point about having been through this before, what has

19   routinely happened is defendants, when faced with having to

20   deal with all these claims, get extremely upset and sharp

21   elbowed.  And on this very point --

22         **THE COURT:**  Hold on, hold on, hold on.  Lawyers

23   are sharp elbowed.  People don't like getting sued.  That is

24   their job, just like it's your job as a plaintiff's attorney

25   to be sharp elbowed on behalf of your clients.  So of course

1    they're going to resist your litigation tactics.  You're

2    asking them for millions of dollars.  I mean, I refuse to

3    hear any of that in my courtroom on any case, unless you

4    have proof that someone is being unethical.  Because all of

5    this complaining back and forth about, oh, he's being unfair

6    or she's being unfair, you guys are lawyers representing

7    entities or clients with a whole lot of money at stake.

8    There are going to be sharp elbows.  Hold on, I'll let you

9    respond to that, but then we're going to break real quickly.

10           MR. POSTMAN:  I appreciate the comments and hear

11   it.  My only intent in that was to ask the Court to take

12   both sides with a grain of salt on this point and let us

13   brief the issue.  Their mere assertion, I think, is

14   unfounded, and in these other cases we've proven that to be

15   the case.

16           THE COURT:  I'm certainly going to let you all

17   brief this.  We're going --

18           MR. POSTMAN:  That was the only --

19           THE COURT:  -- to have a long hearing on the

20   briefing.

21           MR. POSTMAN:  Sorry to talk over you.

22           THE COURT:  Yeah, yeah, that's fine.

23           MR. POSTMAN:  That was the only meaning behind it.

24   Did you want me to pause there?  You sounded like you wanted

25   to --

| | |
|---|---|
| 1 | **THE COURT:** Yeah, because I just want to get rid |
| 2 | of these guys quickly. |
| 3 | (Proceedings recessed at 2:30 p.m.) |
| 4 | (Proceedings resumed at 3:01 p.m.) |
| 5 | **DEPUTY CLERK:** Your Honor, we're recalling civil |
| 6 | action 24-1616, Tubi, Inc. vs. Keller Postman, LLC. Your |
| 7 | Honor, all the parties who were previously before the Court |
| 8 | are currently before the Court. |
| 9 | **THE COURT:** Mr. Postman, do you want to come back |
| 10 | up. I think you wanted to finish saying some things. I |
| 11 | don't want to cut you off if you did. |
| 12 | **MR. POSTMAN:** No, thank you, Your Honor. I guess |
| 13 | I would, if I could, just turn to what I think is the |
| 14 | central legal question in this case which, as I would frame |
| 15 | it, is whether Tubi can state a claim for tortious |
| 16 | interference based on essentially a disagreement with |
| 17 | the legal strategy taken by their opponent's counsel. We've |
| 18 | noted -- and I think we sort of agree on the standard here, |
| 19 | it's under Goldschmidt and these other cases, was Keller |
| 20 | Postman acting with malice or bad faith, which the cases |
| 21 | define as a motive independent of their clients. They try |
| 22 | to say we were, but under Twombly and Iqbal, the legal label |
| 23 | they were acting for their own interest isn't enough. The |
| 24 | facts actually have to plausibly show that. And the only |
| 25 | interest they've said we have is to make money on a |

1    contingent basis, which would be derivative of our clients

2    getting a recovery.  So they say it was a bad legal strategy

3    that's going to be bad for the clients, but it was to serve

4    Keller Postman's interests -- implicitly, to give our

5    clients leverage.

6         And so the heart of this case, I wanted to speak

7    to the broader context of how this is a set of rules that

8    they essentially drafted.  And taking our read of them, the

9    heart of this case for me is that they're taking their

10   read -- which they're entitled to do, but they're then

11   jumping from we have a different view about the legal

12   requirements here, both under Liapes and under the rules at

13   JAMS and under the proper interpretation of the agreement.

14   And because Keller Postman took a different read of those

15   and advised its clients to do something that gave their

16   clients more leverage, they've committed a tort.  And I

17   think that's what the cases reject.  And they reject it for

18   a good policy reason, which is that if that were allowed, it

19   would sort of devolve into every time we -- as you said,

20   there's a lot of sharp elbows, and so you can always say the

21   other side is being tortious.  And I don't think that's what

22   the cases want to happen, and I think that's really the

23   heart of this case and what our motion will be.

24        **THE COURT:**  What their motion would be, your

25   opposition?

1    **MR. POSTMAN:**  Our motion to dismiss.

2    **THE COURT:**  Oh, right, right, yes.  Your motion to

3    dismiss, sorry, of course.  So let me ask you this, though:

4    Let's say there was a law firm, let's call it Reyes &

5    Associates.  My uncle actually was a lawyer in Spain and did

6    have a Reyes law firm; different era.  Reyes & Associates

7    does everything that you've done.  The facts are exactly as

8    they are, the only difference is instead of your firm, Reyes

9    & Associates is the defendant.  Everything else is exactly

10   the same, okay.  And they get -- and Reyes & Associates has

11   brought the claims that you have brought.  They even reached

12   out to every single claimant and got their informed consent.

13   That was proven up by Reyes & Associates.  But they get

14   discovery, and they find in Reyes & Associates' internal

15   documents that Reyes and her associates said to each other:

16   Oh, what an easy way to make money; Let's just get all these

17   claimants, push them through arbitration; Ha ha ha, they're

18   going to get their due, because now they're going to have to

19   actually litigate each of these arbitrations.

20          There's no way that they're going to be able to do

21   that.  It's going to force a settlement, as all class

22   actions are typically forced to settlement if they survive a

23   motion to dismiss, class certification and a motion -- you

24   know, whatever.  And we don't really -- yeah, the clients

25   will get money, but we're not just doing this because the

1    clients will get money, we're doing this because we want

2    money even though we know, A, that the arbitration procedure

3    that we're using is wrong because we've skipped this

4    standard, and B, that the actual claim is worthless.

5            MR. POSTMAN:  I may be --

6            THE COURT:  Would that be -- I understand -- this

7    is why I very specifically used a very different law firm

8    name.  I understand you would contest all of this, but would

9    that be a recognizable claim against Reyes & Associates?

10           MR. POSTMAN:  No, Your Honor.

11           THE COURT:  Why is that?

12           MR. POSTMAN:  Because as I read the cases -- and I

13   think the policy they're pursuing, this would need to be the

14   answer for that to be preserved, is that a parallel

15   motive -- you know, lawyers -- and I won't agree to the part

16   about -- that Keller Postman's doing the part where the

17   claims are meritless and frivolous and all that.  But I

18   will --

19           THE COURT:  That's why I used Reyes & Associates.

20           MR. POSTMAN:  -- agree that we want to make money,

21   and --

22           THE COURT:  Well, you're a plaintiff's law firm,

23   of course you do.

24           MR. POSTMAN:  The fact that we want to make money

25   along --

1      **THE COURT:**  I should have been a plaintiff's

2   lawyer, I would have made a lot more money.

3      **MR. POSTMAN:**  But the parallel motive is not

4   independent of.  And I think it would gut the Goldschmidt

5   test to say these lawyers didn't -- they talked about the

6   money they were going to make, they didn't just talk about

7   the money they were going to make for their clients.  So

8   we'll brief it, but I think the test has real teeth, and it

9   has to.  It can't be a dependent profit motive, it has to be

10   an independent profit motive.

11      **THE COURT:**  Would that be the case even if you

12   recognized -- even if Reyes & Associates recognized that

13   there was no legal merit to their claims?

14      **MR. POSTMAN:**  I don't want to be overly lawyerly,

15   that's obviously a different case.  As I read the test --

16   it's not my fight in this case.  I believe, but I think

17   under the test, that there would potentially be sanctions in

18   the arbitrations if they brought a meritless case.  But it's

19   not a tort to say I'm going to bring a case that's meritless

20   for a client who wants me to do it, and get paid if they get

21   paid.

22      **THE COURT:**  Okay.  But you recognize that for now,

23   I have to take their complaint as true, right?  And their

24   complaint definitely alleges that you weren't doing it in

25   your clients' best interests.

1          **MR. POSTMAN:**  Well, as we'll put in our motion, I

2     really do think that's a conclusory legal label in the

3     Twombly and Iqbal sense.  The actual facts they allege --

4     and on page three, I think, of their letter they do this,

5     they say:  Oh, no, no, we address that; we say that it would

6     harm the clients because their claims might lose, but it

7     would help Keller Postman because they get a settlement.

8     But with respect, that doesn't square the circle.  They

9     can't just keep saying it might be bad for your clients, but

10     you think it will be good for your clients.  They have to

11     say it will be bad for your clients while in the same state

12     of the world being good for you, and they can't allege that.

13     And there's enough facts in the complaint to make clear that

14     they can't allege that.  We just don't have that possibility

15     of doing well if our clients don't do well.

16          **THE COURT:**  It's just that it seems to me, when

17     you boil down to it, what they're claiming is extortion;

18     they're claiming that you're extorting them.  I mean, at the

19     end of the day, they're Jenner & Block, clearly a law firm

20     quite more capable than I am of understanding the law.  They

21     dress it up in tortious interference, and not a bad tort.

22     But at the end of the day, what they're really saying is:

23     You're extorting us.

24          And what I'm going to talk to Mr. Fox about for a

25     moment here is whether a law firm can extort a defendant.  I

1     mean, it's just -- whether a plaintiff's law firm can extort

2     a defendant.  I mean, that seems wrong to me, just like it

3     seems wrong to me that I can dismiss at a motion to dismiss

4     stage a claim that does basically allege that you're

5     extorting them.

6             MR. POSTMAN:  Well, I'll skip over the umbrage I

7     would want to take at that and just say that I think -- to

8     the point about them alleging we're extorting them, I think

9     that is sort of the undercurrent of what they're saying, I

10    agree with you.  Extortion is the wrongful threat -- sorry,

11    in order for a benefit.  There is a disagreement about

12    whether what we're doing is wrongful.  And they have written

13    a set of rules that lay out in a ton of detail the process

14    for deciding that, which is in arbitration.  And so they're

15    now trying to --

16            THE COURT:  But you agree that that's all -- but

17    the fact that they -- that you -- that's how you cast it, I

18    mean, you agree that that's all fact based, right?  I mean,

19    the trouble that I'm having is that they seem to be making a

20    lot of fact based arguments, and your response seems to

21    be -- because that's one of the best responses you have,

22    that the facts don't matter; like, even if they're right

23    about the facts that we're motivated to make money, yeah,

24    duh; we're lawyers representing plaintiffs, that's why we do

25    this.

1          **MR. POSTMAN:**  Two points on that.  I would say the

2     legal requirement -- so what's required under Liapes and

3     what's required under the JAMS rules that, I think, they're

4     referenced in the complaint, and you can take notice and

5     make your own legal assessment of what the legal regime is.

6     And I would suggest that the legal regime, the contract they

7     wrote that you can take cognizance of, says that this

8     question is for JAMS.  So that's point one.  And then two,

9     on the --

10         **THE COURT:**  The question of?

11         **MR. POSTMAN:**  Of whether we acted in a completely

12    meritless way.

13         **THE COURT:**  Their tortious interference claim is

14    for JAMS, is that your argument?

15         **MR. POSTMAN:**  The tortious interference claim

16    depends on legal conclusions that, you know, our clients had

17    not alleged enough; that the standard under Liapes requires

18    showing more.  All of that -- that we had to do the

19    prefiling notice requirement.  All of this is about saying

20    our clients violated the legal requirements that apply to

21    them.  And they have an agreement -- which under the FAA, as

22    you noted, courts are supposed to defer to, and defendants

23    are routinely asking courts to defer to, that says

24    arbitrators decide all those questions.  That's point one.

25         Point two is -- and we'll, of course, brief this.

1    I really do think this is a classic Twombly and Iqbal

2    situation where a party is saying, legal label, they're

3    acting with malice.  And then if you read all their

4    allegations, it's just not plausible.  Malice is present in

5    the way the case is defined at this point, that --

6         **THE COURT:**  I think that's not giving their

7    complaint its fair due.  I mean, with respect, they had a

8    lot of allegations about how your client behaves; about the

9    fact that it does not get informed consent before filing a

10   claim; that thousands -- hundreds, if not thousands, of

11   people didn't have subscriptions.  There was some other

12   stuff, too.  That you didn't actually figure out what their

13   age or gender was, you basically just threw a bunch of stuff

14   against a wall without doing any sort of independent claim

15   for each.  And, you know, that you've told me that the first

16   one isn't true with respect to informed consent, but

17   certainly a factual issue.  Whether or not you brought

18   claims on behalf of people that you either knew didn't have

19   subscriptions or didn't find out before you filed complaints

20   is certainly a factual question.  I hear you on the legal

21   stuff, but I don't know.  I mean, I'm torn.

22        **MR. POSTMAN:**  I appreciate the thoughts, and of

23   course we dispute them.  But I take your point, that this is

24   a complaint in a motion to dismiss standard.  And I would

25   return to -- and we will -- it's helpful, as you noted, to

1   have this, because we'll make sure to address it in our

2   brief.  But I would return to my answer I gave to your

3   hypothetical, which is under Goldschmidt, as I read it, even

4   accepting those, that's not a tortious interference claim.

5   It may be a claim for sanctions in front of the arbitrator

6   for a meritless claim, but they've put these disputes in

7   arbitration.

8          To maybe say it another way.  If we were outside

9   of arbitration, and so there were -- we had filed a lawsuit

10  in California, and they said:  Your Honor, those lawsuits

11  were totally frivolous, tortious interference claim against

12  Keller Postman.  I think what you would say is:  Well, seek

13  sanctions in the Northern District of California.  But you

14  don't need a tortious interference remedy.  If you really

15  think that's true, prove it in the case in California.

16         **THE COURT:**  I think his point is we can't prove it

17  in the case.  His point is we can't prove it in the case,

18  because the way that you have -- the way that Reyes &

19  Associates potentially brought 24,000 claims is to make it

20  so it is impossible for us to litigate this issue.  Whether

21  it's 24,000 independent claims or one consolidated claim,

22  either way, you well know that the potential damages are so

23  high, leaving it in the hands of one arbitrator who

24  basically has little power of review is just a massive

25  exposure.  And Reyes & Associates knows that we are going to

1    fold.  Reyes & Associates absolutely knows that we would pay

2    the $90,000,000 because it is -- you know, when you do the

3    risk analysis, the whole claim is worth $400,000,000.  We

4    feel that -- sorry, the whole claim is worth $200,000,000.

5    We feel like we have a 25 percent success rate, chance of

6    success.  So their potential exposure is $175,000.  And

7    they're like fine, we'll give you the $125,000,000.  We'll

8    give you the $100,000,000 because that's less than our

9    expected cost of this defense, if we believe we have a

10   25 percent chance of success.

11         Does that make sense?  You're a plaintiff's

12   lawyer, I imagine that makes sense to you.

13         **MR. POSTMAN:**  Yes, yes, I think you've stated very

14   well what a defendant might argue.  And what I would respond

15   is that that description does not describe impossibility, it

16   describes an unfavorable bargaining position.  And it's why

17   it's so very important to emphasize that they wrote these

18   rules, and they did it for a big benefit, and now they don't

19   like the position they're in.  And we've had defendants pay

20   eight figures in filing fees, litigate these.  They have

21   that option.  We've litigated -- and we litigated thousands

22   of arbitrations of this sort, and so it's not impossible.

23   They're in a bad bargaining position because they wrote a

24   contract that they don't like, that would be my response.

25         And just one last point, if I could.  I wanted to

1     clarify, because you asked about fees our clients would pay,

2     and I think I left you with an incomplete answer.

3             THE COURT: Okay.

4             MR. POSTMAN: My colleague informed that the per

5     claimant filing fee is $250 each, but the large majority of

6     our clients have a fee waiver. California law requires

7     arbitration forms to waive fees for certain -- a pretty

8     large group of claimants, and they filled them out. So they

9     won't -- the large majority won't be paying any fees, but

10    those who do will pay $250 each.

11           THE COURT: But they're going to pay -- they are

12    going to pay $48,000,000 if they go through this -- if they

13    don't end up getting their consolidation?

14           MR. POSTMAN: As it stands now, JAMS has ruled

15    that they do get the consolidation. But if that were -- if

16    a court -- it probably would have to be a court who said

17    that JAMS is wrong there. If we went to court and got an

18    order that they had to pay the fees, then they would -- your

19    math is right. But as it stands now, they're not.

20           THE COURT: Okay. Are you guys going to court to

21    try to get that reversed? Have you made that decision

22    public yet, whether or not you're doing that?

23           MR. POSTMAN: No, Your Honor.

24           THE COURT: You're not?

25           MR. POSTMAN: We have not made that decision

1   public.

2           **THE COURT:**  Okay.  So you're -- it's still a

3   possibility?

4           **MR. POSTMAN:**  We're assessing our options.

5           **THE COURT:**  Okay.  So I am quite concerned

6   about -- I'll give you the order of my concern.  My first

7   concern is that it does feel like your lawsuit is saying the

8   plaintiff's attorney is acting like a plaintiff's attorney,

9   given the world that we all know that we live in legally.

10  That's with respect to just the overriding claim.  And I

11  don't know how to -- how you would succeed on your case

12  without essentially having me or a jury find that the

13  current system of plaintiff's attorneys finding clients by

14  advertising for them, and then filing claims on their behalf

15  and getting a contingency fee for that is illegal, at least

16  under this California -- well, just -- a tortious

17  interference with a defendant.  It seems to me that that

18  would open every defendant to bringing sort of the type of

19  claim that you've brought here, for any plaintiff's

20  attorney.  So I'm just going to give you the order, and then

21  I'm going to let you talk.

22          My second concern is it does feel to me like in

23  order to succeed you have to prove, A, that they had to go

24  through this initial procedure before going to arbitration;

25  that the defendants acknowledge that internally somehow or

1   they believe that -- and somehow you'd have to prove that.

2   But it seems to me that if an arbitrator disagrees with you,

3   that's still the basis of your claim. And if I agreed with

4   you, I would be basically disagreeing with the arbitrator on

5   an issue that's within the arbitrator's purview. And that

6   seems to me a tortious interference on my part with the FAA.

7   And the same for the legal claim. I mean, if the arbitrator

8   holds that you are breaking the law -- coocoo as I might

9   think it is, that you are violating it, and you are subject

10  to $16,000 in damages, how could any -- how could I say that

11  they were acting -- they were tortiously interfering with

12  your contract given that they would have brought a meritful

13  claim.

14          I mean, your complaint says that their allegations

15  are meritless. And I have to accept that, I suppose, as

16  true for purposes of the motion to dismiss. But let's just

17  like figure out where we're all going here. Again, A, it

18  assumes what the answer's going to be on the very question

19  presented to the arbitral tribunal, both of them. And two,

20  if they rule against you, you're essentially asking for me

21  to rule against the arbitrator -- which we've already

22  discussed. In other words, I don't see how you win your

23  motion unless those two things are true, that they did have

24  to go through the process before arbitration, and they did

25  have meritless claims. And third -- or at least if they

1      believed those things to be true and filed the suit anyway.

2              And third, I am concerned about this, you know,

3      you get what you ask for -- or careful what you ask for in

4      terms of you all wrote this procedure up, and the way that

5      you wrote the procedure up, you now are sort of in a

6      disadvantaged bargaining position.  But there you have it,

7      that's the hard knocks of life.

8              **MR. FOX:**  And Your Honor, it's a -- you took that

9      from Mr. Postman's talking points about how this is their

10     mode of operation, and how they deal with other companies.

11     And all the companies do this, they write these arbitration

12     agreements and then regret it later.  That's what he was

13     saying.  And you cited to a case where the court said

14     something similar to that.  We're actually alleging

15     something different, which is we want them to comply with

16     the arbitration agreement.  That's what they interfered

17     with.  So we're trying to keep those rights that were

18     written into those terms of use.  That's the right to the

19     pre-arbitration process, the informal dispute process.

20             **THE COURT:**  But doesn't the arbitrator always have

21     the jurisdiction to determine its own jurisdiction?  So

22     isn't the question of whether they had to do that a question

23     for the arbitrator?

24             **MR. FOX:**  For the individuals, it could be.

25     Again, they're not a party to the arbitration agreement.

1   And if Keller Postman has their way that they have addressed

2   with you today, they are going to have many different

3   arbitrators.  We could have many different rulings.  We

4   could have arbitrators that decided not to hold the clients

5   responsible for their conduct and say:  Well, I'm going to

6   rule on the issues anyway despite what their lawyers did.

7   And as you've said, Your Honor, there's not much of a review

8   that's going to be happening with the arbitrator.  So they

9   may decide the issue, they may not decide the issue.  And

10  there could be many of them --

11          THE COURT:  I'm not saying that you have -- no, I

12  don't think you have to bring your tortious interference

13  claim to the arbitrators.  I think that's totally wrong.

14  Put that aside.

15          MR. FOX:  Yes.

16          THE COURT:  I think you're properly here.  The

17  problem that I'm seeing -- one of many problems I'm seeing,

18  is that your complaint is based on two presumptions -- at

19  least two underlying presumptions:  That the arbitration

20  agreement is not how you read it, it's how they read it; and

21  that they're entitled, how they read it and how they're

22  going to argue it to the arbitrator, to go straight to

23  arbitration without this primary step.  So your complaint is

24  based on that in part, and it's also based in part on the

25  allegation that their claims are meritless, right?  Quote,

1   unquote meritless, I think that's from your complaint.

2          So my question to you is: Is that true? Like, if

3   you lose on one or both of those, do you not have a claim?

4          **MR. FOX:** Your Honor, if you were to find that the

5   informal dispute resolution process is unenforceable, we

6   would lose, that's correct. With respect to merit, merit is

7   something we believe that these claims are meritless, but

8   that actually is not the damage that Tubi is suffering from

9   this. Tubi is suffering from having to go through this

10  process without Keller Postman having its clients going

11  through the informal dispute resolution process, because it

12  would be able to resolve many of these claims. The reason

13  why they didn't go through the informal dispute resolution

14  process, as alleged in the complaint, is that they didn't

15  want to do their homework. They didn't want to vet these

16  claims. And you'll notice that Mr. Postman didn't answer

17  your question about what they did to vet their claims. They

18  didn't want to vet their claims to obtain the specific

19  facts. And this ties into his Liapes argument that he gave

20  you, Your Honor. You'll read that case. Of course we think

21  it's wrongly decided for the same reasons that you think

22  that -- I mean, at least indicated that you --

23         **THE COURT:** I mean, I saw -- I mean, I read half

24  of the case. They had one point that maybe might make

25  sense, which is they had a certain insurance ad gave a lower

1  rate than the person could get otherwise. Maybe I would see

2  that. But the other stuff that this woman didn't get an

3  insurance ad and so therefore she couldn't figure out what

4  insurance she wanted is, like, insanity to me. It's like

5  Google -- it's not hard, just Google insurance company and

6  you'll get a thousand ads.

7          **MR. FOX:** In that case, even though we believe

8  it's wrongly decided, it's also distinguishable from what's

9  happening here for many different reasons.

10         **THE COURT:** Well, we don't need to get into that,

11 because I -- but I hear you.

12         **MR. FOX:** But I was going to say that one of the

13 reasons -- and I'll just stick to this, is the specific

14 facts it demands. And that's all that we're looking for, is

15 tell us about the ad, tell us about the person. And we've

16 alleged in the complaint the Zoom call that I had with

17 Mr. Postman and Mr. Pak when they refused to provide this

18 information because they didn't have it. They don't know

19 anything about their clients, Your Honor. These are 24,000

20 individual claims. They don't know what relief they want.

21 How can they say that they're doing everything that's in

22 line with what their clients want when I bet Mr. Postman

23 couldn't name 15 of his clients.

24         **THE COURT:** Well, I mean, I'm sure Mr. Postman

25 couldn't either, but I'm sure there's a paralegal in his

1    office that can.

2         **MR. FOX:** Maybe.

3         **THE COURT:** But putting all that aside, does

4    someone have the language from the arbitration agreement

5    handy that I can actually just look at it?

6         **MR. FOX:** From the arbitration agreement, yes,

7    Your Honor.

8         **THE COURT:** The one that you guys contest?

9         **MR. FOX:** Yes, the one that's in effect, let me

10   just pull it out of my binder and find it -- it fell out of

11   my binder.  We attached it to the complacent and I have it

12   here, I just am looking for it.  Mine is highlighted, Your

13   Honor.

14        **THE COURT:** I think your colleague has something.

15        **MR. FOX:** Oh, thank you.

16        **THE COURT:** What does Tubi do, by the way?

17        **MR. FOX:** It's a streaming service, Your Honor.

18   It's a free streaming service.  People can register for it.

19   The way that they make money, or try to make money, is based

20   on ads that they deliver to --

21        **THE COURT:** Are they streaming the U.S. Open?

22   Because I can't watch the U.S. Open now, because

23   Discovery -- I mean, ABC and DirecTV are in a big fight, and

24   so ABC can't show DirecTV which means I can't watch the U.S.

25   Open -- which is only being shown on ABC.

1   **MR. FOX:** It is not affiliated with ABC. I do not

2   believe that they're showing the U.S. Open.

3   **THE COURT:** Well, if they were, then you might

4   have had me.

5   **MR. FOX:** So Your Honor --

6   **THE COURT:** Just let me read it, sorry.

7   **MR. FOX:** -- I was going to point you to the

8   provision list.

9   **THE COURT:** I have it, it's provision 10.

10  (Brief interruption)

11  **THE COURT:** I'm looking specifically at section

12  10-7?

13  **MR. FOX:** Yes, Your Honor.

14  **THE COURT:** Okay. And what is their argument --

15  and Mr. Postman, if you want to speak to this. What is

16  their argument that they can skip section seven and go

17  straight to section -- and go straight to arbitration?

18  **MR. POSTMAN:** Yes, Your Honor, it's that although

19  most of this agreement is written in the obligatory -- you

20  shall, we shall, and it says you shall file, the end of

21  paragraph seven says: "You and me may try to reach a

22  settlement." And there is case law saying that in

23  arbitration agreements where you have requirements that are

24  running only one way -- so they obligate -- they put a

25  burden on the consumer but don't actually obligate the

1    defendant to do anything, those are illusory and are not

2    enforceable.

3          **THE COURT:** Well, hold on. It says -- it seems to

4    go both ways, though. It says: "If either you or Tubi wish

5    to arbitrate a claim, you have to send a notice." Then the

6    other party has 45 days to decide whether to try to reach a

7    settlement. And if they don't reach a settlement, after 45

8    days you can -- either party can initiate arbitration.

9          How is that going one way?

10         **MR. POSTMAN:** And there is case law on this as

11   well. Where you have a big company-consumer relationship

12   and the company says yeah, we'll be obligated if we bring a

13   claim against you, too, that's not really plausibly ever

14   going to happen. This is mainly written -- and courts

15   recognize this in case law, to govern the situation where a

16   consumer is suing the company. And where that happens, the

17   consumer must file the notice and must wait 45 days on their

18   telling. But then Tubi really doesn't have to do anything.

19         And I would add, you know, an important part to

20   this -- which, again, we'll explain, we, at the same time we

21   filed, said: Look, this is going to take a while to get

22   going; we're happy to do the meet and confer on these

23   individually. And the 3,000 that he mentioned, that was as

24   part of the meet and confer process. We said: We'll even

25   start it off; and by the way, anybody who you think doesn't

1    have a valid claim, give us their names and we'll confer.

2    Sometimes people put the wrong e-mail address that's linked

3    to the account.  In our experience, we can fix that.  Let's

4    talk through this.  They've completely stonewalled, they've

5    not engaged in anything, which is their right under the

6    agreement.  But that sort of illustrates that it's illusory.

7           **THE COURT:**  No, it illustrates their point that

8    you are basically trying to do this on the cheap, and you're

9    making them do all the work and pay all the money.  Because,

10    yeah, you might send them a list of 3,000 people and say to

11    them:  Tell me which one of these has a valid claim, and

12    then we'll deal accordingly.  And he says:  Well, that means

13    we have to figure out if they were subscribers; we have to

14    figure out if they were discriminated against, and then tell

15    you which live claims you have.

16           **MR. POSTMAN:**  If he had engaged with us on it, we

17    would be happy to explain why every single one has a valid

18    claim in our view.  We are not asking them to do our work.

19    We have a well thought out legal basis and factual basis for

20    each claim.  They were perfectly entitled to come back and

21    say these -- we disagree on this legal point, we disagree on

22    this factual point.  It's been months now.  They've

23    completely rebuffed our attempts to actually do this

24    process.  And I'll stop there.  The answer to your question

25    is because we think it's illusory.

1          THE COURT:  Okay.  Mr. Fox.

2          MR. FOX:  Your Honor, there's a case that we cited

3     in our response.  It's -- I can't pronounce the first word,

4     but it's Bielski v. Coinbase.  It's a Judge Alsup, I

5     believe, opinion from the Northern District of California.

6          THE COURT:  I was in front of Judge Alsup once, he

7     ruled in my favor.  He's brilliant.

8          MR. FOX:  I'm sorry, it's Ninth Circuit, so it's

9     above Judge Alsup.  I apologize for that, Your Honor.  Yes,

10    I agree.  But it upholds a provision that's actually

11    unilateral and not bilateral that is very similar to Tubi's,

12    but it's actually worse for the consumer.

13         THE COURT:  Okay, I don't care.  Let me ask

14    this -- and I think this is like the key question, though.

15    Your claim depends on your reading of the arbitration

16    agreement being correct, correct?

17         MR. FOX:  That's correct, Your Honor.

18         THE COURT:  And, arguably, it depends on it being

19    so correct that it would be basically sanctionable conduct

20    to even bring the claim and make the argument?

21         MR. FOX:  I don't know that, Your Honor.

22         THE COURT:  I hear you.  I'm not going to make you

23    say that right now on the record, but that is going to be a

24    question I have.

25         MR. FOX:  We certainly would -- we may -- I should

1     say, we may try to seek sanctions.  I don't know what --

2         **THE COURT:**  No, I'm not saying -- basically what

3     I'm saying is your claim doesn't depend just on your reading

4     of the arbitration agreement being right.  It depends on it

5     being so right and so obvious that no one in good faith

6     could bring a claim arguing otherwise.

7         **MR. FOX:**  I disagree with that.  The case that

8     they cited on that point, they left out the words in the

9     quote "good faith."  It's actually part of the quote and

10     they left it out.  They actually have to be operating in

11     good faith.  So that's on page two of their response.  It's

12     an important point, are they operating in good faith.  You

13     explained it in your questioning to Mr. Postman the reasons

14     why we allege that they're not operating in good faith and

15     haven't been operating in good faith.  This is a factual

16     issue, Your Honor.  And as you know, it's not something that

17     can be disposed of on a motion to dismiss in most

18     circumstances.  We've laid out many facts that show that

19     they did not operate in good faith.  They were --

20         **THE COURT:**  Okay, okay, okay.  And your

21     argument -- I was about to ask you who decides whether or

22     not the clause exists -- the prerequisite exists, the

23     arbitrator or me.  And I just realized your answer's going

24     to be:  You, Your Honor, because there is no arbitration

25     between us and Keller.

1    **MR. FOX:** I can sit down right now, Your Honor,

2    that's exactly right, yes.

3    **THE COURT:** See, you're brilliant, too.

4    Mr. Kellerman (sic), do you agree with that, that

5    as part of their claim, someone has to agree with their

6    reading of the arbitration agreement; and that that

7    assessment has to be done -- or it can be done by me and not

8    the arbitrator, because you don't have an arbitration

9    agreement with them?

10   **MR. POSTMAN:** I certainly agree with the first

11   part. As to the second part of who decides, I would say

12   that the Goldschmidt test that we'll talk about says that

13   you shouldn't be making that decision. You could, I'm not

14   saying you're barred from it by the FAA. But the whole

15   purpose of this higher standard is that they have to show a

16   lot more. It's not whether we had good intentions, bad

17   faith and malice as the cases talk about --

18   **THE COURT:** No, no, put the standard aside for the

19   moment. My question is just do I -- do you agree or

20   disagree that if I let the case proceed -- and I know, I

21   know, I get it, I would be wrong to do it, I would be out of

22   my mind, I'd be as kooky as the California Court of Appeals,

23   I get it. But do you agree that if it goes forward, this

24   legal issue has to get decided? I think you agree with

25   that, right, you said that you agreed with that?

1    **MR. POSTMAN:** I agree it's necessary that they

2    show that it was not just wrong, but very wrong --

3    **THE COURT:** Oh, I see, okay.

4    **MR. POSTMAN:** -- is our position. But I think I

5    get your second question, which is can you then in deciding

6    the motion to dismiss decide that. And I think I would

7    say -- it's a tricky one, but that there are lots of other

8    ways you could rule against them. But if you were ruling

9    for them, you would have to decide that, yes.

10   **THE COURT:** Okay. You guys should brief to me the

11   following as part of your briefing, basically this question

12   I've asked. I think that the question -- let's just call

13   it -- what do we want to call it? What do we want to call

14   that pre-dispute whatever, the notice provision?

15   **MR. FOX:** Notice provision is fine, Your Honor, or

16   section 10-7, either one.

17   **THE COURT:** Let's do notice provision. I'm not

18   good with math. As part of your -- both of yours briefing,

19   I am very curious about, one, whether -- I think we all

20   agree that whatever the -- we disagree on the standard of

21   review, but we all agree that for Tubi to win, they have to

22   convince someone that their reading of the notice provision

23   is correct?

24   **MR. FOX:** That's correct, Your Honor.

25   **THE COURT:** And you have different thoughts about

1    how correct it has to be, but -- right, okay.  And then so

2    what I want to you brief secondly is, as part of the motion

3    to dismiss process, do I have the power to make that

4    decision or is that reserved for the arbitrators.  And your

5    answer is going to be:  Of course, Your Honor, you have the

6    power, because there's no arbitration with Keller Postman.

7    I've put them on the spot, so I'm not going to ask them for

8    their response right now unless they have it.

9         I imagine their response will be along the lines

10   of my second thing that I want -- third thing that I you

11   want you all to brief, which is let's say you have your

12   consolidated arbitration, and the arbitrator decides that

13   there is no notice provision, that it doesn't apply.

14        **MR. FOX:**  And there's one arbitrator, Your Honor?

15        **THE COURT:**  There's one arbitrator.  He decides --

16   she decides, let's make it her.  She decides that the notice

17   provision does not apply, so therefore Tubi automatically

18   loses on your claim against Keller, right.  But let's say

19   that the very next day, I decide that the notice provision

20   does apply.  Therefore, you still have to prove a lot more,

21   but you remain in the game.

22        How is that not essentially asking me to review

23   what the arbitrator has done?  I mean, you have an

24   arbitration agreement with individuals -- I mean, it just

25   seems to me that what I'm asking is -- what you're asking me

1    to do is potentially to review an arbitrator's ruling, and

2    if I disagree with it, if I think it's legally wrong, have

3    that make an impact between you two; while under the FAA, if

4    I thought that she was legally wrong, I couldn't do anything

5    as long as she fully interpreted -- you know, did her job.

6    Even if I think it's bananas and totally wrong, I still have

7    to say okay.

8          I guess I'm sort of -- does that make sense as to

9    what my question is?

10         **MR. FOX:**  Yes, Your Honor.  And I think -- you

11   know, we're talking about hypotheticals here, and there are

12   many different scenarios that could happen.  So I think with

13   that third issue, it's -- I don't think it's as black and

14   white, because -- and again, I know you've got extensive

15   arbitration experience.  The arbitrator could decide not to

16   hold it against the user because it was their lawyers who

17   made this call and thinks it would be unfair.  They don't

18   have to follow the law necessarily, even though we'll ask

19   them to.  So that's one possibility, and there probably are

20   seven more that I'm not thinking of right now.  So I think

21   that that third issue, while we're happy to brief it, it's

22   not going to be something that will help you decide the

23   issue likely because of the different permutations that

24   could be out there.

25         **THE COURT:**  Okay.  I just want to make sure that

1    I'm not doing something that the FAA says only the

2    arbitrator can do, and that I'm not doing something that

3    violates my power to review an arbitrator's decision.  Now,

4    sitting here today, not having really thought about it other

5    than what we've talked about, I think I can make the

6    decision and I don't think it would be reviewing the

7    arbitrator's work.  I could do it before the arbitrator even

8    issues her decision.  I might not ever look at it, but I am

9    concerned about that.

10         And I am -- and then just I will tell you,

11   Mr. Fox, I am really quite concerned about letting a case go

12   through on a theory that plaintiffs' lawyers were acting in

13   bad faith by bringing a claim.  Like, that is very troubling

14   to me.  That's not a small accusation.

15         And Mr. Postman, I'm quite concerned about ruling

16   on their case on a motion to dismiss.  I think, based on

17   what I've seen so far, that this is way too fact -- I mean,

18   the fact that we're having this much conversation at a

19   pre-motion conference about whether or not it's fact

20   intensive tells me that it's fact intensive.  So that's your

21   big hurdle, Mr. Fox.  I'm very concerned about the

22   implications of your case.  And Mr. Postman, your hurdle

23   is -- I'm not sure he's wrong.  He has a claim.  And my job

24   isn't to be concerned about the policy of how the legal

25   system works.

1    So hopefully that gives you guys some guidance as

2  to sort of what my thinking is on this.  And then let me

3  make sure I didn't have other questions, hold on one sec.

4    (Brief interruption)

5    **THE COURT:**  Oh, Mr. Fox, you do make a lot of

6  allegations about the harm to the clients.  You're not

7  seeking damages on that, because you have no standing on

8  that?

9    **MR. FOX:**  Correct.  That's just to show, again,

10 that they were operating inconsistent with their duties to

11 their clients, Your Honor.

12   **THE COURT:**  Okay.  But if they succeed, their

13 clients are going to get money, right?

14   **MR. FOX:**  Well, potentially.  We don't know if the

15 arbitrator will rule that they -- so if they succeed on the

16 merits versus damages -- you're saying if they achieve money

17 for their clients, their clients wills obtain money.  Yes,

18 that's absolutely right.  But is it -- you know, they've

19 got -- again, unlike a class action, they have individual

20 responsibilities to each one of their clients.  Some of them

21 may want to resolve the case in different ways than others

22 would.  That certainly would be the case.  But they're

23 trying to, with their $3,000 letters for 24,000 people,

24 they're trying to sell this in a way that's more of a class

25 action, and they have an individual obligation to each

**1**    client. Let's say that the claims have merit -- which we

**2**    obviously dispute, obviously dispute, but say the claims

**3**    have merit. Somebody who watched a lot of Tubi would have a

**4**    stronger claim maybe than somebody who didn't watch Tubi or

**5**    watched it for a second, and yet they're treating them all

**6**    as one. And that's not something that is appropriate when

**7**    we're talking about representing 24,000 individuals.

**8**         **THE COURT:** I mean, look, another reason the

**9**    California case -- which I have not read all the way

**10**    through, in fairness to them. It seems odd to me that

**11**    you're basically having to prove but for this process, but

**12**    for this discriminatory insurance advertising target, the

**13**    woman who brought the claim would have seen the insurance

**14**    ad, because she would have been on Tubi at the moment that

**15**    the ad was playing and she would have been actually paying

**16**    attention. I mean, I don't know, it seems odd to me, but

**17**    what do I know.

**18**         All right. Oh, are there any ethics opinions that

**19**    you all are aware of that address basically the basis for

**20**    your claims?

**21**         **MR. FOX:** We cited to some ethic rules in our

**22**    complaint, and it talks about representation of multiple

**23**    parties. We also cited to a brief filed by a trade -- I

**24**    think it was a trade organization that talked about the

**25**    problems with this model. So if you want us to attach some

1    of that, we will.

2           **THE COURT:** Yeah, yeah, anything related --

3    anything at all that involves claims for or against lawyers.

4    And on the arbitrability question, you'll want to add to

5    your key cases -- which I'm going to talk to you about in a

6    moment.

7           And then, okay, Mr. Postman, you wrote that you

8    wanted to dismiss a portion of count two.  Can you explain

9    to me why only a portion of count two?  You wrote -- I was

10   confused.  Maybe it's because it was seeking declaratory

11   relief, but I thought you wanted to get rid of everything.

12   Oh, yeah, it says in your second paragraph:  "First, the

13   Court should dismiss count one and the portion of count two

14   seeking to hold them" -- you liable in tort.

15          Is there a portion of count two that survives?

16          **MR. POSTMAN:** We don't believe any of the

17   complaint survives.  Our understanding is that they sort of

18   had a portion of count two that held us liable in tort, and

19   then a portion that was declaratory.  We want the

20   declaratory dismissed as well.  That's just a way of saying

21   we want the tort part dismissed, and then we also want the

22   declaratory relief claim dismissed.

23          **THE COURT:** All right, thank you.

24          **MR. POSTMAN:** Thank you for your time, Your Honor.

25          **THE COURT:** Does anyone have anything else that

1    they want to add?

2           **MR. FOX:**  No, Your Honor.

3           **THE COURT:**  Okay.  Go ahead.

4           **MR. POSTMAN:**  I was just going to ask about timing

5    on the brief.

6           **THE COURT:**  We're getting to that, one second.

7        (Discussion off the record)

8           **THE COURT:**  How much time do you guys want for the

9    briefing?  What I'm going to do is set a hearing date, and

10   then we're going to work backwards from there.

11          **MR. POSTMAN:**  If it makes sense to work back from

12   the hearing date, maybe.

13          **MR. FOX:**  That's fine, Your Honor.  And so --

14   well, can we just confer for a minute?

15          **THE COURT:**  Yes.

16       (Discussion off the record)

17          **MR. FOX:**  Your Honor, we've conferred and have

18   agreed on something, so that's pretty good.

19          **THE COURT:**  There you go.  See, I bring people

20   together.

21          **MR. FOX:**  Yes.  So 21 days for the opening brief,

22   21 days for the opposition, and then you said 14?

23          **MR. POSTMAN:**  Fourteen.

24          **MR. FOX:**  Fourteen for the reply, Your Honor.

25          **THE COURT:**  And that gets us to about, what, mid

1   November?

2       **MR. FOX:**  So long as none of us hit Thanksgiving,

3   I think we're all good.

4       **THE COURT:**  Okay.  Yeah, no, we're not going to do

5   this on Thanksgiving.  I will be thanking everyone that I'm

6   not dealing with you people.

7       **MR. FOX:**  We won't take that personally, Your

8   Honor.

9       **THE COURT:**  Yeah, I think that about everyone.

10  You guys have a choice.  We could do this Friday,

11  November 22nd -- which I think is a week before

12  Thanksgiving, or Friday, December 6th.  Do you guys want to

13  confer?

14      **MR. FOX:**  One moment.

15     (Discussion off the record)

16      **MR. FOX:**  A member of our team is going to be out

17  starting in December and would prefer to be here, so we

18  would like the November date, please, Your Honor.

19      **MR. POSTMAN:**  That's fine, Your Honor.

20      **THE COURT:**  So why don't we set a trial -- a

21  hearing date for November 22nd.  This one's going to be a

22  while, so we'll set it to start at 10:30.  And I would just

23  not schedule anything that afternoon, because there's no --

24  I can't tell you how long we'll be here.  And given that

25  we've been here more than an hour on the pre-motion

1    conference, it's going to take a while because I'll have a

2    lot of questions.  So we will do that.

3          And you are aware of my standing order on the

4    briefing?

5          **MR. FOX:**  Yes, I've read it, Your Honor, and we'll

6    reread it again.

7          **THE COURT:**  You didn't mention your Fisk.

8          **MR. FOX:**  Well, so he was my favorite player

9    growing up -- but I have to admit I'm a White Sox fan, so

10   that probably ruins things for you, when he came over as he

11   a free agent.  Yes, and I have hanging in my garage --

12         **THE COURT:**  The only team worse than the Red Sox

13   is the White Sox right now.

14         **MR. FOX:**  Yes, 31 wins.  And I have hanging in my

15   garage his game six home run from the 1975 World Series.

16         **THE COURT:**  Oh, that's super cool.  I think that's

17   it, right?  You guys work out a briefing schedule based on

18   this, send it to us.  We'll get -- oh, I know what I wanted

19   to say.  You guys can be seated.

20         I have dealt with institutional clients for 22

21   years, and I understand all the concerns of in-house

22   counsel.  I have dealt with plaintiff's attorney for 22

23   years, and I understand all the concerns of plaintiff's

24   counsel.  But I will nonetheless say the following:  I

25   understand that this motion to dismiss is incredibly

1 important, I get that.  It would make me very, very happy if

2 both of you were able to figure out some portion of the

3 dismissal that one of your young associates could argue.

4 You know, I don't care how you break it up, one of the legal

5 issues.  There will be something, right.  It might not be as

6 clean cut -- maybe for you, Mr. Postman, but I have a

7 feeling you guys can figure something out.  I don't care if

8 you guys go back and forth, I don't care.  It just would

9 make me very happy.

10      So you can tell your clients that I have ordered

11 you to tell them that it would make me incredibly happy if a

12 young associate could argue part of the motion; and that

13 whether or not you win on that part of the case is not going

14 to come down to whether you argued it or the associate

15 argued it, because neither of you are that good.  You're not

16 so good that you're going to convince me where I otherwise

17 wouldn't have been convinced anyway, I should say.  Does

18 that all make sense?  And I guess I can't order you to ask

19 your client, but you guys talk amongst yourselves.

20      I will see you on the 22nd.  If you guys have any

21 issues before then, any -- whatever spats, whatever, I don't

22 want people wasting time writing stuff, just e-mail my

23 chambers together.  If we need to, we'll get on a quick

24 call.  And if I need briefing, I'll let you all know, okay?

25      **MR. FOX:**  Yes, Your Honor.

1          **MR. POSTMAN:**  Thank you, Your Honor.

2          **THE COURT:**  Thanks a lot, everyone.  By the way,

3   nice job on the PMCs.  Thank you.

4          (Proceedings adjourned at 3:52 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **C E R T I F I C A T E**

2

3          I, **Jeff M. Hook, Official Court Reporter,**

4    certify that the foregoing is a true and correct transcript

5    of the record of proceedings in the above-entitled matter.

6

7

8

9    **September 18, 2024**                _____

10          **DATE**                              **Jeff M. Hook**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEPUTY CLERK:
[3]   2/2 15/1
25/5
MR. FOX: [73]
MR. POSTMAN:
[71]
THE COURT:
[143]

**$**

$100,000,000
[1]   35/8
$125,000,000
[1]   35/7
$16,000 [4]
11/9 11/17
16/14 38/10
$175,000 [1]
35/6
$200 [1]   4/8
$200,000,000
[1]   35/4
$250 [2]   36/5
36/10
$3,000 [4]
12/17 12/18
12/21 54/23
$4,000 [1]
17/20
$4,000,000 [1]
4/7
$400,000,000
[1]   35/3
$46,000,000 [1]
4/5
$48,000,000 [1]
36/12
$71,000,000 [1]
12/20
$90,000,000 [1]
35/2

**1**

10 [3]   13/13
13/18 44/9
10-7 [2]   44/12
50/16
10:30 [1]
58/22
11 [1]   21/23
1100 [1]   1/18
1101 [1]   1/18
14 [1]   57/22
15 [1]   42/23
16,000 [1]
11/8
1616 [3]   1/4

2/2 25/6
1975 [1]   59/15
1:24-cv-1616
[1]   1/4

**2**

20001 [1]   1/25
20036 [1]   1/25
2024 [1]   1/5
21 [2]   57/21
57/22
22 [2]   59/20
59/22
22nd [3]   58/11
58/21 60/20
23 [1]   2/17
23,000 [1]   4/8
23,242 [1]
13/8
24,000 [20]
5/12 8/13 8/15
8/20 8/21 8/23
10/20 10/22
11/8 12/17
13/23 14/6
15/6 15/8
21/20 34/19
34/21 42/19
54/23 55/7
24-1616 [2]
2/2 25/6
25 percent [2]
35/5 35/10
2:03 [1]   1/6
2:30 [2]   14/23
25/3
2:30 to [1]
14/22
2L [1]   2/12

**3**

3,000 [2]
45/23 46/10
31 [1]   59/14
3300 [1]   1/14
333 [1]   1/24
3:00 [1]   14/24
3:01 [1]   25/4
3:52 p.m [1]
61/4

**4**

424 [1]   13/9
45 [3]   45/6
45/7 45/17
45-day [1]
16/7

**5**

515 [1]   1/13

**6**

6th [1]   58/12

**7**

70 [1]   11/19
75 [1]   11/4

**9**

90071 [1]   1/14
910 [1]   18/25
95 [1]   18/24

**A**

ABC [5]   18/6
43/23 43/24
43/25 44/1
ability [1]
15/18
able [5]   21/19
21/22 27/20
41/12 60/2
above [2]   47/9
62/5
above-entitled
[1]   62/5
absolutely [3]
21/25 35/1
54/18
abusive [1]
20/22
accept [1]
38/15
accepting [1]
34/4
according [1]
8/6
accordingly [1]
46/12
account [1]
46/3
accusation [1]
53/14
achieve [1]
54/16
acknowledge [1]
37/25
Act [1]   11/18
acted [1]
32/11
acting [6]
25/20 25/23
33/3 37/8
38/11 53/12
action [14]
1/3 2/2 4/25

5/5 6/16 7/1
8/12 8/17 8/17
12/11 21/21
25/6 54/19
54/25
actions [4]
7/3 15/17
15/19 27/22
actual [2]
28/4 30/3
actually [18]
4/12 7/24
15/14 21/24
25/24 27/5
27/19 33/12
39/14 41/8
43/5 44/25
46/23 47/10
47/12 48/9
48/10 55/15
ad [13]   17/1
18/5 18/8 18/8
19/7 19/17
22/17 23/3
41/25 42/3
42/15 55/14
55/15
ad-supported
[1]   23/3
add [4]   21/14
45/19 56/4
57/1
address [6]
14/18 20/11
30/5 34/1 46/2
55/19
address one [1]
14/18
addressed [1]
40/1
addressing [1]
10/23
adjourned [1]
61/4
admissible [1]
9/25
admit [1]   59/9
ads [12]   16/25
19/6 19/18
21/12 22/6
22/7 22/14
22/20 22/22
23/2 42/6
43/20
advertiser [2]
16/24 18/5
advertisers [3]
16/19 16/21

19/25
advertising
[10]   10/21
11/1 11/21
11/25 12/5
16/9 20/1 20/5
37/14 55/12
advice [1]
9/14
advised [1]
26/15
affected [1]
21/5
affiliated [1]
44/1
afternoon [3]
2/6 3/2 58/23
again [10]
3/19 7/15
10/19 38/17
39/25 45/20
52/14 54/9
54/19 59/6
against [16]
6/4 8/3 8/6
10/20 22/17
28/9 33/14
34/11 38/20
38/21 45/13
46/14 50/8
51/18 52/16
56/3
age [5]   12/8
12/10 16/19
16/21 33/13
agent [1]
59/11
agree [17]
14/6 25/18
28/15 28/20
31/10 31/16
31/18 47/10
49/4 49/5
49/10 49/19
49/23 49/24
50/1 50/20
50/21
agreed [3]
38/3 49/25
57/18
agreeing [1]
7/20
agreement [19]
15/23 16/1
16/2 16/8
20/20 26/13
32/21 39/16
39/25 40/20

**A**

agreement...
**[9]** 43/4 43/6
44/19 46/6
47/16 48/4
49/6 49/9
51/24

agreements [3]
15/22 39/12
44/23

ahead [3] 13/3
17/12 57/3

ALBERT [2]
1/16 3/4

allegation [3]
12/2 20/12
40/25

allegations [6]
8/7 23/10
33/4 33/8
38/14 54/6

allege [6]
16/24 30/3
30/12 30/14
31/4 48/14

alleged [6]
6/21 10/15
11/9 32/17
41/14 42/16

alleges [2]
3/7 29/24

alleging [5]
11/7 11/10
11/17 31/8
39/14

allow [4]
16/23 16/24
20/1 23/2

allowed [2]
7/24 26/18

allows [1]
16/18

along [3] 15/7
28/25 51/9

Alsup [3] 47/4
47/6 47/9

although [1]
44/18

always [2]
26/20 39/20

amongst [1]
60/19

amount [1] 5/3

ANA [1] 1/9

analysis [1]
35/3

Angeles [1]

1/14

animal [1]
8/25

answer's [2]
38/18 48/23

apart [1] 15/4

apologize [1]
47/9

Appeals [7]
16/16 17/3
17/7 17/15
17/23 18/16
49/22

APPEARANCES [1]
1/11

apply [6]
11/20 18/20
32/20 51/13
51/17 51/20

appointed [1]
13/12

appreciate [3]
20/6 24/10
33/22

approach [2]
2/4 13/11

appropriate [1]
55/6

arbitrability
**[1]** 56/4

arbitral [1]
38/19

arbitrate [1]
45/5

arbitration
**[45]** 3/9 3/18
6/2 7/17 8/4
8/24 9/1 11/8
12/4 12/13
12/23 14/10
14/14 15/3
15/21 16/4
20/21 27/17
28/2 31/14
34/7 34/9 36/7
37/24 38/24
39/11 39/16
39/19 39/25
40/19 40/23
43/4 43/6
44/17 44/23
45/8 47/15
48/4 48/24
49/6 49/8 51/6
51/12 51/24
52/15

arbitrations
**[7]** 8/25 15/6

15/8 16/2
27/19 29/18
35/22

arbitrator [24]
6/1 7/20 13/5
13/12 34/5
34/23 38/2
38/4 38/7
38/21 39/20
39/23 40/8
40/22 48/23
49/8 51/12
51/14 51/15
51/23 52/15
53/2 53/7
54/15

arbitrator's
**[5]** 7/23 38/5
52/1 53/3 53/7

arbitrators [5]
32/24 40/3
40/4 40/13
51/4

arguably [1]
47/18

argue [5] 17/2
35/14 40/22
60/3 60/12

argued [2]
60/14 60/15

arguing [1]
48/6

argument [6]
32/14 41/19
44/14 44/16
47/20 48/21

arguments [1]
31/20

around [4] 4/6
4/8 6/7 7/25

arrangement [1]
3/14

aside [3]
40/14 43/3
49/18

assertion [1]
24/13

assess [3]
23/7 23/9
23/13

assessing [1]
37/4

assessment [6]
20/8 21/10
22/9 22/12
32/5 49/7

associate [1]
60/12 60/14

associates [13]
27/5 27/6
27/9 27/10
27/13 27/15
28/9 28/19
29/12 34/19
34/25 35/1
60/3

Associates' [1]
27/14

assumes [2]
7/18 38/18

assumption [1]
20/2

attach [2]
19/1 55/25

attached [1]
43/11

attempts [1]
46/23

attention [1]
55/16

attorney [7]
8/14 8/18
23/24 37/8
37/8 37/20
59/22

attorney-client
**[2]** 8/14 8/15

attorneys [3]
5/4 5/11 37/13

automatically
**[1]** 51/17

Avenue [2]
1/18 1/24

avoid [1]
15/18

award [1] 11/3

aware [2]
55/19 59/3

**B**

back [9] 2/23
7/21 9/14
13/25 24/5
25/9 46/20
57/11 60/8

backwards [1]
57/10

bad [11] 6/8
20/5 25/20
26/2 26/3 30/9
30/11 30/21
35/23 49/16
53/13

baffled [1]
19/11

ballpark [1]

22/20

bananas [1]
52/6

banking [1]
20/3

Bankruptcy [1]
1/24

bargaining [3]
35/16 35/23
39/6

barred [1]
49/14

based [12]
9/25 19/22
22/16 25/16
31/18 31/20
40/18 40/24
40/24 43/19
53/16 59/17

basically [11]
7/22 31/4
33/13 34/24
38/4 46/8
47/19 48/2
50/11 55/11
55/19

basis [9]
11/11 16/19
16/21 19/8
26/1 38/3
46/19 46/19
55/19

behalf [11]
2/7 13/8 13/9
13/15 13/16
21/10 22/11
22/16 23/25
33/18 37/14

behalves [1]
21/18

behaves [1]
33/8

behind [1]
24/23

benefit [3]
21/2 31/11
35/18

best [4] 5/18
5/19 29/25
31/21

bet [1] 42/22

better [2]
2/20 3/19

BHAT [2] 1/17
3/4

Bielski [1]
47/4

big [4] 35/18

**B**

**big... [3]**
43/23 45/11
53/21
**bilateral [1]**
47/11
**binder [2]**
43/10 43/11
**bit [2]** 4/20
4/21
**black [1]**
52/13
**Block [4]** 1/13
2/9 2/11 30/19
**board [1]**
21/18
**boil [1]** 30/17
**both [8]** 3/21
24/12 26/12
38/19 41/3
45/4 50/18
60/2
**bound [2]** 8/2
8/4
**BRANDON [2]**
1/12 2/6
**breach [2]** 8/9
9/3
**breached [2]**
6/19 8/8
**break [4]**
14/21 15/4
24/9 60/4
**breaking [1]**
38/8
**brief [19]**
4/10 19/2
20/15 20/23
21/13 24/13
24/17 29/8
32/25 34/2
44/10 50/10
51/2 51/11
52/21 54/4
55/23 57/5
57/21
**briefing [9]**
4/19 19/2
24/20 50/11
50/18 57/9
59/4 59/17
60/24
**briefly [1]**
16/12
**brilliant [2]**
47/7 49/3
**bring [9]** 8/21

15/18 16/1
29/19 40/12
45/12 47/20
48/6 57/19
**bringing [3]**
22/16 37/18
53/13
**broader [2]**
15/10 26/7
**brought [10]**
8/20 21/20
27/11 27/11
29/18 33/17
34/19 37/19
38/12 55/13
**BS [1]** 7/8
**bucks [3]** 11/4
11/4 11/4
**bunch [2]**
22/23 33/13
**burden [1]**
44/25
**but targeted
[1]** 11/23
**buying [1]**
19/16

**C**

**CA [1]** 1/14
**Cal.App.5th [1]**
18/25
**California [20]**
16/15 16/17
17/3 17/4
17/15 17/16
18/15 18/22
19/3 19/23
19/23 20/10
34/10 34/13
34/15 36/6
37/16 47/5
49/22 55/9
**call [8]** 7/5
27/4 42/16
50/12 50/13
50/13 52/17
60/24
**called [1]**
16/16
**came [1]** 59/10
**can [42]** 2/3
4/20 4/21 5/25
9/8 9/20 10/3
10/19 11/16
14/24 15/12
16/20 17/2
17/21 18/4
19/1 25/15

26/20 30/25
31/1 31/3 32/4
32/7 42/21
43/1 43/5
43/18 44/16
45/8 45/8 46/3
48/17 49/1
49/7 50/5 53/2
53/5 56/8
57/14 59/19
60/7 60/10
**cancel [1]**
14/24
**capable [1]**
30/20
**care [4]** 47/13
60/4 60/7 60/8
**careful [1]**
39/3
**Carlton [1]**
2/23
**carried [1]**
9/15
**carrying [1]**
18/19
**case [47]** 4/15
4/17 5/20 6/4
6/7 7/15 8/10
8/11 8/14 9/3
12/18 16/16
16/18 17/25
24/3 24/15
25/14 26/6
26/9 26/23
29/11 29/15
29/16 29/18
29/19 33/5
34/15 34/17
34/17 37/11
39/13 41/20
41/24 42/7
44/22 45/10
45/15 47/2
48/7 49/20
53/11 53/16
53/22 54/21
54/22 55/9
60/13
**cases [11]** 5/1
20/24 21/20
24/14 25/19
25/20 26/17
26/22 28/12
49/17 56/5
**cast [1]** 31/17
**cause [1]**
12/12
**caused [5]**

6/19 6/22 8/9
8/15 9/3
**centerpiece [1]**
7/15
**central [1]**
25/14
**certain [5]**
13/15 13/16
21/2 36/7
41/25
**certainly [10]**
5/10 5/23 7/13
10/2 24/16
33/17 33/20
47/25 49/10
54/22
**certification
[2]** 5/2 27/23
**certify [1]**
62/4
**challenge [1]**
2/19
**challenging [1]**
5/16
**chambers [1]**
60/23
**chance [2]**
35/5 35/10
**characteristic
[1]** 19/8
**cheap [1]** 46/8
**checks [1]** 5/6
**choice [1]**
58/10
**circle [1]**
30/8
**Circuit [1]**
47/8
**circumstances
[1]** 48/18
**circumstantial
[1]** 10/19
**cite [1]** 18/22
**cited [5]**
39/13 47/2
48/8 55/21
55/23
**civil [6]** 1/3
2/2 8/22 16/17
17/20 25/5
**claim [53]** 7/6
7/14 11/3 11/9
12/7 15/25
16/11 21/9
21/15 21/17
21/17 22/7
22/10 22/16
25/15 28/4

28/9 31/4
32/13 32/15
33/10 33/14
34/4 34/5 34/6
34/11 34/21
35/3 35/4
37/10 37/19
38/3 38/7
38/13 40/13
41/3 45/5
45/13 46/1
46/11 46/18
46/20 47/15
47/20 48/3
48/6 49/5
51/18 53/13
53/23 55/4
55/13 56/22
**claimant [3]**
22/2 27/12
36/5
**claimant's [1]**
3/25
**claimants [6]**
4/8 13/9 13/10
13/15 27/17
36/8
**claiming [3]**
11/24 30/17
30/18
**claims [37]**
5/12 8/20
10/20 10/20
11/5 12/15
15/19 16/9
17/14 20/9
20/11 21/6
21/6 21/18
21/24 23/20
27/11 28/17
29/13 30/6
33/18 34/19
34/21 37/14
38/25 40/25
41/7 41/12
41/16 41/17
41/18 42/20
46/15 55/1
55/2 55/20
56/3
**clarify [1]**
36/1
**class [18]**
4/25 5/2 5/5
6/16 7/1 7/3
8/11 8/17 8/17
8/18 15/17
15/19 20/14

**C**

class... [5]
21/21 27/21
27/23 54/19
54/24
classic [1]
33/1
clause [1]
48/22
clean [1]  60/6
clear [1]
30/13
clearly [2]
2/12 30/19
client [10]
6/9 8/14 8/18
9/18 12/9
22/16 29/20
33/8 55/1
60/19
clients [48]
5/22 6/20 6/22
8/9 8/13 9/3
9/4 9/5 9/9
9/13 9/24 12/5
13/21 16/3
23/25 24/7
25/21 26/1
26/3 26/5
26/15 26/16
27/24 28/1
29/7 30/6 30/9
30/10 30/11
30/15 32/16
32/20 36/1
36/6 37/13
40/4 41/10
42/19 42/22
42/23 54/6
54/11 54/13
54/17 54/17
54/20 59/20
60/10
clients' [2]
5/18 29/25
cockamamie [1]
18/3
cognizance [1]
32/7
Coinbase [1]
47/4
colleague [2]
36/4 43/14
COLUMBIA [1]
1/1
coming [1]  6/3
comments [1]

24/10
commercial [1]
12/10
commercials [1]
7/5
committed [1]
26/16
communicate [2]
10/1 10/22
communicating
[1]  13/20
communication
[2]  10/2
13/23
communications
[4]  5/22 9/6
9/18 9/24
companies [2]
39/10 39/11
company [4]
42/5 45/11
45/12 45/16
company-consume
r [1]  45/11
complacent [2]
6/16 43/11
complaining [1]
24/5
complaint [19]
3/7 4/24 8/7
10/14 10/15
29/23 29/24
30/13 32/4
33/7 33/24
38/14 40/18
40/23 41/1
41/14 42/16
55/22 56/17
complaints [4]
8/22 20/12
21/22 33/19
completely [3]
32/11 46/4
46/23
complied [1]
6/18
comply [2]
20/22 39/15
component [1]
6/15
concern [3]
37/6 37/7
37/22
concerned [7]
37/5 39/2 53/9
53/11 53/15
53/21 53/24
concerns [3]

4/18 59/21
59/23
conclusions [1]
32/16
conclusory [1]
30/2
conduct [2]
40/5 47/19
confer [5]
45/22 45/24
46/1 57/14
58/13
conference [3]
1/9 53/19 59/1
conferences [1]
4/11
conferred [1]
57/17
conforming [1]
22/4
confused [1]
56/10
congressional
[1]  18/15
Connecticut [1]
1/18
consent [13]
6/22 9/4 9/5
9/9 9/13 9/19
9/20 10/5
10/16 10/23
27/12 33/9
33/16
consolidated
[4]  8/23 15/5
34/21 51/12
consolidation
[3]  13/7
36/13 36/15
Constitution
[1]  1/24
constraints [1]
6/5
consumer [7]
15/19 15/25
44/25 45/11
45/16 45/17
47/12
contest [2]
28/8 43/8
context [2]
15/10 26/7
contingency [1]
37/15
contingent [1]
26/1
contract [4]
15/15 32/6

35/24 38/12
contracts [1]
6/19
conversation
[1]  53/18
convince [2]
50/22 60/16
convinced [1]
60/17
coocoo [1]
38/8
cookie [1]
20/12
cookie-cutter
[1]  20/12
cool [1]  59/16
Corporate [1]
15/16
cost [1]  35/9
counsel [6]
2/3 2/5 19/2
25/17 59/22
59/24
count [6]  56/8
56/9 56/13
56/13 56/15
56/18
country [1]
11/21
couple [1]  3/6
course [12]
6/12 6/15
10/25 17/11
19/21 23/25
27/3 28/23
32/25 33/23
41/20 51/5
court [32]  1/1
1/23 1/23 7/10
8/6 8/11 8/11
8/21 13/22
16/15 17/3
17/4 17/7
17/15 17/23
18/11 18/16
19/3 20/24
20/24 21/20
24/11 25/7
25/8 36/16
36/16 36/17
36/20 39/13
49/22 56/13
62/3
courtroom [1]
24/3
courts [4]
1/24 32/22
32/23 45/14

created [1]
9/1
cry [1]  20/21
curious [1]
50/19
current [2]
12/22 37/13
currently [1]
25/8
cut [2]  25/11
60/6
cutter [1]
20/12
cv [1]  1/4

**D**

damage [1]
41/8
damages [9]
11/2 11/17
11/18 16/1
20/17 34/22
38/10 54/7
54/16
date [5]  57/9
57/12 58/18
58/21 62/10
day [5]  11/21
16/7 30/19
30/22 51/19
days [7]  13/13
13/19 45/6
45/8 45/17
57/21 57/22
DC [3]  1/5
1/19 1/25
deal [4]  14/22
23/20 39/10
46/12
dealing [1]
58/6
dealt [2]
59/20 59/22
decades [1]
11/22
December [2]
58/12 58/17
December 6th
[1]  58/12
decide [9]
32/24 40/9
40/9 45/6 50/6
50/9 51/19
52/15 52/22
decided [5]
13/6 40/4
41/21 42/8
49/24

**D**

**decides [7]**
6/1 48/21
49/11 51/12
51/15 51/16
51/16
**deciding [2]**
31/14 50/5
**decision [17]**
7/23 9/15 17/7
17/18 17/19
17/23 18/17
18/23 19/4
19/6 36/21
36/25 49/13
51/4 53/3 53/6
53/8
**declaratory [4]**
56/10 56/19
56/20 56/22
**defendant [10]**
1/7 1/16 3/3
27/9 30/25
31/2 35/14
37/17 37/18
45/1
**defendant's [1]**
4/1
**defendants [6]**
15/16 20/19
23/19 32/22
35/19 37/25
**defense [1]**
35/9
**defer [2]**
32/22 32/23
**define [1]**
25/21
**defined [1]**
33/5
**definitely [1]**
29/24
**deliver [1]**
43/20
**demands [4]**
8/24 11/8 12/4
42/14
**denied [2]**
17/6 17/6
**depend [1]**
48/3
**dependent [1]**
29/9
**depends [4]**
32/16 47/15
47/18 48/4
**deposited [1]**

5/7
**depublish [1]**
19/4
**depublished [1]**
17/8
**derivative [1]**
26/1
**describe [2]**
18/17 35/15
**describes [1]**
35/16
**description [1]**
35/15
**despite [1]**
40/6
**detail [2]**
12/5 31/13
**determine [1]**
39/21
**devolve [1]**
26/19
**difference [1]**
27/8
**different [22]**
6/9 6/14 7/1
7/11 7/23 8/1
8/16 8/25
19/24 26/11
26/14 27/6
28/7 29/15
39/15 40/2
40/3 42/9
50/25 52/12
52/23 54/21
**digital [1]**
16/18
**directly [2]**
6/2 14/11
**DirecTV [2]**
43/23 43/24
**disadvantaged
[1]** 39/6
**disagree [6]**
46/21 46/21
48/7 49/20
50/20 52/2
**disagreeing [1]**
38/4
**disagreement
[5]** 15/2
17/14 17/16
25/16 31/11
**disagreements
[1]** 14/10
**disagrees [1]**
38/2
**discovery [2]**
27/14 43/23

**discriminate
[2]** 16/19
16/21
**discriminated
[2]** 22/17
46/14
**discrimination
[6]** 11/19
12/8 17/19
19/10 19/12
19/14
**discriminatory
[7]** 18/5 18/8
19/20 21/12
22/6 23/2
55/12
**discussed [1]**
38/22
**Discussion [4]**
14/20 57/7
57/16 58/15
**dismiss [15]**
5/2 27/1 27/3
27/23 31/3
31/3 33/24
38/16 48/17
50/6 51/3
53/16 56/8
56/13 59/25
**dismissal [1]**
60/3
**dismissed [3]**
56/20 56/21
56/22
**disparaging [2]**
5/11 6/6
**disposed [1]**
48/17
**dispositive [1]**
4/12
**dispute [13]**
7/17 10/14
10/15 14/13
23/9 33/23
39/19 41/5
41/11 41/13
50/14 55/2
55/2
**disputed [1]**
10/4
**disputes [1]**
34/6
**disputing [4]**
10/7 10/9
10/11 10/12
**disqualified
[2]** 13/9
13/10

**disqualify [2]**
13/16 13/17
**distinguish [1]**
19/7
**distinguishable
[1]** 42/8
**DISTRICT [6]**
1/1 1/1 1/10
1/24 34/13
47/5
**documents [1]**
27/15
**dollar [1]** 5/6
**dollars [1]**
24/2
**done [8]** 12/12
14/23 20/18
20/19 27/7
49/7 49/7
51/23
**down [6]** 4/20
4/21 6/24
30/17 49/1
60/14
**dozens [1]**
20/18
**draft [1]**
15/22
**drafted [2]**
15/15 26/8
**dress [1]**
30/21
**driving [1]**
5/14
**drug [2]** 7/6
7/7
**due [2]** 27/18
33/7
**duh [1]** 31/24
**during [1]**
18/6
**duties [1]**
54/10

**E**

**e-mail [2]**
46/2 60/22
**earth [2]**
19/10 19/11
**easy [3]** 23/12
23/15 27/16
**effect [2]**
12/16 43/9
**effective [1]**
4/19
**efficient [1]**
15/24
**eight [1]**

35/20
**either [7]**
23/15 33/18
34/22 42/25
45/4 45/8
50/16
**elbowed [3]**
23/21 23/23
23/25
**elbows [2]**
24/8 26/20
**eliminate [1]**
15/24
**else [3]** 14/22
27/9 56/25
**emphasize [1]**
35/17
**end [4]** 30/19
30/22 36/13
44/20
**ends [1]** 7/20
**enforceable [1]**
45/2
**engaged [2]**
46/5 46/16
**enough [4]**
5/23 25/23
30/13 32/17
**entirely [1]**
15/17
**entities [1]**
24/7
**entitled [6]**
7/22 17/19
26/10 40/21
46/20 62/5
**era [1]** 27/6
**essentially [5]**
25/16 26/8
37/12 38/20
51/22
**ether [1]** 22/7
**ethic [1]**
55/21
**ethics [1]**
55/18
**evade [1]** 6/5
**even [19]** 2/19
2/21 4/12 12/8
12/14 14/7
23/6 27/11
28/2 29/11
29/12 31/22
34/3 42/7
45/24 47/20
52/6 52/18
53/7
**even-steven [1]**
2/21

**E**

everybody [1]
11/21

everyone [3]
58/5 58/9 61/2

evidence [1]
10/19

exactly [3]
27/7 27/9 49/2

example [3]
16/21 16/22
20/1

Excuse [1]
11/13

exists [2]
48/22 48/22

expect [2]
14/11 21/2

expected [1]
35/9

expense [1]
21/4

experience [3]
8/25 46/3
52/15

explain [9]
13/24 15/10
16/13 16/20
20/15 21/13
45/20 46/17
56/8

explained [1]
48/13

exposure [2]
34/25 35/6

expressly [1]
19/7

extensive [1]
52/14

extort [2]
30/25 31/1

extorting [4]
30/18 30/23
31/5 31/8

extortion [3]
20/21 30/17
31/10

extraordinary
[1] 12/13

extremely [1]
23/20

**F**

F-U-L-L-Y [1]
4/25

FAA [7] 7/24
15/20 32/21
38/6 49/14

52/3 53/1

FAA's [1] 6/5

face [1] 12/12

Facebook [4]
16/16 16/18
16/23 18/24

Facebook's [2]
17/7 19/2

faced [1]
23/19

fact [11]
18/17 22/6
28/24 31/17
31/18 31/20
33/9 53/17
53/18 53/19
53/20

factors [1]
10/23

facts [11]
20/16 22/23
25/24 27/7
30/3 30/13
31/22 31/23
41/19 42/14
48/18

factual [6]
10/15 33/17
33/20 46/19
46/22 48/15

fail [1] 6/20

failed [1]
6/19

failure [1]
6/21

fair [2] 15/18
33/7

fairness [1]
55/10

faith [10]
25/20 48/5
48/9 48/11
48/12 48/14
48/15 48/19
49/17 53/13

falls [1] 6/8

familiar [1]
15/20

fan [1] 59/9

far [5] 5/19
18/6 18/9
18/17 53/17

favor [1] 47/7

favorite [1]
59/8

federal [2]
8/11 21/19

fee [3] 36/5

36/6 37/15

feel [4] 35/4
35/5 37/7
37/22

feeling [1]
60/7

feels [2] 6/6
6/7

fees [9] 3/9
3/12 12/13
15/7 35/20
36/1 36/7 36/9
36/18

fell [1] 43/10

few [1] 8/1

fight [2]
29/16 43/23

figure [7]
33/12 38/17
42/3 46/13
46/14 60/2
60/7

figured [1]
9/2

figures [1]
35/20

file [7] 21/5
21/9 21/18
21/22 22/10
44/20 45/17

filed [7]
10/20 19/3
33/19 34/9
39/1 45/21
55/23

filing [5]
13/14 33/9
35/20 36/5
37/14

filled [1]
36/8

financial [1]
20/3

find [7] 10/6
21/4 27/14
33/19 37/12
41/4 43/10

finding [1]
37/13

fine [7] 2/15
2/15 24/22
35/7 50/15
57/13 58/19

finish [1]
25/10

firm [14] 6/17
7/25 8/6 15/16
16/8 21/3 27/4

27/6 27/8 28/7
28/22 30/19
30/25 31/1

firms [1]
11/19

first [11] 3/7
6/3 6/14 8/2
9/8 16/5 33/15
37/6 47/3
49/10 56/12

Fisk [2] 2/23
59/7

fix [1] 46/3

Flower [1]
1/13

fold [1] 35/1

follow [1]
52/18

following [2]
50/11 59/24

force [2] 5/14
27/21

forced [1]
27/22

forcing [1]
5/1

foregoing [1]
62/4

forms [1] 36/7

forth [3] 9/14
24/5 60/8

forum [1]
15/22

forward [4]
10/24 18/20
20/16 49/23

foul [1] 20/21

founded [2]
16/10 17/14

Fourteen [2]
57/23 57/24

FOX [14] 1/12
2/6 2/8 2/8
3/6 4/9 4/20
4/22 15/12
30/24 47/1
53/11 53/21
54/5

frame [1]
25/14

fraud [1] 5/23

free [5] 11/16
11/16 23/4
43/18 59/11

Friday [2]
58/10 58/12

friend [1]
2/18

frivolous [2]
28/17 34/11

front [2] 34/5
47/6

fully [2] 4/24
52/5

funds [1] 5/8

**G**

game [2] 51/21
59/15

garage [2]
59/11 59/15

gave [4] 26/15
34/2 41/19
41/25

gender [5]
21/12 22/2
22/3 22/4
33/13

gender-conformi
ng [1] 22/4

gets [4] 5/19
11/21 19/7
57/25

given [5] 5/2
9/14 37/9
38/12 58/24

gives [1] 54/1

giving [1]
33/6

God's [1]
19/11

goes [4] 18/17
21/14 21/16
49/23

Goldschmidt [4]
25/19 29/4
34/3 49/12

good [21] 2/6
3/2 13/5 17/2
21/1 26/18
30/10 30/12
48/5 48/9
48/11 48/12
48/14 48/15
48/19 49/16
50/18 57/18
58/3 60/15
60/16

Google [2]
42/5 42/5

got the [1]
9/19

govern [2]
20/7 45/15

grain [1]
24/12

**G**

**great [2]**
12/24 21/4
**green [1]**
19/11
**group [1]** 36/8
**growing [1]**
59/9
**guess [5]** 10/5
13/13 25/12
52/8 60/18
**guidance [1]**
54/1
**gut [1]** 29/4
**guys [18]** 3/21
4/10 21/17
24/6 25/2
36/20 43/8
50/10 54/1
57/8 58/10
58/12 59/17
59/19 60/7
60/8 60/19
60/20

**H**

**ha [3]** 27/17
27/17 27/17
**had an [1]**
22/24
**half [1]** 41/23
**hands [1]**
34/23
**handy [1]** 43/5
**hanging [2]**
59/11 59/14
**happen [4]**
13/18 26/22
45/4 52/12
**happened [1]**
23/19
**happening [3]**
14/12 40/8
42/9
**happens [3]**
4/13 5/8 45/16
**happy [7]**
14/14 45/22
46/17 52/21
60/1 60/9
60/11
**hard [2]** 39/7
42/5
**harm [3]** 19/22
30/6 54/6
**Hartman [1]**
2/18
**hasten [1]**

21/14
**have pay [1]**
4/4
**head [1]** 7/9
**hear [5]** 24/3
24/10 33/20
42/11 47/22
**hearing [4]**
24/19 57/9
57/12 58/21
**heart [3]** 26/6
26/9 26/23
**held [3]** 16/16
18/11 56/18
**Hello [1]** 2/8
**help [2]** 30/7
52/22
**helpful [2]**
16/11 33/25
**high [1]** 34/23
**higher [1]**
49/15
**highlighted [1]**
43/12
**hiking [5]**
19/15 19/16
19/17 19/19
19/22
**hit [1]** 58/2
**hold [11]**
14/17 14/19
23/22 23/22
23/22 24/8
40/4 45/3
52/16 54/3
56/14
**holding [1]**
2/23
**holds [1]** 38/8
**home [1]** 59/15
**homework [1]**
41/15
**honestly [1]**
10/3
**Honor [63]**
**HONORABLE [1]**
1/9
**HOOK [3]** 1/23
62/3 62/10
**hoops [1]** 16/6
**hope [1]** 20/24
**hopefully [2]**
4/19 54/1
**hour [1]** 58/25
**house [2]** 7/9
59/21
**hundred [1]**
11/4

**hundreds [1]**
33/10
**hurdle [2]**
53/21 53/22
**hypocrisy [1]**
20/25
**hypothetical
[1]** 34/3
**hypotheticals
[1]** 52/11

**I**

**idea [1]** 19/25
**illegal [1]**
37/15
**illusory [3]**
45/1 46/6
46/25
**illustrates [3]**
14/12 46/6
46/7
**imagine [2]**
35/12 51/9
**impact [2]**
2/16 52/3
**implications
[1]** 53/22
**implicitly [1]**
26/4
**important [6]**
15/13 22/22
35/17 45/19
48/12 60/1
**impossibility
[1]** 35/15
**impossible [3]**
10/24 34/20
35/22
**impressions [1]**
4/14
**in-house [1]**
59/21
**INC [4]** 1/3
2/3 2/7 25/6
**include [1]**
12/20
**incomplete [1]**
36/2
**inconsistent
[1]** 54/10
**incredibly [2]**
59/25 60/11
**independent [5]**
25/21 29/4
29/10 33/14
34/21
**indicated [1]**
41/22

**individual [19]**
5/5 5/14 8/12
8/20 8/24
10/20 11/2
11/5 12/4
15/21 16/2
16/3 20/21
21/9 21/11
21/20 42/20
54/19 54/25
**individual's
[2]** 8/19
21/10
**individualized
[1]** 21/10
**individually
[3]** 21/5 21/6
45/23
**individuals [4]**
19/19 39/24
51/24 55/7
**indulge [1]**
20/2
**inform [1]**
6/22
**informal [4]**
39/19 41/5
41/11 41/13
**information [2]**
22/13 42/18
**informed [13]**
9/4 9/5 9/9
9/12 9/19 9/20
10/5 10/16
10/22 27/12
33/9 33/16
36/4
**initial [2]**
4/14 37/24
**initiate [1]**
45/8
**insane [1]**
22/15
**insanity [1]**
42/4
**instead [1]**
27/8
**institutional
[1]** 59/20
**insurance [7]**
20/3 41/25
42/3 42/4 42/5
55/12 55/13
**intensive [2]**
53/20 53/20
**intent [2]**
18/15 24/11
**intentions [1]**

49/16
**interest [3]**
19/22 25/23
25/25
**interested [2]**
18/1 20/4
**interesting [2]**
4/23 10/13
**interests [4]**
5/18 5/19 26/4
29/25
**interfered [1]**
39/16
**interference
[12]** 6/15
6/17 25/16
30/21 32/13
32/15 34/4
34/11 34/14
37/17 38/6
40/12
**interfering [2]**
7/16 38/11
**internal [1]**
27/14
**internally [1]**
37/25
**internet [1]**
7/12
**interpretation
[1]** 26/13
**interpreted [1]**
52/5
**interruption
[2]** 44/10
54/4
**into [9]** 5/21
11/7 14/14
14/16 19/19
26/19 39/18
41/19 42/10
**intuition [1]**
20/7
**invading [3]**
5/22 9/6 9/10
**investigate [1]**
22/21
**invoices [1]**
3/15
**invoke [2]**
15/20 20/19
**involve [1]**
12/15
**involves [1]**
56/3
**Iqbal [3]**
25/22 30/3
33/1

## I

**issue [16]**
6/14 8/5 10/12
17/25 22/18
24/13 33/17
34/20 38/5
40/9 40/9
48/16 49/24
52/13 52/21
52/23
**issued [2]**
12/14 12/17
**issues [4]**
40/6 53/8 60/5
60/21

## J

**JAMS [11]**   3/15
3/19 8/23 13/5
13/10 26/13
32/3 32/8
32/14 36/14
36/17
**JEFF [3]**   1/23
62/3 62/10
**Jenner [4]**
1/13 2/9 2/11
30/19
**job [5]**   23/24
23/24 52/5
53/23 61/3
**JUDGE [4]**   1/10
47/4 47/6 47/9
**jumping [1]**
26/11
**jurisdiction
[2]**   39/21
39/21
**jury [1]**   37/12

## K

**Kathleen [2]**
2/18 2/19
**keep [4]**   14/5
14/12 30/9
39/17
**KELLER [23]**
1/6 1/17 2/3
3/3 3/8 3/11
8/3 10/4 11/20
13/6 13/14
25/6 25/19
26/4 26/14
28/16 30/7
34/12 40/1
41/10 48/25
51/6 51/18
**Kellerman [1]**

49/4
**key [2]**   47/14
56/5
**KIRAN [2]**   1/17
3/4
**knew [1]**   33/18
**knocks [1]**
39/7
**knowing [1]**
12/15
**knowledge [1]**
14/7
**knows [2]**
34/25 35/1
**kooky [1]**
49/22

## L

**label [3]**
25/22 30/2
33/2
**laid [1]**   48/18
**language [1]**
43/4
**large [6]**   4/3
5/2 5/3 36/5
36/8 36/9
**last [4]**   2/17
6/14 19/15
35/25
**later [1]**
39/12
**law [23]**   6/17
7/25 8/6 17/14
17/16 20/7
20/10 20/15
21/2 27/4 27/6
28/7 28/22
30/19 30/20
30/25 31/1
36/6 38/8
44/22 45/10
45/15 52/18
**lawsuit [2]**
34/9 37/7
**lawsuits [1]**
34/10
**lawyer [6]**
2/20 6/4 8/17
27/5 29/2
35/12
**lawyerly [1]**
29/14
**lawyers [10]**
5/13 23/22
24/6 28/15
29/5 31/24
40/6 52/16

53/12 56/3
**lay [3]**   14/6
16/11 31/13
**least [8]**   2/20
11/9 22/15
22/19 37/15
38/25 40/19
41/22
**leaving [1]**
34/23
**left [3]**   36/2
48/8 48/10
**leftover [1]**
5/8
**legal [22]**
21/21 25/14
25/17 25/22
26/2 26/11
29/13 30/2
32/2 32/5 32/5
32/6 32/16
32/20 33/2
33/20 38/7
46/19 46/21
49/24 53/24
60/4
**legally [3]**
37/9 52/2 52/4
**legislative [1]**
18/15
**legislature [1]**
19/24
**less [2]**   5/6
35/8
**letter [1]**
30/4
**letters [2]**
12/18 54/23
**letting [1]**
53/11
**leverage [3]**
12/14 26/5
26/16
**liability [1]**
7/4
**liable [2]**
56/14 56/18
**Liapes [8]**
16/16 17/19
18/24 22/3
26/12 32/2
32/17 41/19
**life [1]**   39/7
**likely [1]**
52/23
**line [1]**   42/22
**lines [1]**   51/9
**linked [1]**

46/2
**lion's [1]**   4/1
**list [3]**   20/23
44/8 46/10
**litigate [5]**
8/3 8/5 27/19
34/20 35/20
**litigated [2]**
35/21 35/21
**litigation [2]**
5/15 24/1
**little [2]**
15/11 34/24
**live [2]**   37/9
46/15
**LLC [4]**   1/6
1/17 2/3 25/6
**LLP [1]**   1/13
**log [3]**   9/22
9/23 10/1
**long [4]**   24/19
52/5 58/2
58/24
**look [9]**   7/4
17/24 19/13
19/23 20/8
43/5 45/21
53/8 55/8
**looked [1]**
19/19
**looking [3]**
42/14 43/12
44/11
**loopholes [1]**
9/2
**Los [1]**   1/14
**lose [3]**   30/6
41/3 41/6
**loses [1]**
51/18
**lot [14]**   5/16
8/24 14/9 24/7
26/20 29/2
31/20 33/8
49/16 51/20
54/5 55/3 59/2
61/2
**lots [2]**   4/13
50/7
**loud [2]**   7/9
7/9
**lovely [1]**
19/16
**lower [1]**
41/25

## M

**magazine [1]**

18/9
**magazines [1]**
18/10
**mail [2]**   46/2
60/22
**mainly [1]**
45/14
**maintain [1]**
8/10
**majority [2]**
36/5 36/9
**makes [3]**   4/19
35/12 57/11
**making [3]**
31/19 46/9
49/13
**malice [4]**
25/20 33/3
33/4 49/17
**manner [1]**
10/24
**many [10]**   9/7
20/7 40/2 40/3
40/10 40/17
41/12 42/9
48/18 52/12
**March [1]**   11/1
**mass [1]**   9/1
**massive [1]**
34/24
**math [2]**   36/19
50/18
**matter [3]**
10/2 31/22
62/5
**matters [2]**
7/14 22/2
**may [11]**   6/11
14/18 15/10
28/5 34/5 40/9
40/9 44/21
47/25 48/1
54/21
**maybe [9]**   9/20
34/8 41/24
42/1 43/2 55/4
56/10 57/12
60/6
**mean [32]**   2/15
2/17 6/6 7/4
9/20 17/22
18/4 18/11
18/20 19/14
23/5 23/11
24/2 30/18
31/1 31/2
31/18 31/18
33/7 33/21

**M**

mean... [12]
38/7 38/14
41/22 41/23
41/23 42/24
43/23 51/23
51/24 53/17
55/8 55/16
meaning [1]
24/23
means [2]
43/24 46/12
meant [1]  19/5
mediation [1]
4/15
meet [2]  45/22
45/24
member [1]
58/16
members [1]
8/18
men [3]  18/7
20/4 22/4
mention [1]
59/7
mentioned [1]
45/23
mere [1]  24/13
merely [1]
19/6
merit [5]
29/13 41/6
41/6 55/1 55/3
meritful [1]
38/12
meritless [10]
28/17 29/18
29/19 32/12
34/6 38/15
38/25 40/25
41/1 41/7
merits [2]
21/14 54/16
method [1]
15/25
mic [1]  3/23
mid [1]  57/25
might [12]
2/25 11/22
14/21 30/6
30/9 35/14
38/8 41/24
44/3 46/10
53/8 60/5
millions [1]
24/2
mind [1]  49/22

Mine [1]  43/12
minute [2]  5/4
57/14
mistake [1]
2/14
mode [1]  39/10
model [1]
55/25
modest [1]
15/19
moment [5]
30/25 49/19
55/14 56/6
58/14
money [18]
24/7 25/25
27/16 27/25
28/1 28/2
28/20 28/24
29/2 29/6 29/7
31/23 43/19
43/19 46/9
54/13 54/16
54/17
month [3]
10/21 10/25
19/15
months [1]
46/22
more [13]  4/19
5/13 18/7 18/9
26/16 29/2
30/20 32/18
49/16 51/20
52/20 54/24
58/25
most [4]  5/7
15/24 44/19
48/17
motion [22]
1/9 4/11 5/1
26/23 26/24
27/1 27/2
27/23 27/23
30/1 31/3
33/24 38/16
38/23 48/17
50/6 51/2
53/16 53/19
58/25 59/25
60/12
motions [2]
4/12 4/12
motivated [1]
31/23
motive [6]
15/9 25/21
28/15 29/3

29/9 29/10
Mr. [30]  2/8
2/8 3/6 3/13
3/16 3/19 4/9
4/20 4/22 9/8
15/12 25/9
30/24 39/9
41/16 42/17
42/17 42/22
42/24 44/15
47/1 48/13
49/4 53/11
53/15 53/21
53/22 54/5
56/7 60/6
Mr. Fox [12]
2/8 2/8 3/6
4/9 4/20 4/22
15/12 30/24
47/1 53/11
53/21 54/5
Mr. Kellerman
[1]  49/4
Mr. Pak [1]
42/17
Mr. Postman
[15]  3/13
3/16 3/19 9/8
25/9 41/16
42/17 42/22
42/24 44/15
48/13 53/15
53/22 56/7
60/6
Mr. Postman's
[1]  39/9
much [5]  5/13
13/2 40/7
53/18 57/8
multiple [1]
55/22
must [4]  8/8
16/1 45/17
45/17

**N**

name [2]  28/8
42/23
names [2]  2/4
46/1
nature [2]
7/14 20/13
necessarily [1]
52/18
necessary [1]
50/1
need [9]  3/23
6/24 8/19

20/15 28/13
34/14 42/10
60/23 60/24
needs [1]
17/17
neither [1]
60/15
new [3]  11/22
11/22 13/12
next [1]  51/19
nice [1]  61/3
nicer [1]  7/10
Ninth [1]  47/8
none [1]  58/2
nonetheless [1]
59/24
Northern [2]
34/13 47/5
noted [3]
25/18 32/22
33/25
notice [14]
12/16 16/7
32/4 32/19
41/16 45/5
45/17 50/14
50/15 50/17
50/22 51/13
51/16 51/19
noting [1]
17/13
November [4]
58/1 58/11
58/18 58/21
November 22nd
[2]  58/11
58/21
nowhere [1]
2/13
number [2]
13/15 13/16
numbers [1]
13/8
NW [2]  1/18
1/24

**O**

o'clock [1]
14/24
object [2]
14/7 14/8
obligate [2]
44/24 44/25
obligated [1]
45/12
obligation [1]
54/25
obligations [1]
8/12

obligatory [1]
44/19
obtain [3]
10/22 41/18
54/17
obtained [3]
9/8 9/12 10/5
obvious [2]
18/19 48/5
obviously [5]
4/10 5/12
29/15 55/2
55/2
odd [3]  9/21
55/10 55/16
off [7]  4/15
14/20 25/11
45/25 57/7
57/16 58/15
offer [3]  2/12
2/18 21/4
office [1]
43/1
Official [2]
1/23 62/3
often [1]  4/13
old [1]  11/19
once [1]  47/6
one [44]  8/5
8/13 10/18
10/25 14/17
14/18 14/19
17/2 17/21
19/1 20/13
21/21 31/21
32/8 32/24
33/16 34/21
34/23 35/25
40/17 41/3
41/24 42/12
43/8 43/9
44/24 45/9
46/11 46/17
48/5 50/7
50/16 50/19
51/14 51/15
52/19 54/3
54/20 55/6
56/13 57/6
58/14 60/3
60/4
one can [1]
17/21
one's [1]
58/21
only [16]  8/5
8/10 16/25
17/1 17/1

**O**

**only... [11]**
22/18 24/11
24/18 24/23
25/24 27/8
43/25 44/24
53/1 56/9
59/12

**open [5]** 37/18
43/21 43/22
43/25 44/2

**opening [1]**
57/11

**operate [1]**
48/19

**operating [5]**
48/10 48/12
48/14 48/15
54/10

**operation [1]**
39/10

**opinion [3]**
20/8 20/20
47/5

**opinions [1]**
55/18

**opponent's [1]**
25/17

**opportunity [1]**
22/24

**opposed [1]**
7/12

**opposition [2]**
26/25 57/22

**option [1]**
35/21

**options [1]**
37/4

**order [9]**
15/18 15/24
31/11 36/18
37/6 37/20
37/23 59/3
60/18

**ordered [1]**
60/10

**organization
[1]** 55/24

**others [2]**
6/10 54/21

**otherwise [3]**
42/1 48/6
60/16

**out [30]** 2/22
2/25 6/18 7/9
7/9 9/2 9/15
10/6 16/11

27/12 31/13
33/12 33/19
36/8 38/17
42/3 43/10
43/10 46/13
46/14 46/19
48/8 48/10
48/18 49/21
52/24 58/16
59/17 60/2
60/7

**outlined [1]**
22/1

**outside [1]**
34/8

**over [8]** 10/25
15/15 15/16
16/4 16/8
24/21 31/6
59/10

**overly [1]**
29/14

**overriding [1]**
37/10

**overturning [1]**
7/22

**own [4]** 20/8
25/23 32/5
39/21

**P**

**p.m [4]** 1/6
25/3 25/4 61/4

**page [2]** 30/4
48/11

**paid [4]** 13/1
13/2 29/20
29/21

**PAK [3]** 1/16
3/4 42/17

**papers [1]** 3/5

**paragraph [2]**
44/21 56/12

**paralegal [1]**
42/25

**parallel [2]**
28/14 29/3

**part [18]**
12/19 28/15
28/16 38/6
40/24 40/24
45/19 45/24
48/9 49/5
49/11 49/11
50/11 50/18
51/2 56/21
60/12 60/13

**particularly
[1]** 6/8

**parties [2]**
25/7 55/23

**party [4]** 33/2
39/25 45/6
45/8

**past [2]** 16/4
16/8

**pattern [1]**
15/15

**patterns [1]**
18/17

**pause [1]**
24/24

**pay [12]** 3/8
3/11 4/4 4/5
35/1 35/19
36/1 36/10
36/11 36/12
36/18 46/9

**paying [2]**
36/9 55/15

**people [24]**
4/14 7/5 10/22
13/24 13/25
14/6 14/7 17/1
20/1 21/5
21/17 21/24
23/6 23/7
23/23 33/11
33/18 43/18
46/2 46/10
54/23 57/19
58/6 60/22

**per [4]** 4/8
11/9 17/20
36/4

**percent [2]**
35/5 35/10

**perfectly [2]**
13/5 46/20

**perform [2]**
6/20 6/21

**period [1]**
16/7

**permutations
[1]** 52/23

**person [5]** 4/8
22/2 22/10
42/1 42/15

**personally [1]**
58/7

**perspective [1]**
20/6

**petitioners [1]**
6/1

**place [2]** 18/8
19/6

**placing [1]**

16/25

**plaintiff [5]**
1/4 1/12 2/5
2/7 5/14

**plaintiff's
[11]** 23/24
28/22 29/1
31/1 35/11
37/8 37/8
37/13 37/19
59/22 59/23

**plaintiffs [5]**
4/7 5/5 6/1
15/18 31/24

**plaintiffs' [4]**
5/4 5/11 5/13
53/12

**platform [5]**
16/18 17/18
20/1 22/23
23/2

**plausible [1]**
33/4

**plausibly [2]**
25/24 45/13

**player [1]**
59/8

**playing [1]**
55/15

**please [5]** 2/4
15/10 16/13
16/25 58/18

**plenty [1]** 7/3

**PMCs [1]** 61/3

**pocket [1]**
2/24

**podium [1]** 2/4

**point [22]**
7/20 13/6
15/13 23/18
23/21 24/12
31/8 32/8
32/24 32/25
33/5 33/23
34/16 34/17
35/25 41/24
44/7 46/7
46/21 46/22
48/8 48/12

**points [3]**
18/25 32/1
39/9

**policy [5]**
17/2 20/14
26/18 28/13
53/24

**politics [1]**
19/24

**portion [12]**
3/25 4/1 4/2
5/3 5/4 56/8
56/9 56/13
56/15 56/18
56/19 60/2

**position [6]**
9/5 35/16
35/19 35/23
39/6 50/4

**possess [1]**
22/13

**possibility [3]**
30/14 37/3
52/19

**possibly [1]**
18/14

**POSTMAN [34]**
1/6 1/16 1/17
2/3 3/3 3/3
3/13 3/16 3/19
8/3 9/8 10/4
11/20 13/6
13/14 25/6
25/9 25/20
26/14 30/7
34/12 40/1
41/10 41/16
42/17 42/22
42/24 44/15
48/13 51/6
53/15 53/22
56/7 60/6

**Postman's [3]**
26/4 28/16
39/9

**potential [2]**
34/22 35/6

**potentially [5]**
4/5 29/17
34/19 52/1
54/14

**power [5]** 6/5
34/24 51/3
51/6 53/3

**pre [7]** 1/9
4/11 7/17
39/19 50/14
53/19 58/25

**pre-arbitration
[2]** 7/17
39/19

**pre-dispute [1]**
50/14

**pre-motion [4]**
1/9 4/11 53/19
58/25

**precedent [2]**

**P**

**precedent...**
**[2]** 15/20
20/9

**precedential**
**[2]** 17/8
17/10

**prefer [1]**
58/17

**prefiling [1]**
32/19

**prerequisite**
**[1]** 48/22

**present [2]**
22/25 33/4

**presented [1]**
38/19

**preserved [1]**
28/14

**presumptions**
**[2]** 40/18
40/19

**pretend [1]**
21/21

**pretty [4]**
23/11 23/15
36/7 57/18

**previously [1]**
25/7

**primary [1]**
40/23

**privilege [7]**
5/23 9/7 9/11
9/22 9/23 10/1
12/19

**privileged [3]**
9/9 9/13 12/19

**probably [4]**
4/17 36/16
52/19 59/10

**problem [2]**
5/15 40/17

**problems [3]**
10/23 40/17
55/25

**procedure [4]**
28/2 37/24
39/4 39/5

**procedures [1]**
20/22

**proceed [4]**
14/11 14/14
15/3 49/20

**proceedings [4]**
25/3 25/4
61/4 62/5

**process [15]**

7/17 13/5 21/7
31/13 38/24
39/19 39/19
41/5 41/10
41/11 41/14
45/24 46/24
51/3 55/11

**process to [1]**
21/7

**produce [1]**
9/23

**products [3]**
7/4 18/6 20/3

**profit [2]**
29/9 29/10

**prohibit [1]**
17/3

**prohibits [1]**
17/16

**promised [1]**
16/3

**pronounce [1]**
47/3

**proof [1]** 24/4

**proper [1]**
26/13

**properly [1]**
40/16

**protected [1]**
19/8

**prove [9]**
10/19 22/5
34/15 34/16
34/17 37/23
38/1 51/20
55/11

**proven [3]**
12/14 24/14
27/13

**provide [1]**
42/17

**provided [1]**
12/4

**proving [1]**
9/7

**provision [13]**
5/8 8/9 8/10
44/8 44/9
47/10 50/14
50/15 50/17
50/22 51/13
51/17 51/19

**provisions [1]**
21/1

**public [2]**
36/22 37/1

**pull [3]** 2/22
2/25 43/10

**purpose [1]**
49/15

**purposes [1]**
38/16

**pursuing [1]**
28/13

**purview [1]**
38/5

**push [1]** 27/17

**put [13]** 9/4
11/7 12/16
18/5 18/8
20/23 30/1
34/6 40/14
44/24 46/2
49/18 51/7

**putting [1]**
43/3

**Q**

**quick [3]**
14/21 14/22
60/23

**quickly [2]**
24/9 25/2

**quite [4]**
30/20 37/5
53/11 53/15

**quote [3]**
40/25 48/9
48/9

**R**

**raised [1]**
6/14

**rank [2]** 12/25
13/4

**rate [2]** 35/5
42/1

**reach [3]**
44/21 45/6
45/7

**reached [1]**
27/11

**reaction [1]**
19/1

**read [20]** 3/5
16/2 17/23
17/23 18/9
26/8 26/10
26/14 28/12
29/15 33/3
34/3 40/20
40/20 40/21
41/20 41/23
44/6 55/9 59/5

**reading [5]**
17/17 47/15

48/3 49/6
50/22

**real [4]** 15/8
21/6 24/9 29/8

**realized [1]**
48/23

**really [12]**
4/23 6/9 26/22
27/24 30/2
30/22 33/1
34/14 45/13
45/18 53/4
53/11

**reason [6]**
4/21 4/23 21/1
26/18 41/12
55/8

**reasoning [1]**
18/20

**reasons [4]**
41/21 42/9
42/13 48/13

**rebuffed [1]**
46/23

**recalling [1]**
25/5

**receive [1]**
3/17

**received [1]**
5/5

**recessed [1]**
25/3

**recognizable**
**[1]** 28/9

**recognize [3]**
20/25 29/22
45/15

**recognized [2]**
29/12 29/12

**record [7]** 2/5
14/20 47/23
57/7 57/16
58/15 62/5

**recovery [1]**
26/2

**Red [1]** 59/12

**reference [1]**
2/23

**referenced [1]**
32/4

**refuse [1]**
24/2

**refused [2]**
2/11 42/17

**regardless [1]**
22/3

**regime [2]**
32/5 32/6

**register [2]**
11/17 43/18

**registered [1]**
12/16

**regret [1]**
39/12

**reject [2]**
26/17 26/17

**related [1]**
56/2

**relationship**
**[3]** 8/14 8/18
45/11

**relatively [1]**
15/19

**relevant [1]**
20/11

**relief [3]**
42/20 56/11
56/22

**remain [1]**
51/21

**remedy [2]**
17/21 34/14

**reply [1]**
57/24

**Reporter [3]**
1/23 1/23 62/3

**representation**
**[1]** 55/22

**representing**
**[4]** 13/22
24/6 31/24
55/7

**request [2]**
17/7 19/3

**require [1]**
15/21

**required [3]**
3/18 32/2 32/3

**requirement [2]**
32/2 32/19

**requirements**
**[3]** 26/12
32/20 44/23

**requires [3]**
20/20 32/17
36/6

**reread [1]**
59/6

**reschedule [1]**
14/25

**reserved [1]**
51/4

**resist [1]**
24/1

**resolution [3]**
41/5 41/11

**R**

resolution...
[1]  41/13
resolve [3]
15/25 41/12
54/21
respect [7]
8/12 22/24
30/8 33/7
33/16 37/10
41/6
respond [3]
6/11 24/9
35/14
response [6]
31/20 35/24
47/3 48/11
51/8 51/9
responses [2]
13/25 31/21
responsibilitie
s [1]  54/20
responsible [1]
40/5
result [2]
12/11 15/14
resumed [1]
25/4
return [2]
33/25 34/2
reversed [1]
36/21
review [9]  6/5
7/23 17/6
34/24 40/7
50/21 51/22
52/1 53/3
reviewing [1]
53/6
revise [1]
21/7
REYES [15]  1/9
27/4 27/6 27/6
27/8 27/10
27/13 27/14
27/15 28/9
28/19 29/12
34/18 34/25
35/1
rid [3]  4/12
25/1 56/11
right [38]
2/25 4/7 4/9
5/6 5/9 6/2
7/8 7/18 13/8
13/23 14/2
18/20 27/2

27/2 29/23
31/18 31/22
36/19 39/18
40/25 46/5
47/23 48/4
48/5 49/1 49/2
49/25 51/1
51/8 51/18
52/20 54/13
54/18 55/18
56/23 59/13
59/17 60/5
rights [4]
7/16 16/17
17/20 39/17
risk [2]  10/23
35/3
routinely [2]
23/19 32/23
ruins [1]
59/10
rule [6]  21/23
38/20 38/21
40/6 50/8
54/15
ruled [2]
36/14 47/7
rules [9]  3/18
6/18 15/23
26/7 26/12
31/13 32/3
35/18 55/21
ruling [3]
50/8 52/1
53/15
rulings [1]
40/3
run [1]  59/15
running [1]
44/24

**S**

sadly [1]  2/17
salt [1]  24/12
same [10]  8/20
13/2 18/20
19/18 20/14
27/10 30/11
38/7 41/21
45/20
sanctionable
[1]  47/19
sanctions [4]
29/17 34/5
34/13 48/1
satisfied [1]
21/23
saw [4]  12/5

21/12 22/6
41/23
saying [21]
5/17 9/15
13/11 17/15
18/4 22/1
25/10 30/9
30/22 31/9
32/19 33/2
37/7 39/13
40/11 44/22
48/2 48/3
49/14 54/16
56/20
saying that [1]
40/11
scenarios [1]
52/12
schedule [2]
58/23 59/17
seated [2]
15/12 59/19
sec [1]  54/3
second [9]
14/17 14/19
37/22 49/11
50/5 51/10
55/5 56/12
57/6
secondly [1]
51/2
section [4]
44/11 44/16
44/17 50/16
seeing [3]
13/13 40/17
40/17
seek [2]  34/12
48/1
seeking [3]
54/7 56/10
56/14
seem [1]  31/19
seems [16]  6/4
9/21 18/3
23/11 23/14
30/16 31/2
31/3 31/20
37/17 38/2
38/6 45/3
51/25 55/10
55/16
selected [1]
13/6
sell [1]  54/24
send [3]  45/5
46/10 59/18
sending [1]

19/18
sense [7]  30/3
35/11 35/12
41/25 52/8
57/11 60/18
September [1]
1/5
Series [1]
59/15
serve [1]  26/3
service [7]
11/12 11/14
11/16 23/4
23/7 43/17
43/18
set [6]  3/19
26/7 31/13
57/9 58/20
58/22
settle [1]
12/18
settlement [8]
5/3 12/19
27/21 27/22
30/7 44/22
45/7 45/7
settlements [1]
5/1
settles [1]
4/15
seven [3]
44/16 44/21
52/20
sex [1]  16/19
shall [3]
44/20 44/20
44/20
share [1]  4/1
sharp [5]
23/20 23/23
23/25 24/8
26/20
shoot [1]  4/15
show [9]  16/25
20/16 22/19
25/24 43/24
48/18 49/15
50/2 54/9
showing [3]
18/6 32/18
44/2
shown [10]
5/23 17/1
17/17 19/7
20/4 22/4
22/17 22/18
22/22 43/25
sic [1]  49/4

side [1]  26/21
sides [1]
24/12
significance
[1]  14/13
similar [3]
13/14 39/14
47/11
simple [1]
20/16
single [3]
5/20 27/12
46/17
sit [3]  4/20
4/21 49/1
sitting [1]
53/4
situation [3]
13/24 33/2
45/15
six [4]  15/16
16/4 16/8
59/15
skip [2]  31/6
44/16
skipped [1]
28/3
slow [1]  6/24
small [2]  3/25
53/14
soaps [2]  18/6
18/7
somebody [2]
55/3 55/4
somehow [2]
37/25 38/1
someone [4]
24/4 43/4 49/5
50/22
sometimes [3]
4/11 4/16 46/2
sorry [11]
4/21 10/10
11/24 12/17
23/14 24/21
27/3 31/10
35/4 44/6 47/8
sort [13]  4/18
5/25 25/18
26/19 31/9
33/14 35/22
37/18 39/5
46/6 52/8 54/2
56/17
sounded [1]
24/24
sounds [1]
10/14

**S**

South [1]   1/13
Sox [3]   59/9
59/12 59/13
Spain [1]   27/5
spats [1]
60/21
speak [3]   3/22
26/6 44/15
specialized [1]
16/9
specific [4]
15/23 22/13
41/18 42/13
specifically
[2]   28/7
44/11
specious [1]
7/14
spoken [1]
15/9
spot [1]   51/7
square [1]
30/8
stage [1]   31/4
stake [1]   24/7
standard [8]
7/23 25/18
28/4 32/17
33/24 49/15
49/18 50/20
standardized
[3]   15/25
16/10 20/13
standing [2]
54/7 59/3
standpoint [1]
7/1
stands [2]
36/14 36/19
start [2]
45/25 58/22
started [2]
11/1 19/16
starting [3]
2/5 15/13
58/17
state [3]   2/4
25/15 30/11
stated [1]
35/13
states [3]   1/1
1/10 20/7
status [1]
12/22
statute [3]
11/19 16/17

17/20
statutory [3]
11/18 16/1
20/17
stay [1]   3/21
step [1]   40/23
steven [1]
2/21
stick [1]
42/13
stiff [1]
17/21
still [6]   8/23
15/4 37/2 38/3
51/20 52/6
stonewalled [1]
46/4
stop [1]   46/24
straight [4]
20/16 40/22
44/17 44/17
straight-forwar
d [1]   20/16
strategy [2]
25/17 26/2
streaming [3]
43/17 43/18
43/21
Street [1]
1/13
strike [1]
13/4
strong [1]
20/9
stronger [1]
55/4
structured [1]
5/20
stuff [8]
19/16 19/18
19/19 33/12
33/13 33/21
42/2 60/22
subject [3]
10/2 22/8 38/9
subjected [1]
17/18
subscriber [2]
23/16 23/16
subscribers [1]
46/13
subscription
[3]   11/12
11/14 23/6
subscriptions
[3]   23/8
33/11 33/19
succeed [4]

37/11 37/23
54/12 54/15
success [3]
35/5 35/6
35/10
sudden [1]
19/17
suddenly [1]
21/7
sued [2]   7/25
23/23
suffering [2]
41/8 41/9
suggest [1]
32/6
suing [2]   23/1
45/16
suit [1]   39/1
Suite [2]   1/14
1/18
summer [1]
2/12
super [1]
59/16
support [1]
20/9
supported [1]
23/3
suppose [1]
38/15
supposed [1]
32/22
supreme [2]
17/4 19/3
sure [9]   15/1
18/2 21/11
34/1 42/24
42/25 52/25
53/23 54/3
surprised [1]
4/13
survive [2]
5/1 27/22
survives [2]
56/15 56/17
system [5]
4/25 6/8 9/1
37/13 53/25

**T**

tactics [1]
24/1
talk [9]   24/21
29/6 30/24
37/21 46/4
49/12 49/17
56/5 60/19
talked [3]

29/5 53/5
55/24
talking [9]
4/3 4/4 6/13
9/14 11/3 20/2
39/9 52/11
55/7
talks [1]
55/22
target [1]
55/12
targeted [3]
11/20 11/23
12/5
targeting [1]
19/22
team [2]   58/16
59/12
technology [1]
11/23
teeth [1]   29/8
television [1]
7/12
telling [2]
7/7 45/18
tells [1]
53/20
terms [6]   4/25
7/16 8/2 8/4
39/4 39/18
test [5]   29/5
29/8 29/15
29/17 49/12
thanking [1]
58/5
Thanks [1]
61/2
Thanksgiving
[3]   58/2 58/5
58/12
theory [3]
20/13 22/3
53/12
therefore [3]
42/3 51/17
51/20
thingamajig [1]
11/15
thinking [3]
4/16 52/20
54/2
third [6]
12/15 38/25
39/2 51/10
52/13 52/21
though [6]
27/3 28/2 42/7
45/4 47/14

52/18
thought [7]
2/17 19/4 19/5
46/19 52/4
53/4 56/11
thoughts [2]
33/22 50/25
thousand [2]
11/4 42/6
thousands [4]
23/6 33/10
33/10 35/21
threat [1]
31/10
three [1]   30/4
threw [1]
33/13
ties [1]   41/19
times [3]   4/8
4/13 11/8
timing [1]
57/4
today [2]   40/2
53/4
together [3]
5/12 57/20
60/23
told [1]   33/15
ton [1]   31/13
took [3]   12/11
26/14 39/8
torn [2]   4/10
33/21
tort [6]   26/16
29/19 30/21
56/14 56/18
56/21
tortious [13]
6/15 6/17
25/15 26/21
30/21 32/13
32/15 34/4
34/11 34/14
37/16 38/6
40/12
tortiously [1]
38/11
totally [4]
2/15 34/11
40/13 52/6
touched [1]
16/11
trade [2]
55/23 55/24
transcript [2]
1/9 62/4
treating [1]
55/5

**T**

trial [1]
58/20

tribunal [1]
38/19

tricky [1]
50/7

trip [1]   19/15

trouble [1]
31/19

troubling [1]
53/13

true [10]   8/8
21/25 29/23
33/16 34/15
38/16 38/23
39/1 41/2 62/4

trust [1]
17/23

try [7]   13/8
25/21 36/21
43/19 44/21
45/6 48/1

trying [7]
11/20 15/4
31/19 39/17
46/8 54/23
54/24

TUBI [22]   1/3
2/3 2/7 3/10
10/20 12/12
15/15 16/24
17/17 20/18
25/6 25/15
41/8 41/9
43/16 45/4
45/18 50/21
51/17 55/3
55/4 55/14

Tubi's [2]
7/16 47/11

turn [1]   25/13

TV [1]   11/15

two [15]   18/25
32/1 32/8
32/25 38/19
38/23 40/18
40/19 48/11
52/3 56/8 56/9
56/13 56/15
56/18

two is [1]
32/25

Twombly [3]
25/22 30/3
33/1

type [1]   37/18

typically [1]
27/22

**U**

U.S [5]   1/24
43/21 43/22
43/24 44/2

ultimately [1]
22/13

umbrage [1]
31/6

uncle [1]   27/5

under [21]
3/18 7/16 7/24
11/18 17/19
21/23 22/3
25/19 25/22
26/12 26/12
26/13 29/17
32/2 32/3
32/17 32/21
34/3 37/16
46/5 52/3

undercurrent
[1]   31/9

underlying [2]
21/14 40/19

unenforceable
[1]   41/5

unethical [1]
24/4

unfair [4]
15/11 24/5
24/6 52/17

unfavorable [1]
35/16

unfounded [1]
24/14

unilateral [1]
47/11

unique [1]   9/2

UNITED [2]   1/1
1/10

unless [4]
21/23 24/3
38/23 51/8

unlike [3]   7/1
8/11 54/19

unlike a [1]
7/1

unquote [1]
41/1

Unruh [1]
11/18

up [13]   3/16
3/21 7/20
13/11 21/4
25/10 27/13

30/21 36/13
39/4 39/5 59/9
60/4

upholds [1]
47/10

upset [1]
23/20

upset and [1]
23/20

use [5]   7/17
7/24 8/3 8/4
39/18

used [3]   13/2
28/7 28/19

user [3]   12/21
17/18 52/16

users [2]
12/16 12/21

using [1]   28/3

**V**

valid [3]   46/1
46/11 46/17

value [1]
15/19

versus [1]
54/16

vet [4]   8/19
41/15 41/17
41/18

video [1]   23/4

view [5]   15/24
16/3 20/15
26/11 46/18

violated [2]
16/17 32/20

violates [2]
20/10 53/3

violating [1]
38/9

violation [3]
17/20 19/8
20/16

Virginia [1]
19/24

**W**

wait [1]   45/17

waive [1]   36/7

waiver [1]
36/6

wall [1]   33/14

wants [1]
29/20

WARREN [2]
1/16 3/2

Washington [3]
1/5 1/19 1/25

wasting [1]
60/22

watch [3]
43/22 43/24
55/4

watched [2]
55/3 55/5

way [35]   5/10
5/15 5/17 6/5
6/7 6/8 8/5
8/10 8/20
14/10 15/14
17/22 18/23
21/19 22/23
27/16 27/20
32/12 33/5
34/8 34/18
34/18 34/22
39/4 40/1
43/16 43/19
44/24 45/9
45/25 53/17
54/24 55/9
56/20 61/2

ways [6]   9/7
10/18 21/2
45/4 50/8
54/21

week [1]   58/11

weren't [2]
23/16 29/24

what's [10]
6/14 9/2 11/2
12/14 12/22
13/18 15/2
32/2 32/3 42/8

whatev [1]
2/16

white [3]
52/14 59/9
59/13

who's [1]
13/12

whole [5]
22/23 24/7
35/3 35/4
49/14

wills [1]
54/17

win [3]   38/22
50/21 60/13

wins [1]   59/14

wish [1]   45/4

within [3]   6/8
8/23 38/5

without [9]
5/22 6/22 9/4
9/5 9/6 33/14

37/12 40/23
41/10

woman [2]   42/2
55/13

women [7]
16/25 17/1
18/5 18/7 18/9
20/4 22/4

women's [2]
18/9 18/9

word [1]   47/3

words [2]
38/22 48/8

work [7]   7/5
46/9 46/18
53/7 57/10
57/11 59/17

works [6]   4/25
5/15 5/17
15/14 22/24
53/25

world [4]
21/22 30/12
37/9 59/15

worse [2]
47/12 59/12

worth [2]   35/3
35/4

worthless [1]
28/4

write [1]
39/11

writing [1]
60/22

written [4]
31/12 39/18
44/19 45/14

wrong [17]   6/4
7/19 7/21 9/21
28/3 31/2 31/3
36/17 40/13
46/2 49/21
50/2 50/2 52/2
52/4 52/6
53/23

wrongful [2]
31/10 31/12

wrongly [2]
41/21 42/8

wrote [10]
20/20 20/23
20/25 32/7
35/17 35/23
39/4 39/5 56/7
56/9

**Y**

years [7]   2/17

**Y**

**years... [6]**
11/19 15/16
16/4 16/8
59/21 59/23
**young [3]**  17/1
60/3 60/12

**Z**

**zero [1]**  12/4
**Zoom [1]**  42/16

# EXHIBIT B

CA B. An., A.B. 2915 Assem., 5/14/2002

California Bill Analysis, Assembly Floor, 2001-2002 Regular Session, Assembly Bill 2915

May 14, 2002
California Assembly
2001-2002 Regular Session

ASSEMBLY THIRD READING

AB 2915 (Wayne)

As Amended May 14, 2002

Majority vote

JUDICIARY                                                                                         10-0

| Ayes: | Corbett, Harman, Dutra, |
| | Jackson, Longville, |
| | Shelley, Steinberg, |
| | Vargas, Wayne, Aroner |

SUMMARY: Enacts rules for mandatory consumer arbitration fees. Prohibits "loser-pays" policies under which non-prevailing consumers are required to pay the fees and costs of opposing businesses, and implements administrative fee waivers for indigent consumers, consistently with the longstanding practice of courts.

FISCAL EFFECT: None

COMMENTS: This bill comprises another element of the comprehensive package developed out of the Judiciary Committee's two informational hearings earlier this year regarding consumer arbitration, the first of which specially focused on the role and operation of private judging companies. The author reports that these hearings underscored substantial concerns about the fairness of consumer arbitrations, and just as importantly, the appearance of fairness, particularly in arbitrations against repeat players. These hearings also pointed out, the author states, that a great deal of the consumer arbitrations being conducted today are the result of agreements imposed on consumer parties by large corporate entities in take-it-or-leave-it adhesion contracts. In addition, it was noted that the lion's share of these consumer arbitrations is believed to be conducted by arbitrators affiliated with large private judging companies.

In support of this bill, Consumer Attorneys of California (CAOC) state that this bill is "aimed at what we believe to be unethical requirements by some of the major [arbitration] providers." CAOC concludes, "AB 2915 is a step in the right direction by at least addressing this harsh system's impact on indigent consumers."

Consumers Union (CU), also in support, states that reducing loser pays rules in consumer cases "would eliminate one of the ways in which arbitration can be more costly for consumers than the court system." As to fee waivers for indigent consumers, CU notes that this bill is consistent with the policy of the American Arbitration Association (AAA). Despite AAA's stated policy, however, CU observes that the court in Ting v. AT&T, 182 F.Supp.2d 902 (N.D. Cal. 2002) found that the company has historically had no mechanism by which to actually implement its supposed fee waiver policy.

Unlike the judicial system, the author points out, which has numerous safeguards against bias, legal and factual error and arbitrary decisionmaking, the arbitration industry is largely unsupervised. Indeed, unlike every other area of professional practice in the legal field, the author notes that private judging companies are essentially unregulated by state or federal law. Most critically, for the purpose of this bill, the author notes, unlike civil court, private arbitration is subject to no fee limitations. As a result, access to the system may be greatly affected by the wealth of the consumer. The author states that this bill addresses these inequities by prohibiting large private judging companies from conducting mandatory consumer arbitrations where a consumer who loses the case must pay the winning company's fees and costs. This bill also implements a fee waiver policy for indigent consumers akin to the long-standing practice in public courts. This bill does not affect commercial arbitrations between businesses.

One of the primary arguments advanced in support of mandatory consumer arbitration is that it is less costly than civil litigation. However, this argument is cast into significant doubt by the available evidence. In fact, arbitration costs are so high that many people drop their complaints because they can't afford to pursue them, a recent study by Public Citizen found.

The reason for the policy proposed by this bill is evident: particularly where there is great disparity in wealth and power between adversaries, as is typically true of mandatory consumer arbitrations, the prospect that a losing consumer party may be required to pay the high attorneys' fees and expenses of a corporate opponent may be so daunting as to deter the consumer from pursuing his or her case at all. This prospect is underscored by the significant concerns that corporate "repeat-players" may well be disproportionately favored by arbitrators and private judging companies in mandatory arbitrations against "one-shot" individual consumers. In sum, the very real fear that big companies have an unfair advantage in arbitration, coupled with the risk that the consumer would be forced to pay the potentially staggering costs of the company's lawyers and other costs, may be enough to effectively preclude a consumer from even seeking to vindicate his or her rights, particularly where the amount at issue may be dwarfed by the potential financial loss. Certainly, as proponents of arbitration contend, if arbitration is a worthy alternative to litigation, the door to the process must be open.

The second provision deals with indigent consumers. Under California law, civil litigants may proceed in forma pauperis and obtain a waiver of all fees and costs. This bill would enact a similar provision for indigent consumers in mandatory arbitration. In order to prevent intrusion by private judging companies into the personal financial affairs of the consumer, and to prevent the collection and distribution of such information, this bill provides for execution of declarations regarding indigence, and prohibits the private judging companies from disclosing the consumer's financial information. Finally, in order to make the indigent consumer's right to waiver meaningful, this bill requires that the consumer be notified of the right to seek waiver.

Although not strictly in opposition, the California Dispute Resolution Council (CDRC) states that it is concerned that this bill would prevent arbitrators from punishing "vexatious" consumer parties who assert frivolous arbitration claims against companies. Of course, there are considerable differences between private arbitration companies and civil courts that severely undermine this comparison. But putting aside the pertinence of the analogy, the short answer to CDRC's contention is that, to the extent that barring sanctions against consumers is a problem, it is one of the company's own making by forcing the consumer out of the courts and into a private judging system. If the company wishes to have the full panoply of rights and remedies to which civil litigants are entitled, it need not impose a mandatory arbitration agreement on its consumers. Indeed, avoiding mandatory arbitration would have the "side benefit" of preserving the full legal rights that consumers are forced to give up in arbitration.

<u>Analysis Prepared by</u>: Kevin G. Baker / JUD. / (916) 319-2334

FN: 0004789

CA B. An., A.B. 2915 Assem., 5/14/2002

---

**End of Document**                                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.