## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

SEGA OF AMERICA, INC.,

*Plaintiff,*

v.                                                    Case No. 1:25-cv-257

CONSOVOY MCCARTHY PLLC,

*Defendant.*

## DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    California law applies to Sega's state-law tort claims (Counts I, II, & IV). ..................... 2

II.   Immunity bars Sega's claims. ...................................................................................... 5

    A.   Litigation privilege precludes liability for Sega's tort claims (Counts I, II, & IV). ....... 6

    B.   *Noerr-Pennington* immunity bars Sega's Lanham Act claim (Count III). .................... 8

III.  Sega's tortious interference claims fail for additional reasons (Counts I & II). ............... 10

    A.   *Bear Stearns* held that inducing clients to file legal actions is outside the scope of tortious interference claims. ........................................................................... 10

    B.   Count I fails to state a claim for tortious interference due to Consovoy's filing its clients' successful *Hensley* petition to compel arbitration. ........................................... 11

        1.   An agent cannot tortiously interfere with its principal's contract. ......................... 11

        2.   Consovoy's clients did not breach the Class Action Waiver. ................................. 13

    C.   Count II fails to state a claim for tortious interference with a contract with JAMS. ..... 15

        1.   Arbitral immunity forecloses Sega's underlying breach claim against JAMS. ..... 15

        2.   Sega has not otherwise alleged JAMS breached a contract. ................................... 16

        3.   Sega does not allege the remaining elements of a tortious interference claim....... 17

IV.  Sega does not state a Lanham Act claim (Count III). ....................................................... 17

    A.   Sega lacks statutory standing and has not pleaded proximate cause. .......................... 17

    B.   Sega failed to plead the basic elements of a Lanham Act claim................................. 19

V.   Count IV should be dismissed because Sega failed to plead a legal claim. ....................... 20

CONCLUSION.................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Abernathy v. DoorDash, Inc.*,
  438 F. Supp. 3d 1062 (N.D. Cal. 2020) ................................................................. 10

*Action Apartment Ass'n, Inc. v. City of Santa Monica*,
  41 Cal. 4th 1232 (2007) .......................................................................... 5, 6, 7

*Buckland v. Commonwealth*,
  2025 WL 1559621 (Va. Ct. App. June 3, 2025) ....................................................... 13

*Cardinal Holding Co. v. Deal*,
  258 Va. 623 (1999) ............................................................................... 13

*Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*,
  472 F. Supp. 2d 740 (E.D. Va. 2007) ................................................................. 4

*Computerized Payroll Sols., Inc. v. Rapid Payroll, Inc.*,
  2004 WL 7400825 (C.D. Cal. Oct. 4, 2004) .......................................................... 12

*Cooper v. Adobe Sys. Inc.*,
  2019 WL 5102609 (N.D. Cal. Oct. 11, 2019) ......................................................... 16

*Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*,
  440 F. Supp. 2d 1184 (D. Nev. 2006) ................................................................ 11

*Design Res., Inc. v. Leather Indus. of Am.*,
  789 F.3d 495 (4th Cir. 2015) ....................................................................... 20

*Devonshire v. EurAuPair Int'l, Inc.*,
  1996 WL 33456040 (Va. Cir. Ct. May 22, 1996) ...................................................... 20

*Divino Plastic Surgery, Inc. v. Superior Ct.*,
  78 Cal. App. 5th 972 (2022) ....................................................................... 14

*DoorDash, Inc. v. Plascencia*,
  2023 WL 2801677 (Cal. Super. Ct. Apr. 3, 2023) .................................................... 1

*Eurotech, Inc. v. Cosmos European Travels*,
  189 F. Supp. 2d 385 (E.D. Va. 2002) .............................................................. 5, 8

*Ford Motor Co. v. Nat'l Indemn. Co.*,
  972 F. Supp. 2d 850 (E.D. Va. 2013) ........................................................... 2, 4, 8

*Fox v. Deese*,
  234 Va. 412 (1987) ............................................................................... 13

*Francis Hosp., Inc. v. Read Props., LLC*,
  296 Va. 358 (2018) ............................................................................... 13

*Guinnane Constr. Co. v. Chess*,
  2020 WL 7640216 (Cal. Ct. App. Dec. 22, 2020) .................................................... 11

*Hofer v. Young*,
  38 Cal. App. 4th 52 (1995) ................................................................. 16

*Hoffmann-La Roche Inc. v. Sperling*,
  493 U.S. 165 (1989) .......................................................................... 14

*Holgate v. Baldwin*,
  425 F.3d 671 (9th Cir. 2005) ............................................................. 20

*Jordan v. Shaw Indus., Inc.*,
  131 F.3d 134 (4th Cir. 1997) ............................................................... 4

*Lexmark Int'l., Inc. v. Static Ctrl. Components, Inc.*,
  572 U.S. 118 (2014) .......................................................................... 18

*Liapes v. Facebook, Inc.*,
  95 Cal. App. 5th 910 (2023) ................................................................ 9

*McVey v. Stacy*,
  157 F.3d 271 (4th Cir. 1998) ............................................................... 5

*Milton v. IIT Rsch. Inst.*,
  138 F.3d 519 (4th Cir. 1998) ........................................................... 3, 4

*Mintz v. Blue Cross of Cal.*,
  172 Cal. App. 4th 1594 (2009) ................................................ 11, 12, 13

*Moore v. Conliffe*,
  7 Cal. 4th 634 (1994) ......................................................................... 6

*Morgan Phillips, Inc. v. JAMS/Endispute, LLC*,
  140 Cal. App. 4th 795 (2006) ............................................................ 15

*Mundy v. Lenc*,
  203 Cal. App. 4th 1401 (2012) .......................................................... 15

*Navellier v. Sletten*,
  106 Cal. App. 4th 763 (2003) .............................................................. 6

*Navient Sols., LLC v. Lohman*,
  136 F.4th 518 (4th Cir. 2025) ............................................................. 8

*Nickell v. Matlock*,
  206 Cal. App. 4th 934 (2012) ............................................................ 14

*Pacific Gas & Elec. Co. v. Bear Stearns & Co.*,
  50 Cal. 3d 1118 (1990) ................................................................. 10, 11

*PBM Prods., LLC v. Mead Johnson & Co.*,
  639 F.3d 111 (4th Cir. 2011) ............................................................. 19

*People v. Bd. of Parole Hearings*,
  83 Cal. App. 5th 432 (2022) .............................................................. 14

*People v. Potter Handy, LLP*,
  97 Cal. App. 5th 938 (2024) ............................................................... 5

*Perdue v. Croker Nat'l Bank*,
    38 Cal. 3d 913 (1985) ............................................................................................ 3

*PM Grp., Inc. v. Stewart*,
    154 Cal. App. 4th 55 (2007) ............................................................................... 11

*Rosenfeld, Meyer & Susman v. Cohen*,
    146 Cal. App. 3d 200 (1983) ................................................................................ 7

*Schick v. Lerner*,
    193 Cal. App. 3d 1321 (1987) ........................................................................ 7, 11

*Scotts Co. v. Pennington Seed, Inc.*,
    2014 WL 12591406 (E.D. Va. Feb. 26, 2014) .................................................. 20

*Self Insured Servs. Co. v. Panel Sys., Inc.*,
    352 F. Supp. 3d 540 (E.D. Va. 2018) .............................................................. 4, 5

*SIC Metals, Inc. v. Hyundai Steel Co.*,
    442 F. Supp. 3d 1251 (C.D. Cal. 2020) ........................................................... 17

*Silberg v. Anderson*,
    50 Cal. 3d 205 (1990) ........................................................................................... 7

*Stasz v. Schwab*,
    121 Cal. App. 4th 420 (2004) ............................................................................. 15

*Thomas v. Peddie*,
    2019 WL 2950161 (Cal. Ct. App. July 9, 2019) ............................................... 11

*Uber Tech., Inc. v. Am. Arb. Ass'n, Inc.*,
    167 N.Y.S.3d 66 (2022) ......................................................................................... 1

*Uwasomba v. Bank of Am.*,
    2022 WL 4181719 (E.D. Va. Aug. 22, 2022) ................................................... 20

*Valve Corp. v. Bucher Law PLLC*,
    2025 WL 1792620 (Wash. Ct. App. June 30, 2025) ........................................... 1

*Verisign, Inc. v. XYZ.COM LLC*,
    848 F.3d 292 (4th Cir. 2017) ...................................................................... 17, 19

*Waugh Chapel S. v. United Food & Com. Workers*,
    728 F.3d 354 (4th Cir. 2013) ................................................................................ 9

*Wells v. Liddy*,
    186 F.3d 505 (4th Cir. 1999) ................................................................................ 4

*White v. Miyares*,
    2025 WL 1599076 (E.D. Va. June 5, 2025) ....................................................... 5

*Yu v. Signet Bank/Virginia*,
    103 Cal. App. 4th 298 (2002) ........................................................................... 6, 7

**Statutes**

Cal. Civ. Code §1644 .................................................................................................. 14, 15

Cal. Civ. Proc. Code §1048 ............................................................................................ 14

Cal. Civ. Proc. Code §1063 ............................................................................................ 13

Cal. Civ. Proc. Code §1281.2 ......................................................................................... 13

Va. Code §18.2-216 ........................................................................................................ 20

## INTRODUCTION

Nothing in Sega's opposition brief changes the nature of its claims. They are beyond frivolous because Sega has sued Consovoy—a law firm—merely for soliciting and representing clients in successful litigation against Sega. Nor is there anything "extraordinary" about law firms representing many individual consumers in arbitration, as Sega claims. Mass arbitrations are a common vehicle for vindicating consumers' claims. *See* MTD 3-4. For its part, Consovoy has litigated thousands of individual arbitrations against companies like Sega. *See, e.g.*, *DoorDash, Inc. v. Plascencia*, 2023 WL 2801677, at *1 (Cal. Super. Ct. Apr. 3, 2023) (confirming arbitration award of $4,876,000 for 78 of Consovoy's clients); *Uber Tech., Inc. v. Am. Arb. Ass'n, Inc.*, 167 N.Y.S.3d 66, 67 (2022). Consovoy stands ready to do so here.

Sega obviously doesn't like mass arbitrations. But they exist precisely because companies like Sega force their customers to arbitrate their claims. That Sega wants to avoid the consequences of its own arbitration agreement is no justification for suing lawyers for representing their clients. In fact, this tactic—suing attorneys for doing their job—is the latest in a long line of subversive strategies that companies have employed to avoid arbitrations. And like those companies' prior tactics, this one isn't gaining any traction. Just two weeks ago, a court rejected a materially identical lawsuit against attorneys representing consumers in a mass arbitration. "The conduct [the plaintiff] complains of—the filing of thousands of individual arbitration requests—is the direct result of its own agreement barring class actions and prohibiting collective or representative arbitration." *Valve Corp. v. Bucher Law PLLC*, --- P.3d --- , 2025 WL 1792620, at *7 (Wash. Ct. App. June 30, 2025). "Such conduct is part of a legal practice and directly related to representing clients, which is precisely the kind of conduct the litigation privilege is designed to protect." *Id.* Those same principles apply here. For those reasons and the ones outlined in Consovoy's motion and this reply brief, the Court should dismiss Sega's claims with prejudice.

1

## ARGUMENT

**I.  California law applies to Sega's state-law tort claims (Counts I, II, & IV).**

**A.** In Virginia, "the place of the wrong is the place the last event necessary to make an actor liable for an alleged tort takes place." *Ford Motor Co. v. Nat'l Indemn. Co.*, 972 F. Supp. 2d 850, 856 (E.D. Va. 2013) (cleaned up). "For a claim of tortious interference, the last event necessary is a legal injury or damage to the plaintiff caused by the wrongful interference." *Id.* at 858. That injury is the underlying breach, and so "a court must identify the state in which the breach occurred and apply the law of that state." *Id.* Sega previously agreed that *Ford* controls and that, "the 'wrongful act' is the 'breach of the contract between the plaintiff and its business counterparty,'" Dkt. 21, at 8-9 (quoting *Ford*, 972 F. Supp. 2d at 858). As a result, Sega explained, "'a court must identify the state in which the breach occurred and apply the law of that state.'" *Id.*

Here, both alleged breaches underlying Sega's tortious interference claims occurred in California. On Count I, Sega alleges that Consovoy's clients "materially breached [the EULA] by filing a single, consolidated petition to compel Sega to arbitrate." FAC ¶79 ("*Hensley* petition"). The *Hensley* petition was filed in L.A. Superior Court. FAC ¶69. On Count II, Sega alleges that "JAMS breached its contract with SEGA by issuing a [$39 million] invoice to Sega." FAC ¶89; *see also* FAC ¶¶91-92. JAMS is a California-based company that issued the invoice to Sega, which is also California-based. *See* FAC ¶5. California law thus governs Sega's interference claims.

Because that outcome is obvious, Sega now ignores *Ford* entirely and its past (correct) view that "a court must identify the state in which the breach occurred and apply the law of that state." Dkt. 21, at 9. Sega instead argues (at 5) for Count I that "the wrongful act was not the filing of the Petition, but Consovoy's decision to file the Petition on a consolidated basis, and that decision was made in Virginia." Sega says "[t]he same goes" for Count II. This has two problems. First, the site

of Consovoy's alleged tortious conduct isn't the relevant "wrongful act," since "[t]he 'place of the wrong' becomes the place of the contract breach." *Ford*, 972 F. Supp. 2d at 858-59.

Second, even if the tortious conduct (rather than the breach) were the relevant inquiry, that conduct also occurred in California. Sega asserts (at 7) that Consovoy's tortious conduct was in Virginia because that is where "Consovoy made the decision to file" the *Hensley* petition and demands. That's a nonsense attempt to evade California law. "A tort is … a wrongful act," *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 522 (4th Cir. 1998), not "thinking" about doing a wrongful act. For instance, when a Virginia resident decides to drive to Tennessee and then causes an accident there, "[e]ven though the parties were domiciled in Virginia at the time of the accident," Tennessee law applies because "Tennessee [is] the place of the injury." *Id.* The same is true here. Even if Consovoy *decided* in Virginia to file the lawsuits in California, it *filed* them in California.[1]

Sega's own EULA and complaint confirm that California law applies. For Count I, Sega's EULA provides that "[a]ny dispute arising out of or related to this Agreement shall be governed in all respects by the laws of the State of California … without regard to conflict of law provisions." FAC, Ex. A, §20. And for Count II, Sega relies on California precedent for the underlying breach. *See* FAC ¶90 (citing *Perdue v. Croker Nat'l Bank*, 38 Cal. 3d 913 (1985)). Sega thinks that Virginia law should apply to *some* elements of its claims while California law applies to the breach element. There is no reason for the Court to adopt such a convoluted outcome because the choice-of-law question is easy under *Ford* and Sega's own prior concessions about the relevant inquiry.

---

[1] There are also no allegations in the complaint about where Consovoy made the "decision" to file the *Hensley* petition. So, Sega alleges no facts to support applying Virginia law under its own theory for Count I. For Count II, the complaint does allege "[o]n information and belief, Consovoy made the decision in Texas or Virginia to submit" the arbitrations. FAC ¶53. But "[p]leading on information and belief alone is not enough to raise allegations beyond a speculative level." *Mao v. Glob. Tr. Mgmt., LLC*, 2022 WL 989012, at *12 (E.D. Va. Mar. 31, 2022). This is doubly speculative since Sega can't decide whether the "decision" happened in Virginia or Texas.

**B.** The parties also agree that "the place of the wrong" test applies to Sega's state-law false advertising claim. For a claim where "a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made." *Jordan v. Shaw Indus., Inc.*, 131 F.3d 134, at *3 (4th Cir. 1997) (table). The law that applies, then, is "the law of the forum where the party allegedly defrauded is headquartered." *Cars Unlimited II, Inc. v. Nat'l Motor Co., Inc.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007). And Sega is headquartered in California. FAC ¶5.

Sega doesn't respond with cases applying the "place of the wrong" test for fraud-based claims. Instead, it points to a case stating the general proposition that "Virginia selects the place of where the wrongful act occurred and not … the place where the injury was suffered." Opp. 5. That is true as far as it goes, but it gets Sega nowhere. In Virginia, the "place of the wrong" "will vary amongst different claims, depending on … which element is deemed to provide the 'last event necessary' to make the actor liable for the particular tort." *Ford*, 972 F. Supp. 2d at 857. Sometimes the "last event necessary" isn't the plaintiff's injury. *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999). But "[i]n the fraud context," "the place of the wrong is where the loss is sustained." *Self Insured Servs. Co. v. Panel Sys., Inc.*, 352 F. Supp. 3d 540, 553 (E.D. Va. 2018). That is the plaintiff's "principal place of business," *id.*—California.

Even on Sega's own terms, California law would still apply. Sega effectively concedes that all Consovoy's clients are Californians. FAC ¶63 (noting that all Consovoy's clients submitted fee waiver declarations "under California law"). And on their face, the challenged advertisements asked viewers whether they were "a permanent resident of California." FAC ¶¶43, 49, 96, 104. So, the advertisements themselves were directed at and viewed by Californians. Under any test, then, California is the place of the wrong on this claim and thus supplies the governing law.

4

**C.** As a last-ditch effort, Sega asks the Court to open discovery on the choice-of-law question if the Court intends to rule against it. But federal courts in Virginia routinely decide choice of law at the motion to dismiss stage in cases like this one. *See, e.g.*, *Milton*, 138 F.3d at 522; *Self Insured*, 352 F. Supp. 3d at 551-53. And none of the three topics that Sega would seek discovery on are relevant. *See* Opp. 7. The location where "Consovoy made the decision to file the Petition" and where "Consovoy made the decision to submit over 19,000 individual arbitration demands" are irrelevant to choice of law for the reasons already stated. *Id.* So is the location where "Consovoy … created and published the false and misleading advertisements." *Id.* Sega's proposed discovery wouldn't advance the ball on the choice-of-law question. It's ripe for decision now.

## II. Immunity bars Sega's claims.

Sega contends (at 7) that, because Consovoy's immunities are "affirmative defenses," the Court should defer deciding them until after discovery. But immunities provide "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal immunity question." *McVey v. Stacy*, 157 F.3d 271, 275 (4th Cir. 1998) (cleaned up). "It is therefore incumbent on the courts to review the immunity defense critically at an early stage of the proceedings." *Id.* "At the motion to dismiss stage," then, "a defendant may properly raise the issue[] of his immunity to suit." *White v. Miyares*, 2025 WL 1599076, at *4 (E.D. Va. June 5, 2025) (collecting cases). As a result, courts regularly dismiss cases at the pleading stage based on California's litigation privilege and *Noerr-Pennington*. *E.g.*, *People v. Potter Handy, LLP*, 97 Cal. App. 5th 938, 947 (2024); *Eurotech, Inc. v. Cosmos European Travels*, 189 F. Supp. 2d 385, 391-94 (E.D. Va. 2002). And though Sega claims (at 7) that "there are factual issues that cannot be resolved at this stage," it doesn't identify any that prevent addressing Consovoy's immunities now.

## A. Litigation privilege precludes liability for Sega's tort claims (Counts I, II, & IV).

Sega doesn't dispute that the Supreme Court of California has held there is "no communication that is more clearly protected by the litigation privilege than the filing of a legal action." *Action Apartment Ass'n, Inc. v. City of Santa Monica*, 41 Cal. 4th 1232, 1249 (2007). And it doesn't dispute that court has also held the litigation "privilege applies to all arbitration proceedings." *Moore v. Conliffe*, 7 Cal. 4th 634, 648 (1994). Sega instead tries to carve out a new exception from these longstanding rules because it is purportedly "challeng[ing] the decision to file the arbitration demands and Petition in a particular *manner*." Opp. 8. No such exception exists.

Sega's argument relies on a passing statement from *Navellier v. Sletten*, 106 Cal. App. 4th 763 (2003), that "exceptional situations can arise where pleadings and conduct connected with litigation are not privileged," *id.* at 771 (citing *Yu v. Signet Bank/Virginia*, 103 Cal. App. 4th 298, 309 (2002)). The only "exceptional circumstances" that any California court has ever identified, however, were those in *Yu*. That case addressed "'distant forum abuse,' the practice of collecting consumer obligations by suing debtors in distant locations to deprive them of the opportunity to defend themselves." *Yu*, 103 Cal. App. 4th at 305. "Distant forum abuse is unconscionable, and insidious conduct." *Id.* (cleaned up). And an "abuse of process" claim is "a catch-all category to cover improper uses of the judicial machinery that do not constitute malicious prosecution." *Id.*

*Yu* is the only carveout to the rule that "no communication … is more clearly protected by the litigation privilege than the filing of a legal action." *Action Apartment*, 41 Cal. 4th at 1249. Sega cites no other case applying an exception to that rule, and Consovoy hasn't located any. And *Yu* has no application here. Sega doesn't allege that Consovoy filed its clients' arbitration demands and the *Hensley* petition in the wrong forums, much less that Consovoy committed "distant forum abuse." Nor could it. Sega's own arbitration agreement *required* filing arbitration demands with JAMS and the *Hensley* petition in L.A. Superior Court. *See* FAC, Ex. A, §19. Sega also doesn't

allege an "abuse of process" claim against Consovoy, which—like a malicious prosecution claim—is premised on grossly misusing the court system. *See Action Apartment*, 41 Cal. 4th at 1242 (malicious prosecution claim is not protected by litigation privilege). Nor could it. Consovoy's clients *prevailed* on the *Hensley* petition and the underlying arbitrations haven't yet begun. Sega's state-law claims against Consovoy thus cannot fall within *Yu*'s narrow carveout.

This case is also no basis for extending *Yu*. To start with, the Supreme Court of California has long "given the litigation privilege a broad interpretation." *Id.* at 1241. It has done so because the privilege is "the backbone of an effective and smoothly operating judicial system." *Silberg v. Anderson*, 50 Cal. 3d 205, 215 (1990). Thus, that court has said malicious prosecution claims are the *only* exception to the privilege, *Action Apartment*, 41 Cal. 4th at 1242, which renders the intermediate appellate court's decision in *Yu* out of line. Even so, none of the factors animating the *Yu* exception exist here. *Yu* was concerned with "wealthy or large interests" depriving "consumers" of their ability to defend themselves in court. *Yu*, 103 Cal. App. 4th at 305. This case is the opposite. *Sega* is the "wealthy interest" seeking to pierce the litigation privilege against *consumers* and their lawyers. There is no reason for this Court to go further than the Supreme Court of California by creating a new, baseless exception to the litigation privilege just for this case.[2]

---

[2] California's privilege doubly protects lawyers because "public policy dictates that attorneys must remain free to counsel their clients without fear of subjecting themselves to liability as a result of the proper discharge of their professional obligations." *Schick v. Lerner*, 193 Cal. App. 3d 1321, 1329 (1987); *see* MTD 11-12 (collecting cases). Sega responds to that rule in a footnote, claiming that "[a]n attorney has no absolute privilege to interfere with contractual relations, whether those of his client or anyone else." Opp. 9 n.4 (quoting *Rosenfeld, Meyer & Susman v. Cohen*, 146 Cal. App. 200, 228 (1983)). But *Rosenfeld* wasn't addressing litigation privilege; it was addressing a dispute between former law partners where a client ended its engagement agreement with its prior lawyers and retained the departing partners at their new firm. *Rosenfeld*, 146 Cal. App. 3d at 210-11. The newly retained lawyers argued they were entitled to an "absolute defense" or "absolute privilege" from a tortious interference claim "because of the fiduciary relationships that exist between attorney [] and [] client." *Id.* at 227. In other words, they argued taking

### B. *Noerr-Pennington* immunity bars Sega's Lanham Act claim (Count III).

Sega doesn't dispute that *Noerr-Pennington* protects against Lanham Act claims. Nor does it dispute that *Noerr-Pennington* applies to advertisements made in anticipation of litigation. Sega argues only that (1) *Noerr-Pennington* doesn't apply because the immunity doesn't extend to arbitrations; and (2) the "underlying theory" in the arbitration demands "is baseless" and constitutes "sham litigation." Opp. 10-11. Neither argument holds water.

**1.** The Fourth Circuit has not yet decided whether *Noerr-Pennington* immunizes conduct in private arbitrations. *Navient Sols., LLC v. Lohman*, 136 F.4th 518, 524-25 (4th Cir. 2025). And judges in this district have split on that question. *Compare Eurotech*, 189 F. Supp. 2d at 392, *with Ford*, 972 F. Supp. 2d at 866-67. The decisions applying the doctrine to arbitration are correct. Because "courts have generally shown a willingness to immunize conduct incidental to the prosecution of the suit," *Navient Sols.*, 136 F.4th at 525 (cleaned up), Consovoy has the better argument.

At any rate, Sega's Lanham Act claim doesn't target arbitration proceedings. The claim targets the advertising through which Consovoy procured clients. FAC ¶¶96-97. So even if the Court sides with the opinions excluding arbitration proceedings from *Noerr-Pennington*'s coverage, it makes no difference here. Sega seems to suggest (at 10) that *Noerr-Pennington* shouldn't apply because the alleged ads led to Consovoy filing arbitration demands. But that is no help to Sega either; those ads also led to Consovoy filing a court action on its clients' behalf—the successful *Hensley* petition. So, the advertising *did* serve "[t]he doctrine's purpose to protect the right of the people to petition the Government for redress of grievances." Opp. 10 (cleaned up).

---

a client away from their prior firm wasn't actionable because of the unique nature of "the attorney-client relationship." *Id.* The *Rosenfeld* court rejected that argument. But the plaintiff there was not challenging a lawyer's filing of lawsuits on its clients' behalf; so *Rosenfeld* says nothing about the litigation privilege. It thus in no way contradicts the other courts who have held that the California law immunizes lawyers for advising their clients in litigation. MTD 11-12 (collecting cases).

**2.** Sega next argues that *Noerr-Pennington* immunity shouldn't apply because the clients' arbitration claims are "baseless" and thus qualify as "sham litigation." Opp. 10-11. Yet the collateral litigation that Sega alleges is a "sham" hasn't even started yet. Generally, litigation must conclude in the plaintiff's favor before another court can evaluate whether that litigation was a sham. In Sega's primary authority, for example, the collateral litigation had ended and "the vast majority of [those] legal challenges failed demonstrably." *Waugh Chapel S. v. United Food & Com. Workers*, 728 F.3d 354, 364 (4th Cir. 2013). What Sega is doing—asking one court to evaluate the merits of cases in another forum that haven't even began—is not the proper cadence.

Even so, the claims filed by Consovoy's clients are not "objectively baseless." *Id.* at 358. They are based on controlling California precedent that companies like Sega who target their customers with ads based on protected characteristics—-such as consumers' gender, age, and race— violate California's Unruh Civil Rights Act. *Liapes v. Facebook, Inc.*, 95 Cal. App. 5th 910, 920-27 (2023). In *Liapes*, the plaintiff alleged that "Facebook expressly relies on gender and age to determine the audience for its ads." *Id.* at 926. As a result, the court held, "the complaint raises a plausible inference Facebook treated Liapes unequally because of her gender and age—a valid Unruh Civil Rights Act claim for intentional discrimination." *Id.* Each of Consovoy's clients have made materially identical allegations in their demands against Sega. *See* FAC, Ex. C, at 3. The demands outline how "Sega uses its customers 'age or date of birth and gender' for its 'marketing and advertising purposes'" and how Sega partners with Facebook—the defendant in *Liapes* itself—to facilitate advertisers using the "age and gender of the customers you want to see your ads" on Sega's platform. *Id.* Consovoy's clients have alleged the very theory that *Liapes* sustained.[3]

---

[3] Sega's only merits response on *Liapes* is to cite some stray comments from a hearing before another judge in another dispute. *See* Opp. 11. But that hearing was not about the merits of

Sega's reliance on the "pattern of legal proceedings" also falls short. Here, Sega thinks that mass arbitrations are categorically improper and "abusive." Opp. 11 ("Consovoy submitted over 19,000 identical arbitration demands against Sega."). But mass arbitrations are now a common vehicle for vindicating the rights of consumers who are forced into arbitration. MTD 3-4 (collecting cases). Those consumers have no other place to go to adjudicate their claims *because of* the companies' arbitration agreements. As for arbitral fees, courts have repeatedly rejected companies' claims that those fees are unfair, since the companies' own agreements require them. *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1068 (N.D. Cal. 2020) (rejecting the "hypocrisy" of when a company "blanches at the cost of the filing fees it agreed to pay in the arbitration clause").

## III.  Sega's tortious interference claims fail for additional reasons (Counts I & II).

### A. *Bear Stearns* held that inducing clients to file legal actions is outside the scope of tortious interference claims.

The Supreme Court of California long ago held in *Bear Stearns* that a tortious interference claim cannot be premised on a party filing a lawsuit. *Pacific Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1137 (1990); MTD 13-14. Sega tries to escape *Bear Stearns* by manufacturing a factual distinction with its case. "In *Bear Stearns*," Sega notes (at 26-27), "the plaintiff alleged a tortious interference claim based on a *disruption*, not a breach." And "[h]ere, Sega alleges that Consovoy caused [its clients] and JAMS to *breach* their respective contracts."

This supposed distinction between "disruption" and "breach"—Sega's *only* defense to *Bear Stearns* barring its claims—fails. *Bear Stearns* never drew a distinction between interference

---

the *Liapes*-based claims in the underlying arbitrations; it was a pre-motion conference on ancillary litigation. *See* Dkt. 35-1, Ex. A, at 1. The judge specifically told the parties that she had read only "half of the case" and that "we don't need to get into" the merits of the arbitration claims. *Id.* at 41:23-24, 42:10-11. At most, her statements criticized the holding of *Liapes*. *Id.* at 55:8-10 ("[A]nother reason the California case—which I have not read all the way through, in fairness to [the defendant]. It seems odd to me."). Sega's use of this one transcript to suggest that "[o]ther courts" have found the theory baseless is misleading. Opp. 11.

claims resting on a "breach" and "disruption." Nor would there be reason to do so, because the two theories are identical. *Bear Stearns*, 50 Cal. 3d at 1126 (laying out the elements). On the contrary, *Bear Stearns* made clear that the decision addressed both "[t]he torts of inducing *breach of contract* and interference with prospective advantage," since it "ha[d] no motivation to expand *these torts* so that they begin to threaten the right of free access to courts." *Id.* at 1137 (emphasis added). It is unsurprising, then, that Sega cannot identify any case where *Bear Stearns* was found inapplicable when the plaintiff pleads "breach" rather than "disruption." Indeed, California courts regularly apply *Bear Stearns* to claims alleging a breach of contract. *See, e.g.*, *Guinnane Constr. Co. v. Chess*, 2020 WL 7640216, at \*5, 9 (Cal. Ct. App. Dec. 22, 2020); *Thomas v. Peddie*, 2019 WL 2950161, at \*3-4, 10 (Cal. Ct. App. July 9, 2019). *Bear Stearns* bars Counts I and II as a result.

### B. Count I fails to state a claim for tortious interference due to Consovoy's filing its clients' successful *Hensley* petition to compel arbitration.

#### 1. An agent cannot tortiously interfere with its principal's contract.

Sega cannot state a claim for tortious interference with the contracts between Sega and Consovoy's clients because Consovoy was its clients' agent. Under California law, "[t]he tort of intentional interference with contractual relations is committed only by strangers." *PM Grp., Inc. v. Stewart*, 154 Cal. App. 4th 55, 65 (2007) (cleaned up). And the contracting party's agents—who "stand in the place of the [principal]," *Mintz v. Blue Cross of Cal.*, 172 Cal. App. 4th 1594, 1604 (2009)—cannot be held liable for the principal's breach of contract. *PM Grp.*, 154 Cal. App. at 65; *see also Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1196 (D. Nev. 2006) ("California has recognized an attorney cannot be held liable for urging a client to breach a contract with a third party." (citing *Schick*, 193 Cal. App. 3d at 1329)).

In response, Sega tries to muddy the waters (at 15-16) by pointing to a different theory of agency under California law: the "manager's privilege," otherwise known as the "agent's immunity rule." *See Computerized Payroll Sols., Inc. v. Rapid Payroll, Inc.*, 2004 WL 7400825, at \*4

11

(C.D. Cal. Oct. 4, 2004) ("These privileges have been described by California courts interchangeably as the 'manager's privilege' and the 'agent's immunity rule.'"); Opp. 15 ("The 'agent's privilege,' also known as the 'manager's privilege.'"). Like standard claims for intentional interference with contract, the "agent's immunity rule" provides agents immunity when they act on behalf of their principals. *Mintz*, 172 Cal. App. at 1605. Unlike with tortious interference claims, however, the "agent's immunity rule" has an exception—there is no immunity "when the agents are acting 'as individuals for their individual advantage.'" *Id.* Because the complaint alleges that Consovoy was acting in its self-interest when it filed its clients' successful *Hensley* petition, Sega contends, Consovoy cannot take advantage of the agent's immunity rule at this stage of the case.

The problem with that theory? "[T]he 'agent's immunity rule' has no direct applicability to a claim for interference with contract rights." *Id.* "[T]he rule … applies only to claims of *conspiracy* to commit a tort." *Id.* (emphasis added). And Sega "has not alleged that [Consovoy] conspired with [its clients] to do anything, and hence neither the agent immunity rule nor its exception has any literal application in this case." *Id.* at 1605-06.

Sega concedes all of this in a footnote, admitting that "the 'financial advantage exception' is an exception to the agent's immunity rule—a rule that applies only to 'civil conspiracy claims.'" Opp. 17 n.9. Sega also concedes that *Mintz* explained "the 'financial advantage exception' does not apply to a claim for tortious interference." *Id.* at 18 n.9. Sega asserts, however, that part of *Mintz* was "dicta." *Id.* Sega is wrong. Like here, *Mintz* addressed a tortious interference with contract claim where the plaintiff argued—as Sega does—that "the 'individual advantage' exception" applied. *Mintz*, 172 Cal. App. 4th at 1605. And the court rejected that argument: "In short, the agent's immunity rule, with its exceptions, applies to civil conspiracy claims, which this is not." *Id.* at 1606. Instead, "[t]he only question is whether the representative of a contracting party may

12

be held liable for the substantive tort of interfering with the contract" and "the cases answer that question in the negative." *Id.* Consovoy thus cannot interfere with its clients' contracts by filing litigation on their behalf, regardless of its motivations.

The same rule applies in Virginia. "[O]nly a party outside the contractual relationship with the plaintiff is subject to liability as an interferor." *Francis Hosp., Inc. v. Read Props., LLC*, 296 Va. 358, 363 (2018). When an "agent" acts "within the scope of his employment," the principal's "contract [is] also his contract, and he c[an] not interfere with it." *Fox v. Deese*, 234 Va. 412, 427 (1987). "An attorney at law is an agent to act for his principal," *Buckland v. Commonwealth*, 2025 WL 1559621, at *6 (Va. Ct. App. June 3, 2025), and "signing and filing [] pleadings" falls "within the scope of [an attorney's] employment," *Cardinal Holding Co. v. Deal*, 258 Va. 623, 631 (1999). Under Virginia law too, Consovoy is an agent and cannot be liable in this context.

## 2. Consovoy's clients did not breach the Class Action Waiver.

Sega also failed to plead an actual breach of the contract between it and Consovoy's clients. The Class Action Waiver in Sega's EULA prohibits only "plaintiffs" or "class members" from filing a "claim" against Sega as part of a "collective" or "consolidated" action. FAC ¶32. None of these terms of art apply to the *Hensley* petition. *See* MTD 16-20.

*First*, Consovoy's clients were neither "plaintiffs" nor "class members" in *Hensley* because the statute governing petitions to compel arbitration labels the moving party a "petitioner." Cal. Civ. Proc. Code §1281.2. Sega's only response is to point to a different background statute, which says that "[t]he party prosecuting a special proceeding may be known as the plaintiff." *Id.* §1063. But that general statute indicates nothing more than parties to special proceedings "may" some-times be called plaintiffs—it doesn't *mandate* it. The more specific statute for petitions to compel

13

arbitrations—with its specific use of "petitioner"—controls. *See Nickell v. Matlock*, 206 Cal. App. 4th 934, 944 (2012) ("[T]he specific statute … takes precedence over the more general one.").[4]

*Second*, Sega's EULA prohibits only bringing "claims." Under California law, a petition to compel arbitration is not a "claim." A "claim" is "a demand for money, property, or a legal remedy to which one asserts a right." *Divino Plastic Surgery, Inc. v. Superior Ct.*, 78 Cal. App. 5th 972, 993 (2022) (cleaned up). Legal dictionaries and California courts alike define "claim" as "the part of a complaint in a *civil action* specifying what relief the plaintiff asks for." *Id.* (emphasis added). And in California, there are two types of cases: "actions" and "special proceedings." *People v. Bd. of Parole Hearings*, 83 Cal. App. 5th 432, 445 (2022). "A civil action is prosecuted by one party against another for the declaration, enforcement or protection of a right, or the redress or prevention of a wrong," while "[a] petition is … a special proceeding," and "*not* a … civil … action." *Id.* at 446 (emphasis added). So the *Hensley* petition didn't assert "claims."

*Third*, the *Hensley* petition wasn't a "collective" or "consolidated" action. *See* MTD 18-20. Collective actions are when one plaintiff "may bring an action on behalf of himself and other[s] … similarly situated." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 167 (1989). And a "consolidated" action is where already-pending cases are combined into one case. Cal. Civ. Proc. Code §1048(a). Sega acknowledges (at 14 n.7) that it "raised" this "collective" and "consolidated" theory in the *Hensley* action as a reason to deny the petition. And the court granted the petition despite that argument. Collateral estoppel bars Sega from raising it again here. *See* MTD 19 n.2

In any event, Sega doesn't attempt to answer Consovoy's exhaustive explanation of the two terms' meanings. Instead, Sega's response (at 13-14) is premised on the idea that "[t]he words

---

[4] As explained above, *see supra* 2-4, both of Sega's underlying breach claims against Consovoy's clients and JAMS are governed by California law. Sega appears to agree, as it cites only California law in the sections addressing the alleged underlying breaches. Opp. 12-15, 23-24.

of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense." Cal. Civ. Code §1644. Based solely on an online dictionary's definitions, Sega argues that it is "reasonable" to view Consovoy's filing of "one" petition as a "consolidated or collective action." Opp. 14. But Sega's EULA refers to "collective[ or] consolidated … action[s]" as types of "court proceedings." FAC, Ex. A, §19. So "collective" and "consolidated" are meant to have "technical" meanings. *See Mundy v. Lenc*, 203 Cal. App. 4th 1401, 1410 (2012) ("[T]he phrase 'causes of action' … is used in a technical sense," so "it is a legal term of art." (citing Cal. Civ Code §1644)). The general definitions of "collective" and "consolidated" from an online dictionary do not shed light on the meaning of "collective[ or] consolidated action" here. And Sega doesn't contest the legal meaning of "collective" or "consolidated" that Consovoy outlined. *See* MTD 18-20.

### C. Count II fails to state a claim for tortious interference with a contract with JAMS.

#### 1. Arbitral immunity forecloses Sega's underlying breach claim against JAMS.

Arbitral immunity protects all acts "integrally related to the arbitral process," which expressly includes "billing for services." *Stasz v. Schwab*, 121 Cal. App. 4th 420, 432-33 (2004). Sega's breach claim against JAMS is based solely on the forum's billing methods. FAC ¶¶89-92.

Sega responds that "[a]rbitral immunity does not apply to Sega's breach claim against JAMS" because it "does not shield JAMS from a breach of contract claim alleging that it charged an incorrect or unconscionable fee." Opp. 18-19 (citing *Morgan Phillips, Inc. v. JAMS/Endispute, LLC*, 140 Cal. App. 4th 795, 800 (2006)). But arbitral immunity applies "even if the sponsoring organization has violated its own internal rules." *Stasz*, 121 Cal. App. 4th at 434. And here, JAMS followed its fee policies to the letter. *See* MTD 22-23. Nor does *Morgan Phillips* help Sega. It only "recognized a narrow exception to arbitral immunity: the immunity does not apply to the arbitrator's breach of contract by failing to make any decision at all." *Morgan Phillips*, 140 Cal. App. 4th

at 801. Those aren't the alleged facts here, and Sega has no answer to California law immunizing arbitrators for "billing for services." *Stasz*, 121 Cal. App. 4th at 433. With no underlying claim against JAMS, Sega also has no intentional interference with contract claim against Consovoy.

### 2. Sega has not otherwise alleged JAMS breached a contract.

**a.** On contract formation, Sega now admits that no "single, discrete written contract with JAMS exists." Opp. 20. It says that "JAMS offered its services through its advertisements" and "Sega accepted JAMS's offer by designating it as the arbitration services provider in its EULA." *Id.* at 21. But Sega also "does not claim that JAMS is a party to the EULA," nor that JAMS authorized this purported method of acceptance. *Id.* An entity cannot accept an offer from one party (JAMS) by entering a contract with another party (the EULA between Sega and its users). *See Hofer v. Young*, 38 Cal. App. 4th 52, 56 (1995) ("It is … hornbook law that an acceptance of an offer must be communicated to the offeror to become effective."). Nor is there any consideration. Sega asserts (at 21) that the "consideration JAMS receives for arbitrations it conducts is revenue in exchange for its services." Sega, however, has not paid JAMS any fees for these arbitrations. FAC ¶67. This failure to pay means Sega hasn't provided consideration to form a contract.

**b.** Even if Sega had alleged contract formation, JAMS didn't breach it. Sega finally identifies (at 21) the terms of its purported contract to be "the JAMS Comprehensive Arbitration Rules and Schedule of Fees." Yet nothing there addresses the format of invoices or process by which JAMS issues invoices—the crux of Sega's breach theory. *See* JAMS Rules (2021), perma.cc/2A77-AL4K; JAMS Schedule of Fees & Costs (2025), perma.cc/JZ5X-WUNU.[5] Sega agrees. Opp. 23 ("[N]o rule or regulation required JAMS to [issue] a single invoice for thousands

---

[5] Courts routinely take judicial notice of the JAMS Rules and Schedule of Fees, which Sega relies on in its complaint and brief. FAC ¶15 & n.10; *see Cooper v. Adobe Sys. Inc.*, 2019 WL 5102609, at *4 (N.D. Cal. Oct. 11, 2019) ("JAMS rules are … subject to judicial notice.").

of individual arbitrations."). The best Sega can do is say that "JAMS's own policy *should* require individualized invoicing." *Id.* JAMS did not breach the purported contract when it invoiced Sega.

### 3. Sega does not allege the remaining elements of a tortious interference claim.

Sega also fails to plead the remaining elements of a tortious interference claim. On the "knowledge" element, Sega contends (at 25) that "Consovoy was clearly aware of the EULA, which designated JAMS as the provider of arbitral services for Sega and its customers." But again, the EULA is an agreement between Sega and its customers. Consovoy's awareness of the EULA says nothing about its awareness of a separate contract between Sega and JAMS, nor the terms.

On the "inducement" element, Sega doesn't dispute that if "conduct was lawful and undertaken to enforce … rights," then a party cannot be "liable for intentional interference of contract." *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020). Sega responds to that rule by conclusorily labeling Consovoy's "tactics" as "illegitimate." Opp. 25. But even Sega is forced to admit that merely "filing an arbitration demand is not within itself an act meant to induce breach." *Id.* It instead claims that "the *manner* in which Consovoy did so" was illegitimate, *i.e.*, filing "19,541 individual demands for arbitration." *Id.* But because the EULA *requires* its users to file individual arbitrations with JAMS, that was the only way Consovoy could pursue its clients' claims. That Consovoy has more than one client with those claims doesn't convert filing arbitration demands from legitimate to "illegitimate." *See id.* And again, mass arbitrations such as these are common vehicles for vindicating consumers' rights. *See supra* 1; MTD 3-4.

## IV. Sega does not state a Lanham Act claim (Count III).

### A. Sega lacks statutory standing and has not pleaded proximate cause.

**1.** To have Lanham Act standing, a plaintiff must allege "direct diversion of sales or … lessening of goodwill associated with its products." *Verisign, Inc. v. XYZ.COM LLC*, 848 F.3d 292, 299 (4th Cir. 2017). Consovoy outlined how Sega's complaint boils down to the theory that

Consovoy used ads to solicit too many clients, which resulted in Sega being required to pay more arbitration fees. *See* MTD 26-27; FAC ¶¶64, 73, 98, 102. Because arbitration fees are not "diversion of sales" or "lessening of goodwill," Sega has not alleged a viable Lanham Act injury.

In its brief, Sega runs away from its complaint's fee-based theory and now says that "Consovoy's advertisements very strongly imply to all consumers that merely playing Sega games would entitle them to hundreds of dollars in compensation (*i.e.*, there is something inherently damaging about Sega's games)." Opp. 27-28 (citing FAC, at 13-14). But that theory appears *nowhere* in Sega's complaint. The two pages Sega cites from its complaint for support are little more than pictures of Consovoy's alleged ads and allege nothing about the ads' implications or Sega's injuries. And even accepting Sega's new characterization about what the ads "imply," the statement "merely playing Sega's games would entitle [users] to hundreds of dollars in compensation" *still* isn't a specific allegation that Sega lost "sales" or "goodwill" because of the advertisements.

**2.** A plaintiff must also plead that its injuries were "proximately caused by violations of the" Lanham Act. *Lexmark Int'l., Inc. v. Static Ctrl. Components, Inc.*, 572 U.S. 118, 132 (2014). For false advertising, this means alleging that "deception of consumers causes them to withhold trade from the plaintiff." *Id.* at 133. Sega doesn't dispute that requirement—nor does it identify any allegation that someone "withheld trade" because of the advertisements (there are none).

Sega instead simply asserts that the complaint "alleges damage to the goodwill associated with its products." Opp. 28 (citing FAC ¶¶97-98, 101-02). But here again, the cited parts of the complaint *don't* allege harm to Sega's goodwill. Paragraphs 97, 98, 101, and 102 say nothing on that topic. They merely repeat Sega's (apparently) abandoned theory that the ads led to Sega being charged more arbitration fees. Because Sega hasn't alleged Consovoy's advertisements caused anyone to "withhold trade," Sega fails to allege proximate cause under the Lanham Act.

18

**B. Sega failed to plead the basic elements of a Lanham Act claim.**

Sega also failed to plead the basic elements of a Lanham Act false-advertising claim. As Consovoy explained, a false-advertising claim under the Lanham Act has five elements, *Verisign*, 848 F.3d at 298-99, and Sega failed to plausibly allege four of them, *see* MTD 27-29. *First* is the lack of a viable injury, discussed above. *Second*, Consovoy explained how Sega failed to "plead a 'material' misrepresentation 'likely to influence the purchasing decision.'" *Id.* at 28. Sega provides no answer to that argument, thus conceding the point. *Third*, Consovoy outlined how Sega failed to plead that any of "Consovoy's advertisements 'actually deceive[d] or ha[d] the tendency to deceive a substantial segment of [the] audience.'" MTD 28-29 (quoting *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011)). That element requires Sega to plead both that a "substantial segment of its audience" was deceived, *PBM Prods.*, 639 F.3d at 120, and "present evidence of consumer deception," *De Simone v. Alfasigma USA, Inc.*, 847 F. App'x 174, 182 & n.10 (4th Cir. 2021). Consovoy pointed out Sega doesn't allege "a substantial segment of its audience" was deceived. *See* MTD 29. Sega ignores that defect, too, and thus concedes it. On consumer deception, Sega says only (at 29) that it will "produce such consumer data … via expert testimony." But Sega must *allege* consumer deception; it cannot simply promise to produce evidence later.

*Fourth*, Sega must identify a "false or misleading description of fact or representation of fact." *PBM Prods.*, 639 F.3d at 120. Yet the alleged ads state only that the recipient "may qualify" or "likely qualify" for "hundreds of dollars in compensation." FAC ¶¶41-42. That tempering language is an "opinion" and "cannot be the basis of a Lanham Act claim." *Verisign*, 848 F.3d at 302; *see* MTD 27-28. Sega responds (at 29) that the ads can be "interpreted as a statement of objective fact" because "entitle[ment] to compensation can be conclusively determined by a judicial or quasi-judicial body." In other words, the ads state facts that, when the clients' claims are adjudicated in the future, that will reveal whether Consovoy's clients "likely qualify" for compensation.

This argument is absurd. For one thing, the fact that the viability of each individual claim can be determined only in the future—after an adjudication—necessarily means that entitlement is not "determinable" today. *See Design Res., Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 505 (4th Cir. 2015) ("[A] prediction, or statement about the future … is essentially an expression of opinion that is not actionable." (cleaned up)). For another, Consovoy's ads are typical attorney ads: "Hurt by a reckless driver? You may be eligible for a financial award." It would turn attorney ads upside down if soliciting potential clients is sufficient to create a Lanham Act false-advertising claim.

## V. Count IV should be dismissed because Sega failed to plead a legal claim.

Sega purports to bring a Virginia false-advertising claim against Consovoy. This claim should be dismissed because Virginia law does not apply here. *See supra* 2-4. It should also be dismissed because Sega pleaded *only* under a criminal statute, which has no private cause of action. Courts in Virginia have made clear that a plaintiff may not plead a false-advertising claim only under the criminal statute. *See Uwasomba v. Bank of Am.*, 2022 WL 4181719, at *2 (E.D. Va. Aug. 22, 2022); *Devonshire v. EurAuPair Int'l, Inc.*, 1996 WL 33456040, at *2 (Va. Cir. Ct. May 22, 1996). Sega failed its obligation to conduct an adequate investigation before filing this claim, as simply reading Va. Code §18.2-216 would have revealed the defect. Sega wants the Court to over-look that failure, or else permit Sega to amend its complaint again. Opp. 30. Sega's carelessness shouldn't be rewarded with yet another opportunity to harass Consovoy merely for soliciting and representing its clients in litigation against Sega. If the Court construes the complaint as alleging a civil claim, however, it fails for the same reason as the Lanham Act claim. *Scotts Co. v. Pennington Seed, Inc.*, 2014 WL 12591406, at *9 n.1 (E.D. Va. Feb. 26, 2014) ("[N]o separate analysis is needed to resolve the false advertising claim under Virginia law.").

## CONCLUSION

The Court should grant Consovoy's motion to dismiss with prejudice.

Dated: July 11, 2025                    Respectfully submitted,

                                         _/s/ Bryan Weir_
                                        Thomas R. McCarthy (VA Bar No. 47154)
                                        Bryan Weir (VA Bar No. 82787)
                                        CONSOVOY MCCARTHY PLLC
                                        1600 Wilson Blvd., Ste. 700
                                        Arlington, VA 22209
                                        (703) 243-9423
                                        tom@consovoymccarthy.com
                                        bryan@consovoymccarthy.com

                                        *Counsel for Consovoy McCarthy PLLC*

## CERTIFICATE OF SERVICE

I certify that on July 11, 2025, I filed this document via the Court's CM/ECF system, which will email everyone requiring notice.

_/s/ Bryan Weir_
Bryan Weir